# Exhibit 1

Offering Memorandum

Confidential

**CONFIDENTIAL OFFERING MEMORANDUM**
**August 2, 2016**
**STRICTLY CONFIDENTIAL**

# Secure Natural Resources LLC

**Offering of 6,000,000 Common Units**
**at a price of $1.00 per Common Unit**

Secure Natural Resources LLC (the "<u>Company</u>," "<u>SNR</u>," "<u>we</u>," "<u>our</u>" or "<u>us</u>") is offering to (i) holders of our outstanding Common Units, (ii) holders of record as of April 22, 2016 (the "<u>Record Date</u>") of the 10% Senior Secured Notes due 2020 in the aggregate principal amount of $650 million issued by Molycorp, Inc., a Delaware corporation ("<u>Molycorp</u>"), pursuant to the Indenture dated as of May 25, 2012 among Molycorp, the Guarantors party thereto, and UMB Bank, N.A., as successor trustee to Wells Fargo Bank, National Association (the "<u>10%</u> <u>Notes</u>"), who are entitled to receive Common Units pursuant to Section 3.1 of the Limited Liability Company Agreement of the Company, dated as of April 15, 2016, attached hereto as <u>Annex A</u> (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>LLC Agreement</u>") and who have not made the Voluntary Cash-Out election per that certain notice from the Company distributed to the holders of the 10% Notes dated as of May 20, 2016 (the "<u>10% Noteholder Notice</u>") and will not make such Voluntary Cash-Out election on or before August 19, 2016, and (iii) certain affiliates of and funds managed by Oaktree Capital Management L.P. (collectively, "<u>Oaktree</u>"), in each of cases (i) through (iii), who are "accredited investors" (as such term is defined in Rule 501 of Regulation D under the Securities Act of 1933 (as amended, the "<u>Act</u>")) (only such parties, "<u>Eligible</u> <u>Purchasers</u>") the opportunity to purchase newly authorized Common Units (the "<u>Offered Units</u>"), consisting of 6,000,000 Common Units (the "<u>Offering Amount</u>") at a cash subscription price of $1.00 per Offered Unit (the "<u>Offering</u>") on the terms set forth in the Secure Natural Resources LLC Unit Purchase Agreement in the form attached hereto as <u>Annex B</u> (the "<u>Purchase Agreement</u>").

The Offering Amount will be allocated to Eligible Purchasers pro rata (subject to rounding) on the basis of 6 Offered Units for each Common Unit (i) already held by such Eligible Purchaser, (ii) in the case of an Eligible Purchaser that is a holder of 10% Notes that has not received its Common Units pursuant to Section 3.1 of the LLC Agreement, which such Eligible Purchaser is entitled to receive pursuant to Section 3.1 of the LLC Agreement, and (iii) in the case of Oaktree, which Oaktree is entitled to receive pursuant to Section 3(b)(ii) of the Second Amended and Restated Credit Bid Agreement and Direction dated as of April 15, 2016 by and among (A) JHL Capital Group Holdings One LLC, QVT Fund V LP, QVT Fund IV LP, and Quintessence Fund L.P. (collectively, the "<u>Lead</u> <u>Investors</u>"), (B) UMB Bank, N.A., (C) Wells Fargo Bank, National Association, and (D) the Company (the "<u>Credit</u> <u>Bid Agreement</u>").  Each Eligible Purchaser will be allocated its pro rata allocation of Offered Units (rounded to the nearest thousandth of an Offered Unit) included in the Offering Amount for purchase (such Eligible Purchaser's "<u>Base Allocation Amount</u>"), and Eligible Purchasers who subscribe for their entire Base Allocation Amount will have the right to purchase additional Offered Units allocated to other Eligible Purchasers as part of the Offering Amount who do not elect to purchase their entire Base Allocation Amounts (such purchasing Eligible Purchaser's "<u>Excess Participation Amount</u>").  Holders of Common Units, holders of 10% Notes, and Oaktree that are not Eligible Purchasers will not be eligible to exercise such purchase rights and will be deemed to have declined to exercise their right to purchase their respective Base Allocation Amounts or any part thereof, or otherwise purchase any Common Units.  Each Eligible Purchaser's right to purchase its Base Allocation Amount and Excess Participation Amount, if any, is non-transferrable and any attempt to transfer or purported transfer of such purchase rights shall be void ab initio.

**THE COMPANY'S BOARD OF MANAGERS MAKES NO RECOMMENDATION REGARDING YOUR PARTICIPATION IN THE OFFERING.  AN INVESTMENT IN THE COMPANY IS HIGHLY SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. WE URGE YOU TO READ IN FULL THIS MEMORANDUM, INCLUDING THE RISKS DESCRIBED UNDER "*RISK FACTORS*" BEGINNING ON PG. 15 AND ALL THE ANNEXES ATTACHED HERETO, BEFORE YOU DECIDE WHETHER TO PARTICIPATE IN THE OFFERING.  YOU MUST BE PREPARED TO BEAR THE RISK OF YOUR**

INVESTMENT FOR AN INDEFINITE PERIOD OF TIME AND BE ABLE TO WITHSTAND A TOTAL LOSS OF YOUR INVESTMENT.

PLEASE NOTE THAT ELIGIBLE PURCHASERS WHO DO NOT FULLY PARTICIPATE IN THE OFFERING WILL OWN (OR BE ENTITLED TO), UPON COMPLETION OF THE OFFERING, A SMALLER PROPORTIONAL INTEREST IN THE COMPANY.

The Eligible Purchasers' opportunity to participate in the Offering will expire at 5:00 p.m., New York City time, on August 23, 2016, which deadline may be extended by the Company in its sole discretion (the "Deadline"). Eligible Purchasers may participate in the Offering by becoming party to the Purchase Agreement. The process by which an Eligible Purchaser may participate in the Offering is more fully described in the Subscription Materials accompanying this Memorandum.

In connection with the Offering, the Company and the Lead Investors have entered into a Commitment Letter dated August 2, 2016, (the "Letter Agreement") in the form attached hereto as Annex C pursuant to which the Lead Investors have committed to purchase their Base Allocation Amount, their maximum Excess Participation Amount, and any of the Offering Amount not purchased by the other Eligible Purchasers.

**Electing to Participate in the Offering**

After having read this Confidential Offering Memorandum (this "Memorandum") in its entirety, including each of the annexes hereto, please consider whether and the extent to which you may wish to participate in the Offering.  Such participation must be pursuant to the Purchase Agreement and in accordance with the instructions contained herein and the instructions and other information included in the Subscription Materials accompanying this Memorandum.

Complete copies of the documents to which these instructions relate are included as annexes to this Memorandum, and such signature pages to be executed by the participating Eligible Purchasers are included in the Subscription Materials that accompany this Memorandum.  If you are an Eligible Purchaser, **these documents are essential to your ability to participate in the Offering.  If you do not sign and return them in strict compliance with the instructions contained herein and in the Subscription Materials, then you will not be entitled to participate in the Offering**.

THIS MEMORANDUM CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF VARIOUS DOCUMENTS RELATING TO THE OPERATIONS OF THE COMPANY AND THE TERMS OF THE SECURITIES OFFERED HEREBY. THESE SUMMARIES DO NOT PURPORT TO BE COMPLETE OR COMPREHENSIVE AND IN EVERY RESPECT ARE QUALIFIED BY AND SUBJECT TO THE TERMS OF THE FULL DOCUMENTS ATTACHED HERETO, WHICH CONTROL IN THE EVENT OF ANY INCONSISTENCY.  THOSE DOCUMENTS, AND NOT THE DESCRIPTIONS OR SUMMARIES THEREOF CONTAINED HEREIN, DEFINE YOUR RIGHTS AS AN OFFEREE AND POTENTIAL PURCHASER OF OUR SECURITIES. NO REPRESENTATIONS, WARRANTIES OR ASSURANCES OF ANY KIND ARE MADE OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN, IF ANY, THAT MAY ACCRUE TO A PURCHASER OF THE OFFERED UNITS.

ONLY HOLDERS OF OUR OUTSTANDING COMMON UNITS, HOLDERS OF THE 10% NOTES AS OF THE RECORD DATE WHO HAVE NOT ELECTED AND WILL NOT ELECT TO MAKE THE VOLUNTARY CASH-OUT ELECTION PER THE 10% NOTEHOLDER NOTICE, AND OAKTREE THAT AT THE TIME OF THIS OFFERING ARE "ACCREDITED INVESTORS" (AS SUCH TERM IS DEFINED IN RULE 501 OF REGULATION D UNDER THE ACT) WILL BE PERMITTED TO PARTICIPATE IN THE OFFERING.  YOU SHOULD CAREFULLY CONSIDER WHETHER TO PARTICIPATE BEFORE THE EXPIRATION OF THE OFFERING. ALL ELECTIONS TO PARTICIPATE IN THE OFFERING ARE IRREVOCABLE AND WILL REMAIN IN EFFECT NOTWITHSTANDING ANY CHANGE OR EXTENSION OF ANY APPLICABLE DATE OR DEADLINE, INCLUDING THE CLOSING DATE OF THE OFFERING (AS DEFINED IN THE PURCHASE AGREEMENT).  WE WILL USE REASONABLE EFFORTS TO NOTIFY ELIGIBLE PURCHASERS OF ANY SUCH CHANGE OR EXTENSION.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE ACT, AND ARE BEING ISSUED SOLELY TO CERTAIN PERSONS IN RELIANCE UPON THE SAFE HARBORS PROVIDED BY REGULATION D    PROMULGATED UNDER THE ACT.   SUCH SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE UNITED STATES OR TO U.S. PERSONS (AS DEFINED IN REGULATION S) IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER THE ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED OR UNLESS SOLD PURSUANT TO RULE 144 OF THE ACT.

THIS MEMORANDUM MAY NOT BE COPIED OR REPRODUCED IN WHOLE OR IN PART BY ANY MEANS. IT MAY BE DISTRIBUTED AND ITS CONTENTS DISCLOSED ONLY TO THE ELIGIBLE PURCHASER TO WHOM IT IS PROVIDED AND SUCH ELIGIBLE PURCHASER'S ACCOUNTANT OR LEGAL COUNSEL. THIS MEMORANDUM IS PERSONAL TO SUCH ELIGIBLE PURCHASER AND DOES NOT CONSTITUTE AN OFFER TO ANY OTHER PERSON OR TO THE PUBLIC IN GENERAL. DISTRIBUTION OF THIS MEMORANDUM TO ANY PERSON OTHER THAN SUCH ELIGIBLE PURCHASER IS UNAUTHORIZED, AND ANY DISCLOSURE OF ANY OF ITS CONTENTS, WITHOUT OUR PRIOR WRITTEN CONSENT, IS PROHIBITED. BY ACCEPTING DELIVERY OF THIS MEMORANDUM, YOU AGREE TO THESE RESTRICTIONS, WHICH ARE INTENDED FOR THE COMPANY'S BENEFIT AND MAY BE ENFORCED BY THE COMPANY. NOTWITHSTANDING ANYTHING IN THIS MEMORANDUM TO THE CONTRARY, EACH SUCH ELIGIBLE PURCHASER (AND ANY EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT OF THE COMPANY OR SUCH ELIGIBLE PURCHASER) MAY DISCLOSE TO ITS TAX ADVISOR THE TAX STRUCTURE OF THE TRANSACTION AND ALL MATERIALS OF ANY KIND THAT ARE PROVIDED TO IT RELATING TO SUCH TAX STRUCTURE.   NO TAX ADVICE WHATSOEVER IS PROVIDED HEREIN, AND EACH SUCH ELIGIBLE PURCHASER MUST CONSULT ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES ASSOCIATED WITH THE TRANSACTIONS CONTEMPLATED HEREIN.

WE HAVE NOT AUTHORIZED ANYONE OTHER THAN THE COMPANY TO PROVIDE YOU WITH ADDITIONAL OR DIFFERENT INFORMATION.   IF ANYONE PROVIDES YOU WITH ADDITIONAL, DIFFERENT OR INCONSISTENT INFORMATION, YOU SHOULD NOT RELY ON IT. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY SECURITY IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL FOR SUCH PERSON TO MAKE SUCH AN OFFER OR SOLICITATION. THE DELIVERY OF THIS MATERIAL SHALL UNDER NO CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY OR THAT THE INFORMATION SET FORTH HEREIN IS COMPLETE OR CORRECT AS OF ANY DATE.

THIS MEMORANDUM INCLUDES CERTAIN STATISTICAL DATA.   THIS DATA WAS OBTAINED FROM PUBLICLY AVAILABLE SOURCES, WHICH THE COMPANY BELIEVES TO BE RELIABLE SOURCES.  HOWEVER, THE ACCURACY AND COMPLETENESS OF THIS DATA ARE NOT GUARANTEED.  THE COMPANY HAS NOT INDEPENDENTLY VERIFIED THIS DATA NOR SOUGHT THE CONSENT OF THE SOURCES TO REFER TO THEIR REPORTS IN THIS MEMORANDUM.    ALL TRADEMARKS AND TRADE NAMES REFERRED TO IN THIS MEMORANDUM ARE THE PROPERTY OF THEIR HOLDERS.

NEITHER THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION OR FOREIGN SECURITIES AGENCY HAS APPROVED OR DISAPPROVED OF ANY SECURITIES REFERENCED HEREIN OR DETERMINED IF THIS MEMORANDUM IS TRUTHFUL OR COMPLETE.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**Table Of Contents**

Page

FORWARD-LOOKING STATEMENTS ............................................................................... 3

EXECUTIVE SUMMARY ............................................................................................ 4

TERMS OF THE OFFERING ........................................................................................ 6

COMPANY OVERVIEW ........................................................................................... 9

BUSINESS PLAN .................................................................................................. 13

FINANCIAL DATA ................................................................................................ 14

RISK FACTORS ................................................................................................... 15

PROCEDURES FOR THE OFFERING ............................................................................. 25

COMMON UNIT OWNERSHIP .................................................................................... 26

USE OF PROCEEDS .............................................................................................. 26

UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ..................................................... 26

DISTRIBUTION POLICY .......................................................................................... 26

MANAGEMENT SERVICES AGREEMENT ........................................................................ 27

DESCRIPTION OF COMMON UNITS ............................................................................. 30

ANNEXES RELATING TO THE OFFERING:

Annex A -    Limited Liability Company Agreement

Annex B -    Form of Purchase Agreement

Annex C -    Letter Agreement

## FORWARD-LOOKING STATEMENTS

This Memorandum contains certain forward-looking statements that involve risks and uncertainties.  All statements, other than statements of historical facts, included or incorporated by reference in this Memorandum that address activities, events or developments that we expect or anticipate will or may occur in the future are forward-looking statements, including statements that refer to objectives, expectations, intentions, future events, or our future financial performance, and involve known and unknown risks, uncertainties, and other factors that may cause our actual results, level of activity, performance, or achievements to be materially different from any results expressed or implied by these forward-looking statements. In some cases, you can identify forward-looking statements by words such as "may," "will," "should," "could," "expect," "anticipate," "intend," "plan," "believe," "estimate," "predict," "potential," and similar expressions.  You should read statements that contain these words carefully and should not place undue reliance on these statements.  Forward-looking statements are inherently uncertain and actual future results may differ from current expectations.  Factors that could contribute to these differences include those matters discussed in "*Risk Factors*" beginning on pg. 15 and elsewhere in this Memorandum.

In addition, such forward-looking statements necessarily depend on assumptions and estimates that may prove to be incorrect. Although we believe the assumptions and estimates reflected in such forward-looking statements are reasonable, we cannot guarantee that our plans, intentions, or expectations will be achieved. The information contained in this Memorandum, including the section discussing risk factors, identifies important factors that could cause such differences.

The cautionary statements made in this Memorandum are intended to be applicable to all forward-looking statements wherever they appear in this Memorandum. We assume no obligation to update such forward-looking statements or to update the reasons that actual results could differ materially from those anticipated in such forward-looking statements.

## EXECUTIVE SUMMARY

**Company Overview**

Secure Natural Resources LLC (the "Company," "SNR," "we," "our" or "us") is a Delaware limited liability company formed in 2016 to acquire certain assets out of the Chapter 11 bankruptcy proceedings involving Molycorp, Inc., a Delaware corporation ("Molycorp"), and certain related affiliates. As set forth more fully below, the Company acquired from Molycorp Minerals, LLC, PP IV Mountain Pass Inc., RCF Speedwagon Inc., and PP IV Mountain Pass II, Inc. (collectively, the "Sellers") all of the Sellers' right, title and interest in and to the subterranean mineral rights (the "Mineral Rights") under a rare earth mining facility located in San Bernardino County, California (the "Mountain Pass Facility"), certain intellectual property assets and the associated goodwill of the Sellers, including those related to the design, development, marketing, and sale of rare earth-based products for the removal of contaminants from water, including the SorbX$^{TM}$ and PhosFIX$^{TM}$ trademarks (the "Intellectual Property Assets", and together with the Mineral Rights, the "Minerals Assets"), and cash.

**Business Plan**

Although the Company owns the Mineral Rights and the Minerals Assets, the property, plant and equipment of the Mountain Pass Facility used to extract the rare earth minerals from the deposit is owned by Molycorp Minerals, LLC, a debtor in Chapter 11. The Company may seek to monetize the Mineral Rights by exploring several options, including, but not limited to: (i) selling, or leasing the Mineral Rights to, or establishing a royalty structure with, a third party that wishes to recommence mining and processing operations at the Mountain Pass Facility and (ii) recommencing operations at the Mountain Pass Facility. Each of these options will require that the Company or a third party enter into an agreement with the owner of the Mountain Pass Facility.

In addition, the Company may explore options to monetize the Minerals Assets aside from the Mineral Rights, including the Intellectual Property Assets, including by (i) recommencing the production of SorbX and PhosFIX using minerals produced at the Mountain Pass Facility, (ii) importing the required rare earth minerals necessary to formulate SorbX and PhosFIX for sale in the United States or in other countries, and (iii) selling or licensing the Intellectual Property Assets to a third party.

In order to implement the business plan, the Company has retained an affiliate of JHL Capital Group Holdings One LLC ("JHL"), one of the Lead Investors, to provide certain management, consulting and financial services upon the terms and conditions set forth in the Management Services Agreement, dated as of July 6, 2016, by and between JHL and the Company. For a description of the terms of the Management Services Agreement, please see "*Management Services Agreement*" beginning on pg. 27.

**The Offering**

In this Offering, the Offered Units will be offered to Eligible Purchasers based on a pro rata allocation of 6 newly authorized Common Units (the "Offered Units") for each Common Unit (i) already held by such Eligible Purchasers, (ii) in the case of an Eligible Purchaser that is a holder of 10% Notes that has not received its Common Units pursuant to Section 3.1 of the LLC Agreement, which such Eligible Purchaser is entitled to receive pursuant to Section 3.1 of the LLC Agreement, and (iii) in the case of Oaktree, which Oaktree is entitled to receive pursuant to Section 3(b)(ii) of the Credit Bid Agreement.

Each Eligible Purchaser will be allocated its pro rata allocation of the Offered Units (rounded to the nearest thousandth of an Offered Unit) included in the Offering Amount for purchase (such Eligible Purchaser's "Base Allocation Amount"), and Eligible Purchasers who subscribe for their entire Base Allocation Amount will have the right to purchase additional Offered Units allocated to other Eligible Purchasers as part of the Offering Amount who do not elect to purchase their entire Base Allocation Amounts (such Eligible Purchaser's "Excess Participation Amount"). Holders of Common Units, holders of 10% Notes, and Oaktree that are not Eligible Purchasers will not be eligible to exercise such purchase rights and will be deemed to have declined to exercise their right to purchase their respective Base Allocation Amounts or any part thereof, or otherwise purchase any Common Units. Each Eligible Purchaser's right to purchase its Base Allocation Amount and Excess Participation Amount, if any, is non-

transferrable and any attempt to transfer or purported transfer of such purchase rights shall be void ab initio.

The Eligible Purchasers' opportunity to participate in the Offering will expire on the Deadline, which Deadline may be extended by the Company in its sole discretion.  We will use reasonable efforts to notify the Eligible Purchasers of any such extension.

In connection with the Offering, the Company and the Lead Investors have entered into the Letter Agreement attached hereto as <u>Annex C</u>, pursuant to which the Lead Investors have committed to purchase their Base Allocation Amount, their maximum Excess Participation Amount, and any of the Offering Amount not purchased by the other Eligible Purchasers.

The procedures for participating in the Offering are set forth below under "*Procedures for the Offering*" beginning on pg. 25 and in the Subscription Materials accompanying this Memorandum.  For a description of the terms of the Common Units, please see "*Description of Offered Units*" beginning on pg. 30.  The Offered Units will be subject to the terms and conditions of the LLC Agreement, which is attached hereto as <u>Annex A</u>.

Pursuant to the Purchase Agreement, the obligation of the Company to consummate the Offering is subject to certain other conditions, which are described in "*Terms of the Offering - Closing Conditions and Termination Events*" beginning on pg. 7.

## TERMS OF THE OFFERING

*Set forth below is a description of the Offering. You should read this entire Memorandum and the annexes hereto carefully, including the section of this Memorandum entitled "Risk Factors" beginning on pg. 15, before you decide whether to participate in the Offering.*

**Offering; Allocations**

We are offering to (i) holders of our outstanding Common Units; (ii) holders of record as of April 22, 2016 (the "Record Date") of the 10% Notes, who are entitled to receive Common Units pursuant to Section 3.1 of the LLC Agreement and who have not made the Voluntary Cash-Out election pursuant to the 10% Noteholder Notice and will not make such Voluntary Cash-Out election on or before August 19, 2016; and (iii) Oaktree, in each of cases (i) through (iii), who are "accredited investors" (as such term is defined in Rule 501 of Regulation D under the Securities Act of 1933 (as amended, the "Act")) (only such parties, "Eligible Purchasers") the opportunity to purchase newly authorized Common Units (the "Offered Units"), consisting of 6,000,000 Units (the "Offering Amount") at a cash subscription price of $1.00 (the "Offering") on the terms set forth in the Purchase Agreement.

The Offering Amount will be allocated to Eligible Purchasers based on a pro rata allocation of 6 Offered Units for each Common Unit (rounded to the nearest thousandth of an Offered Unit) (i) already held by such Eligible Purchasers, (ii) in the case of an Eligible Purchaser that is a holder of 10% Notes that has not received its Common Units pursuant to Section 3.1 of the LLC Agreement, which such Eligible Purchaser is entitled to receive pursuant to Section 3.1 of the LLC Agreement, and (iii) in the case of Oaktree, which Oaktree is entitled to receive pursuant to Section 3(b)(ii) of the Credit Bid Agreement. Each Eligible Purchaser will be allocated its pro rata share of Offered Units (rounded to the nearest thousandth of an Offered Unit) included in the Offering Amount for purchase (such Eligible Purchaser's "Base Allocation Amount"), and Eligible Purchasers who subscribe for their entire Base Allocation Amount will have the right to purchase additional Offered Units allocated to other Eligible Purchasers as part of the Offering Amount who do not elect to purchase their entire Base Allocation Amounts as set forth below. The Eligible Purchasers' opportunity to participate in the Offering will expire at 5:00 p.m., New York City time, on August 23, 2016, which deadline may be extended by the Company in its sole discretion (the "Deadline").

Holders of Common Units, holders of 10% Notes, and Oaktree that are not Eligible Purchasers will not be eligible to exercise such purchase rights and will be deemed to have declined to exercise their right to purchase their respective Base Allocation Amounts or any part thereof, or otherwise purchase any Common Units.

*Excess Participation Amount*

If any Eligible Purchaser does not elect to purchase the entire amount of its Base Allocation Amounts such that a portion of the Offering Amount remains available for purchase, such remaining portion of the Offering Amount will be allocated as described below.

Each Eligible Purchaser will have the right to indicate on the Indication of Investment Interest (which form is included in the Subscription Materials) the amount (if any) that such Eligible Purchaser would like to invest in Common Units in excess of its Base Allocation Amount described above (such excess being such Eligible Purchaser's "Excess Participation Amount"). In the event Eligible Purchasers do not exercise in full their respective Base Allocation Amounts, such unexercised portions (the "Unallocated Amount") will be allocated among the Eligible Purchasers that have elected to participate for more than their respective Base Allocations (the "Fully-Exercising Holders") ratably in accordance with the proportion their respective Excess Participation Amounts represent of the total Excess Participation Amounts of all Fully-Exercising Holders; provided, however, that if the aggregate Excess Participation Amounts of all Fully-Exercising Holders exceed the Unallocated Amount, then (a) first, each Fully-Exercising Holder will be allocated an amount equal to the lesser of (i) such Fully-Exercising Holder's Excess Participation Amount and (ii) such Fully-Exercising Holder's ratable share of the Unallocated Amount based on the proportion its Base Allocation Amount represents of the total Base Allocations of all the Fully-Exercising Holders and (b) second, to the extent the Unallocated Amount is not fully allocated pursuant to

clause (a), then any remaining amounts will be allocated to each Fully-Exercising Holder with an available Excess Participation Amount that has not been fully satisfied by repeating the allocation process described in clause (a) in respect of each such Fully-Exercising Holder (with appropriate reductions to each Fully-Exercising Holder's Excess Participation Amount to reflect prior allocations) until the Unallocated Amount has been fully allocated or all Excess Participation Amounts have been satisfied.

Each Eligible Purchaser's right to purchase its Base Allocation Amount and Excess Participation Amount, if any, is non-transferrable and any attempt to transfer or purported transfer of such purchase rights shall be void ab initio.

*Backstop*

In connection with the Offering, the Company and the Lead Investors have entered into the Commitment Letter dated August 2, 2016, attached hereto as <u>Annex C</u> (the "<u>Letter Agreement</u>"), pursuant to which the Lead Investors have committed to purchase their Base Allocation Amount, their maximum Excess Participation Amount, and any of the Offering Amount not purchased by the other Eligible Purchasers. The Lead Investors' obligation to purchase such Base Allocation Amounts, Excess Participation Amounts, and any of the Offering Amount not purchased by the other Eligible Purchasers is subject to the terms and conditions of the Letter Agreement.

*Indication of Investment Interest*

Each Eligible Purchaser will have the right to indicate on the Indication of Investment Interest contained in the Subscription Materials accompanying this Memorandum the amount (if any) of such Eligible Purchaser's Base Allocation Amount of Common Units that such Eligible Purchaser would like to purchase and, if applicable, the amount of any desired Excess Participation Amount such Eligible Purchaser would like to purchase (as described above). An Eligible Purchaser may purchase some or all of its Base Allocation Amount but it may not purchase more than its Base Allocation Amount, except in accordance with the limitations and pro-rations for purchasing an Excess Participation Amount described above.

**Closing Conditions and Termination Events**

Pursuant to the Purchase Agreement, the obligation of the participating Eligible Purchasers to consummate the closing of the Offering is subject to certain customary conditions including, without limitation: (i) all authorizations, approval, or permits, if any, of any governmental authority or regulatory body that are required in connection with the lawful issuance and sale of the Common Units shall have been received and (ii) the Board of Managers shall have approved and authorized the transactions contemplated under the Purchase Agreement.

Pursuant to the Purchase Agreement, the obligation of the Company to consummate the closing of the Offering is subject to certain customary conditions including, without limitation: (i) all authorizations, approval, or permits, if any, of any governmental authority or regulatory body that are required in connection with the lawful issuance and sale of the Common Units shall have been received and (ii) the Board of Managers shall have approved and authorized the transactions contemplated under the Purchase Agreement.

If an Eligible Purchaser does not sign and deliver prior to or at the Deadline the applicable Investment Documents which are included in the Subscription Materials, the Company will have no obligation to sell or issue any Common Units to such Eligible Purchaser and the Company may consummate the closing of the Offering with respect to all other Eligible Purchasers who have satisfied such obligations.

Pursuant to the Letter Agreement, the Lead Investors' obligation to purchase their entire Base Allocation Amounts, their maximum Excess Participation Amount and any Offering Amount not purchased by other Eligible Purchasers is subject to the terms and conditions of the Letter Agreement, including, without limitation that the Company not amend, supplement, waive, or modify the terms of the Offering in any material respect without the consent of the Lead Investors.

In addition, the Purchase Agreement shall terminate prior to the closing of the Offering upon (a) the mutual

written consent of the Company and the Lead Investors and (b) by either the Company or the Lead Investors if the closing of the Offering does not occur on or prior to September 30, 2016.

## COMPANY OVERVIEW

### Company History

Molycorp, Inc., a Delaware corporation ("Molycorp"), and UMB Bank, National Association, in its capacity as successor trustee (in such capacity, the "Trustee") are party to that certain Indenture, dated as of May 25, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Indenture"), by and among Molycorp, the entities from time to time party thereto as guarantors (such entities, the "Guarantors"), UMB Bank, N.A., as successor trustee to Wells Fargo Bank, National Association, pursuant to which Molycorp issued 10% Senior Secured Notes due 2020 in the aggregate principal amount of $650 million (the "10% Notes").

Pursuant to (i) the Collateral Agency Agreement, dated as of June 11, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Collateral Agency Agreement"), among Molycorp, the Guarantors, and Wells Fargo Bank, National Association, as collateral agent (in such capacity, the "Collateral Agent"); (ii) the Security Agreement, dated as of June 11, 2012 (as amended, restated, supplemented, or otherwise modified from time to time, the "Security Agreement"), among Molycorp, the Guarantors, and the Collateral Agent; and (iii) the Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of August 15, 2012 (together with the Collateral Agency Agreement and Security Agreement, the "Security Documents"), given by Molycorp Minerals, LLC ("Minerals"), Molycorp and the other Grantors (as defined in the Security Agreement) granted liens on and security interests in certain assets (collectively, the "Shared Collateral") to the Collateral Agent for the equal and ratable benefit of the holders of the 10% Notes (the "Noteholders") and, subject to certain limitations, certain affiliates of and funds managed by Oaktree Capital Management L.P. (collectively, "Oaktree" and, together with the Noteholders, the "Secured Parties").

On June 25, 2015, Molycorp, the Guarantors and certain of their affiliates (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

The commencement of the Chapter 11 bankruptcy proceedings by the Debtors (the "Proceedings") constituted an Event of Default under section 6.01(9) of the Indenture and an Actionable Default (as defined in the Security Agreement) under the Security Documents.  Further, Molycorp and the Guarantors have failed to pay debt service on the Notes at the times required by the Indenture, causing further Events of Default under section 6.01(2) of the Indenture and further Actionable Defaults, which Actionable Defaults are continuing.

On January 14, 2016, the Court entered an order in the Proceedings that, among other things, authorized the Debtors to pursue one or more transactions for the sale of substantially all of the Debtors' assets through the bidding procedures attached to such order as Exhibit 1 (the "Bidding Procedures"), pursuant to which the Debtors sought to sell their assets associated with the Debtors' Mountain Pass rare earth mining facility located in San Bernardino County, California (the "Molycorp Minerals Assets").

The Bidding Procedures authorized the Noteholders to submit a credit bid for some or all of the Molycorp Minerals Assets, which represent Shared Collateral, pursuant to section 363(k) of the Bankruptcy Code and in accordance with the terms of the Indenture, the Collateral Agency Agreement, and applicable law (the "Credit Bid"), provided that such Credit Bid provides Oaktree with its pro rata share (calculated in accordance with the Collateral Agency Agreement) of the Molycorp Minerals Assets or the ownership of any acquisition vehicle to which such assets would be transferred consistent with the Bidding Procedures.

Pursuant to the Collateral Agency Agreement, the Lead Investors, constituting holders of a majority in aggregate principal amount of the 10% Notes outstanding, were authorized to direct the Trustee, as the Applicable Authorized Representative under the Collateral Agency Agreement, who in turn was authorized to direct the Collateral Agent, to implement the Noteholders' rights to submit a Credit Bid for the Molycorp Minerals Assets.

The Lead Investors formed the Company to submit a Credit Bid to acquire the Molycorp Minerals Assets from Minerals, PP IV Mountain Pass Inc., PP IV Mountain Pass II, Inc., and RCF IV Speedwagon Inc. (collectively, the "Sellers").

On February 26, 2016, the Company submitted an initial Credit Bid to the Debtors for the purchase of the Molycorp Minerals Assets (the "Initial Bid").  The Initial Bid was not accepted by the Debtors.

On March 25, 2016, the Debtors, the Lead Investors, Oaktree and the official committee of unsecured creditors appointed in the Proceedings entered into that certain 10% Noteholder Group Settlement (the "Settlement Agreement"), which was incorporated into Debtors' Fourth Amended Joint Plan of Reorganization (the "Plan").

Pursuant to the Settlement Agreement, the Lead Investors agreed to modify the Credit Bid in accordance with the Settlement Agreement (the "Amended Bid") and the Debtors agreed to accept the Amended Bid.  The terms of the Amended Bid are set forth in that certain Asset Purchase Agreement, dated as of April 15, 2016 (as may be amended, supplemented, or otherwise modified in accordance with the terms thereof, and including all Exhibits, Schedules, and agreements ancillary thereto, the "Asset Purchase Agreement").

The Asset Purchase Agreement provides for the purchase by the Company from the Sellers of certain specified assets (the "Purchased Assets"), including (i) approximately $783,000 in cash; (ii) all of the Sellers' right, title and interest in and to the subterranean mineral rights (the "Mineral Rights") under the Mountain Pass rare earth mining facility located in San Bernardino County, California (the "Mountain Pass Facility"); and (iii) certain intellectual property assets and associated goodwill of the Sellers, including those related to the design, development, marketing, and sale of rare earth-based products for the removal of contaminants from water, including SorbX$^{TM}$ and PhosFIX$^{TM}$ trademarks (the "Intellectual Property Assets", and together with the Mineral Rights, the "Minerals Assets").

The Asset Purchase Agreement provides that the consideration for the Company's acquisition of the Purchased Assets from the Sellers is (i) $1 million, satisfied in the form of a credit, on a pro rata basis, against the principal amount of the indebtedness secured by the Shared Collateral, pursuant to section 363(k) of the Bankruptcy Code (the "Credit Bid Amount"); and (ii) the assumption of certain liabilities.  The Asset Purchase Agreement specifies that the pro rata allocation of the Credit Bid Amount is $352,830 against the claims of Oaktree secured under the Security Documents and $647,170 against the claims of the Noteholders secured under the Security Documents.

On April 5, 2016, the Court entered an order (A) approving the Asset Purchase Agreement and the transactions contemplated thereby, (B) approving the sale of the Purchased Assets to the Company free and clear of all liens, claims and encumbrances and (C) approving the assumption and assignment of certain executory contracts free and clear of all liens, claims, encumbrances and other interests (the "Sale Order").

On April 15, 2016, the closing of the Asset Purchase Agreement occurred and the Purchased Assets were transferred to the Company thereafter.

**Entitlements to Common Units**

The relative rights and responsibilities of the Lead Investors, the Trustee, and the Collateral Agent respecting the implementation of the Credit Bid, the Asset Purchase Agreement and the transactions contemplated thereby are governed by the Credit Bid Agreement and Direction by and among the Lead Investors, the Trustee, and the Collateral Agent dated as of February 26, 2016, as amended and restated on March 28, 2016 by the Lead Investors, the Trustee, and the Collateral Agent and as further amended and restated on April 15, 2016 by the Lead Investors, the Trustee, the Collateral Agent, and the Company (the "Credit Bid Agreement and Direction").

In accordance with the Security Documents, the Asset Purchase Agreement, the Settlement Agreement, and the Sale Order, the Credit Bid Agreement and Direction provides that (a) each of the Noteholders is entitled to receive its respective Pro Rata Share (as described below) of the initial 1,000,000 Common Units issued by the Company and (b) Oaktree is entitled to receive 35.283% of the initial 1,000,000 Common Units issued by the Company, in each case calculated to a thousandth of a unit (the "Membership Entitlement").

The Company is required to issue to each Noteholder (other than the Lead Investors) that was the beneficial owner of Notes as of the Record Date, for no payment or other consideration (beyond the indebtedness held by such

Noteholder that is part of the Amended Bid), a number of Common Units equal to its Pro Rata Share of 1,000,000 Common Units.  The Noteholders' collective Membership Entitlement is 647,170 Common Units, consistent with the allocation of the Credit Bid Amount in the Asset Purchase Agreement as between Oaktree and the Noteholders. Oaktree's Membership Entitlement is 352,830 Common Units.

Each Noteholder's "<u>Pro Rata Share</u>" of the 1,000,000 Common Units is calculated as follows:

$$1{,}000{,}000 \times 0.64717 \times \left[ \frac{\text{Number of Notes Held}}{650{,}000{,}000} \right] = \underline{\text{Pro Rata Share of Common Units}}$$

**Cash-Outs of Membership Entitlements**

Notwithstanding the foregoing Membership Entitlement, Section 3(b) of the Credit Bid Agreement and Direction provides that the Company will not issue Common Units to any person unless such person:

(x) is an "accredited investor" (as defined in Rule 501 under the Act) or another exemption from the registration requirements under the Act is available in order that Common Units may be issued to such Person without registration of the Common Units under the Act; and

(y) executes and delivers to the Company and the Lead Investors, at or within 180 days after the Closing (as defined in the Credit Bid Agreement and Direction), a counterpart or joinder to the LLC Agreement pursuant to which such Person becomes a party to the LLC Agreement and agrees to be bound by all of the terms and conditions thereof.

If any Noteholder to whom Common Units are to be issued in satisfaction of the foregoing Membership Entitlement certifies in writing to the Company within 180 days after the Closing (as defined in the Credit Bid Agreement and Direction) that it is not an "accredited investor," then the Lead Investors and the Company are obligated to use their reasonable best efforts to utilize another available exemption from the registration requirements of the Act, in order that Common Units may be issued to such Noteholder without registration of the Common Units under the Act.

If any Noteholder is not an "accredited investor" and another exemption is not available, that Noteholder will receive cash in lieu of Common Units (the "<u>Non-Accredited Investor Cash-Out</u>").  The Lead Investors shall have the right to, in their sole discretion (and if the Lead Investors do not exercise such right, then the Company shall) deliver to such Noteholder a cash payment equal to the fair market value (based on the amount of the Amended Bid, i.e., $1,000,000) of the Pro Rata Share of the 1,000,000 Common Units that such Noteholder would otherwise have received.

If the Lead Investors exercise their right to cash out such Noteholder, the Company shall issue such Common Units to the Lead Investors.  If the Lead Investors do not exercise their right to cash out such Noteholder, the Company shall not issue such Common Units.

Any Noteholder that has otherwise complied with Section 3(b) of the Credit Bid Agreement and Direction and not received the Non-Accredited Investor Cash-Out may otherwise receive cash in lieu of Common Units (the "<u>Voluntary Cash-Out</u>").  Such Noteholder may do so if it executes and delivers to the Company and the Lead Investors a written election, within 90 days of receiving the 10% Noteholder Notice, to receive a cash payment equal to the fair market value (based on the amount of the Amended Bid, i.e., $1,000,000) of the Pro Rata Share of the 1,000,000 Common Units that such Noteholder would otherwise have received.

Upon making a timely Voluntary Cash-Out election, the Lead Investors shall deliver to such Noteholder such cash payment, the Company shall issue to the Lead Investors the Pro Rata Share of the 1,000,000 Common Units that such Noteholder would otherwise have received, and such Noteholder shall be deemed to have

unconditionally and irrevocably relinquished its right to receive Common Units and otherwise to participate in the ownership of the Company.

If any Noteholder (a) does not execute and deliver a joinder to the LLC Agreement to the Company and the Lead Investors within 180 days after the Closing (as defined in the Credit Bid Agreement and Direction); and (b) has not otherwise received the Non-Accredited Investor Cash-Out or the Voluntary Cash-Out, the Lead Investors have the right, in their sole discretion (and if the Lead Investors do not exercise such right, then the Company has the right), to deliver to such Noteholder a cash payment equal to the fair market value (based on the amount of the Amended Bid, i.e., $1,000,000) of the Pro Rata Share of the 1,000,000 Common Units that such Noteholder would otherwise have received (the "Cash-Out Right").

If the Lead Investors exercise the Cash-Out Right with respect to such Noteholder, the Company will issue such Common Units to the Lead Investors.  If the Lead Investors do not exercise the Cash-Out Right, the Company shall not issue such Common Units.  Such Noteholder (regardless of whether the Lead Investors or the Company shall have exercised the Cash-Out Right) shall be deemed to have unconditionally and irrevocably relinquished its right to receive Common Units and otherwise to participate in the ownership of the Company.

**Oaktree Litigation**

In April 2016, disputes between Oaktree and the Noteholders arose with respect to the implementation of the Settlement Agreement, including whether the terms of the LLC Agreement concerning the formation and governance of the Company were consistent with the Settlement Agreement. Oaktree and the Noteholders were unable to resolve their dispute and thus sought a ruling from the Court. During hearings on April 13, 2016 and April 20, 2016, the Court ruled that the LLC Agreement is consistent with the terms of the Settlement Agreement, the Collateral Agency Agreement, and related prepetition security documents, and that Oaktree had failed to negotiate for the specific governance rights it was seeking. On April 21, 2016, Oaktree filed its notice of appeal of the Court's April 20, 2016 ruling.  Oaktree has not signed a joinder to the LLC Agreement, accepted its Common Units pursuant to its Membership Entitlement, or become a member of the Company.  Despite the foregoing, Oaktree is being offered the right to subscribe for its pro rata allocation of the Offered Units in this Offering.

# BUSINESS PLAN

We own the right, title and interest in and to the Mineral Rights under the Mountain Pass Facility, and the other Minerals Assets, which includes certain intellectual property assets and associated goodwill acquired from the Sellers.

The Mountain Pass Facility sits on top of one of the world's largest and richest deposits of rare earths (including light, mid, and heavy rare earths).[1]  The Mountain Pass Facility is the only developed rare earths mine and processing facility in North America.[2]  Prior to being put into care-and-maintenance status in 2015, the Mountain Pass Facility was equipped to extract rare earth minerals and produce light rare earth concentrate (purified and unseparated), separated rare earth oxides, heavy rare earth concentrates and others, and a line of proprietary rare earth-based water treatment products, including SorbX and PhosFIX.[3]  The Mineral Rights give us the exclusive right to extract the rare earth minerals from the deposit at the Mountain Pass Facility.  Options for monetizing the Mineral Rights include, but are not limited to: (i) selling or leasing the Mineral Rights to or establishing a royalty structure with a third party that wishes to recommence mining and processing operations at the Mountain Pass Facility and (ii) recommencing operations ourselves.  However, the property, plant, and equipment of the Mountain Pass Facility ("Mountain Pass PP&E") used to extract the rare earth materials from the deposit remains property of Molycorp Minerals, LLC, a debtor in Chapter 11 bankruptcy.  As a result, our business plan and that of any party that wishes to recommence mining and processing operations at the Mountain Pass Facility is contingent on reaching agreement with the owner of the Mountain Pass PP&E to acquire some or all of the Mountain Pass PP&E or otherwise obtain a right to use some or all of the Mountain Pass PP&E (through a joint venture, lease or otherwise).

Any party that wishes to recommence mining and processing operations will likely need to undertake a technical assessment of the Mountain Pass PP&E to establish a business plan for the Mountain Pass Facility.  Further, our willingness, or that of any third party, to recommence operations at the Mountain Pass Facility will depend in part on prices for rare earth materials.  Pricing for rare earth materials has been volatile, and between 2008 and 2011, prices increased significantly – in some cases to 20 or 30 times their prior price.[4]  Since then, however, the pricing environment of rare earth materials has weakened due to global factors, including demand rationalization by end users seeking to limit the use of rare earth materials as an input and the oversupply of rare earths products, particularly from mining operations in China.

We may also seek to monetize the other Minerals Assets aside from the Mineral Rights.  The other Minerals Assets include patents and trademarks related to the removal of various contaminants from water using rare earth materials.  Historically, SorbX and PhosFIX, products that remove phosphorus from waste water, were produced at the Mountain Pass Facility and sold to industrial and municipal customers.  If the Mountain Pass Facility does not recommence operations in the future, we could potentially import the required rare earth materials to formulate SorbX and PhosFIX for sale in the United States or in other countries.  We could also potentially sell or license the Intellectual Property Assets to a third party.  However, we have not identified such a third party and it is uncertain as to whether we would be able to identify a party that would be interested in the Intellectual Property Assets on terms that are favorable to the Company.

---

[1] See 10-Q of Molycorp, Inc. for the quarterly period ended June 30, 2015 filed on August 17, 2015.

[2] See Second Amended Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization filed on January 21, 2016 in the Chapter 11 Proceedings of the Debtors in the United States Bankruptcy Court for the District of Delaware.

[3] See 10-Q of Molycorp, Inc. for the quarterly period ended June 30, 2015 filed on August 17, 2015.

[4] See Second Amended Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization filed on January 21, 2016 in the Chapter 11 Proceedings of the Debtors in the United States Bankruptcy Court for the District of Delaware.

# FINANCIAL DATA

The balance sheet data as of June 30, 2016 presented below has not been audited, compiled or reviewed by any independent firm and does not necessarily comply with all requirements of generally accepted accounting principles in the U.S.  In the opinion of the Company, we have prepared the following unaudited balance sheet data as of June 30, 2016 and have included all adjustments, consisting of normal and recurring adjustments, that we consider necessary for a fair presentation of the financial data, with the exception of the provision for income taxes. As such the financial data as of June 30, 2016 does not include any provision for income taxes.

## Secure Natural Resources LLC

### Balance Sheet - (Unaudited)

| Assets | June 30, 2016 |
|---|---|
| Cash | $ 767,043 |
| Mineral Assets | 217,140 |
| Prepaid Assets | 7,179 |
| **Total Assets** | $ 991,361 |
| | |
| **Liabilities and Stockholders' Equity** | |
| Accounts payable | $ 226,327 |
| **Total Liabilities** | $ 226,327 |
| | |
| **Stockholders' Equity** | |
| Common Units | $ 1,000,000 |
| Retained Earnings | (234,966) |
| **Total Stockholders' Equity** | $ 765,034 |
| **Total Liabilities & Stockholders' Equity** | $ 991,361 |

14

## RISK FACTORS

*This offering involves a high degree of risk and should only be considered by Eligible Purchasers who can afford the loss of their entire investment.  This investment is suitable only for persons who have substantial resources and who do not anticipate that they will be required to liquidate their investment in the foreseeable future.  You should carefully consider the risks described below and the other information in this Memorandum before deciding whether to invest in the Offered Units.  Any of the risks we describe below could cause our business, financial condition, or operating results to suffer materially.  You could lose all or part of your investment.  Some of the statements in this Memorandum are forward-looking statements.  For more information about forward-looking statements, please see the section of this Memorandum entitled "Forward-Looking Statements."*

**Risks related to our business.**

***We are in the development stage, are not generating revenue and have limited operating history.***

The Company is in the development stage and faces all of the risks and uncertainties associated with a new and unproven business. Our future is based on an unproven business plan with no historical facts to support projections and assumptions. The Company was founded in April 2016 and has no operating history as an owner/operator of the Minerals Assets upon which Eligible Purchasers can evaluate its performance. The Company is not currently generating revenue and does not expect to generate revenue until it is able to monetize, whether through sale, lease, license or other similar arrangement, its Mineral Rights and Intellectual Property Assets.  Eligible Purchasers should understand that an investment in a start-up business is significantly riskier than an investment in a business with any significant operating history. There can be no assurance that the Company will ever achieve revenues or profitability. The Company's operations are subject to all of the risks inherent in the establishment of a new business enterprise. The likelihood of our success must be considered in light of the problems, expenses, difficulties, complications and delays frequently encountered in connection with the formation of a pre-revenue business. Our lack of a significant and relevant operating history makes it difficult to manage operations and predict future operating results.  There can be no assurance that the Company will successfully overcome these difficulties.

***We own certain mineral rights, but we do not own any facilities required for the production and processing of rare earth minerals or other products that may be obtained from exploiting such mineral rights.  Our ability to monetize the Mineral Rights will depend on reaching an agreement with the owner of the Mountain Pass Facility.***

The Minerals Assets acquired from the Sellers represents substantially all of the Company's non-financial assets. The Mineral Rights that we own constitute subterranean mineral rights and do not include the land above the area where the Mineral Rights are located or the rare earth mining facility located in San Bernardino County, California (collectively, the "Mountain Pass Facility").   The property, plant and equipment of the Mountain Pass Facility used to extract the rare earth minerals remains the property of Molycorp and/or its subsidiaries and affiliates that are debtors and debtors in possession (the "Molycorp Mineral Debtors").  Because we do not own the Mountain Pass Facility, our ability to monetize the Mineral Rights depends on our reaching an agreement with the owner of the Mountain Pass Facility for the production and processing of rare earth minerals or other products that may be obtained from exploiting the Mineral Rights.  The cost and time necessary to negotiate for such access or to develop such facilities may have a material and adverse effect on the Company.   There is no assurance that such an agreement will be reached, the timing of reaching such an agreement or that the terms and conditions of such an agreement will be favorable to the Company as a result of a variety of factors, many of which are outside our control, including:

- *A potential change in ownership of the Mountain Pass Facility.*

The Mountain Pass Facility is currently owned by the Molycorp Mineral Debtors under Title 11 of the

United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").  The Molycorp Mineral Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on June 25, 2015 in the United States Bankruptcy Court for the District of Delaware.  The Molycorp Mineral Debtors may seek to sell the Mountain Pass Facility; however, the timing of such sale, or the identity of potential buyers, is unknown today.  The Company's ability to reach an agreement with the Molycorp Mineral Debtors or any subsequent owners of the Mountain Pass Facility is a material component of the Company's business plan.  The bankruptcy proceeding, including the potential for creditors to raise challenges against any potential sale of the Mountain Pass Facility or arrangements with the Company by the Molycorp Mineral Debtors, and the potential change in ownership of the Mountain Pass Facility, could in each case delay or frustrate the Company's business plan.

- *The timing of recommencement of production at the Mountain Pass Facility.*

Rare earth production at the Mountain Pass Facility was suspended in October 2015 and transitioned to a "care and maintenance" mode.  Significant capital expenditures may be required in order to recommence production at the Mountain Pass Facility, including ensuring that it is in a safe and stable condition and that government regulatory commitments can be met.  There can be no assurances that the Mountain Pass Facility will recommence production in the foreseeable future.

**We expect continued operating losses and cannot be certain of our future profitability.**

We have accumulated a net deficit through June 30, 2016, all of which has been funded through the cash acquired by us under the Asset Purchase Agreement.  We expect to incur significant losses in the foreseeable future as we increase expenditures for the development of the Mineral Assets, corporate overhead and management services. The time required for us to become profitable is uncertain, and there can be no assurances that we will achieve profitability on a sustained basis, if at all.  As a result of our limited operating history, we have neither internal nor industry-based historical financial data for any significant period of time upon which to project revenues or base planned operating expenses. We expect that our results of operations may also fluctuate significantly in the future as a result of a variety of factors, including: (i) the ability to enter into arrangements to monetize the Mineral Rights; (ii) specific economic conditions in the rare earth products market and/or in the commodities industry; (iii) general economic conditions; and (iv) other factors.  In addition, unanticipated factors such as increased development expenses or increased cost of equipment may impact the Company's business plan and potential for profitability.

**We lack adequate financing.**

We have limited capital and, there is no assurance that we will have sufficient capital to fully implement our business plan. We do not currently generate cash from operations to fund our operations. We do not have any bank credit facility or other working capital credit line under which we may borrow funds for working capital or other general corporate purposes. Should we fail in future efforts to provide adequate working capital, we will experience difficulties in all areas. This would have a material adverse effect on our business, results of operations, financial condition and prospects.

**The Company is dependent on key personnel that are provided through the Management Services Agreement with an affiliate of one of the Lead Investors; it is unclear whether the Company has the resources or ability to hire or retain additional personnel.**

The Company will rely heavily on the expertise, experience and services of personnel provided through the Management Services Agreement, dated as of July 6, 2016, by and between JHL Capital Group LLC and the Company (the "MSA").  The loss of the services provided through the MSA could adversely affect the Company's ability to achieve its business plan.  The Company's future will depend on the manager's ability to retain key persons and its ability to attract and retain additional skilled personnel.  The manager's employees may voluntarily terminate their employment with the manager and the manager could terminate the MSA with the Company.  There is no assurance that the Company will be able to attract, train or retain qualified personnel in the future or enter into

an agreement with an alternative management services company.

***Certain potential conflicts of interest exist or may arise.***

The Lead Investors currently own all of the outstanding Common Units of the Company and have substantial control over the management and affairs of the Company.  Further, an affiliate of one of the Lead Investors is providing management services to the Company pursuant to the MSA.  The interests of the Lead Investors may not always coincide with the interests of the Eligible Purchasers in the Offering.

***The Members and their affiliates may compete with the Company and are not obligated to bring business opportunities to the Company.***

Members of the Company and their affiliates, officers, directors, trustees, employees, partners, managers, members, stockholders, beneficiaries and agents have no duty (including any fiduciary duty) not to engage in any business, business activity or line of business that may be deemed to be competing with the Company and no duty (including any fiduciary duty) to bring potential transactions or matters that may be business opportunities for the Company before the Company or not to pursue such business opportunities. Competition from our Members or their affiliates and their pursuit of business opportunities may have a material and adverse effect on the Company.

***There are challenges to the production of products derived from the Mineral Rights at or near the Mountain Pass Facility.***

Due to its position on the regional electric grid, the Mountain Pass facility faces occasional power shortages during peak periods. Instability in electrical supply in past years has caused sporadic outages and brownouts and higher costs. Such outages and brownouts have had a negative impact on production.

The Mountain Pass Facility uses significant amounts of hydrochloric acid and other chemical reagents to process rare earths. A significant increase in the price, or decrease in the availability, of these chemicals if not produced on site, together with wastewater haulage costs, could materially increase the cost of developing products from the Mineral Rights.

Transportation from the Mountain Pass Facility could be subject to delay from labor disputes, work stoppages, derailments, adverse weather conditions or other environmental events. Changes to rail or ocean freight systems could interrupt or limit available transport services, which could materially adversely affect our results.

***There may not be sufficient demand for the rare earth products derived from the Mineral Rights.***

The value of the Mineral Rights depends on the extent to which there is sufficient demand for downstream products derived from the exploitation of the Mineral Rights.  A substantial portion of the Mountain Pass Facility's most recent production from the Mineral Rights was cerium, which is in surplus and prices for which have declined significantly since 2011.

***We may be adversely affected by fluctuations in demand for, and prices of, rare earth products.***

Changes in demand for, and the market price of, rare earth minerals and products could significantly affect our profitability. The value of our Mineral Assets and our financial results may be adversely affected by declines in the prices of rare earth minerals and products. Rare earth minerals and product prices fluctuate and are affected by numerous factors beyond our control such as interest rates, exchange rates, inflation or deflation, fluctuation in the relative value of the U.S. dollar against foreign currencies on the world market, global and regional supply and demand for rare earth minerals and products, and the political and economic conditions of countries that produce rare earth minerals and products.

Pricing for rare earth elements ("REEs") has experienced significant volatility over the past several years due to a number of factors, including: (i) the most recent global financial crisis; (ii) a severe contraction by China of rare

earths it allows for export; (iii) illegal mining in China; (iv) China's continuing efforts to institute stronger environmental reforms across its rare earths industry, forced industry consolidation, and constricted rare earths production; (v) a build-up of stockpiles by rare earths consumers and government entities; (vi) product substitution; and (vii) a general lack of certainty among rare earths customers regarding the reliability of the future supply of REEs. Protracted periods of low prices and demand for rare earth minerals and products could significantly reduce revenues and the availability of required development funds in the future. This could substantially reduce, or suspend, rare earths production operations, impair asset values and reduce the proven and probable rare earth ore reserves at the Mountain Pass Facility.

Demand for products derived from the Mineral Rights may be impacted by demand for downstream products incorporating rare earths, including hybrid and electric vehicles, wind power equipment and other clean technology products, as well as demand in the general automotive and electronic industries. Lack of growth in these markets may adversely affect the demand for products derived from the Mineral Rights, which would have a material adverse effect on our business and results of operations.

In contrast, extended periods of high commodity prices may create economic dislocations that may be destabilizing to rare earth minerals supply and demand and ultimately to the broader markets. Periods of high rare earth mineral market prices generally are beneficial to our financial performance. However, strong rare earth mineral prices, as well as real or perceived disruptions in the supply of rare earth minerals, also create economic pressure to identify or create alternate technologies that ultimately could depress future long-term demand for rare earth minerals and products, and at the same time may incentivize development of otherwise marginal mining properties.

***Conditions in the rare earths industry have been, and may continue to be, extremely volatile, which could have a material impact on the Company.***

Conditions in the rare earths industry have been extremely volatile, and prices, as well as supply and demand, have been significantly impacted by a number of factors, principally changes in economic conditions and demand for rare earth materials and changes, or perceived changes, in Chinese quotas for the production and export of rare earth materials. If conditions in the industry remain volatile, the value of our Mineral Rights and any products derived therefrom will continue to exhibit volatility as well.

***The Mountain Pass Facility operates in a highly competitive industry.***

The rare earths mining and processing markets are capital intensive and competitive. Chinese producers may have greater financial resources, as well as other strategic advantages to maintain, improve and expand their facilities. Additionally, the Chinese producers have historically been able to produce at relatively low costs due to Chinese domestic economic factors. If it is not possible to achieve cost-effective production at the Mountain Pass Facility, then any strategic advantages that competitors may have over the Mountain Pass Facility, such as lower labor costs, could have a material adverse effect on our business.

***The value of our assets will depend, in part, on the establishment of new uses and markets for rare earth products.***

The value of our assets will depend, in part, on the establishment of new markets by third parties for certain rare earth products that may be in low demand. For example, cerium is, and is expected to remain, in global surplus. Although we have acquired from the Molycorp Mineral Debtors a proprietary line of cerium-based water treatment products, including SorbX™ and PhosFIX™, these products have been sold only in limited commercial quantities and have yet to be fully commercialized. Any unexpected costs or delays in the commercialization of any of the foregoing products and applications could have a material adverse effect on our financial condition or results of operations.

***An increase in the global supply of rare earth products, dumping and predatory pricing by producers may materially adversely affect our profitability.***

18

The pricing and demand for products derived from the Mineral Rights are affected by a number of factors beyond our control, including growth of economic development and the global supply and demand for rare earth products. According to the United States Geological Survey, it is estimated that China accounted for approximately 85% of global rare earths production in 2015. Increased competition may lead producers to engage in predatory pricing behavior. Any increase in the amount of rare earth products exported from other nations and increase in competition may result in price reductions, reduced margins and loss of potential market share, any of which could materially adversely affect the profitability of the Mountain Pass Facility and thereby the value of our assets. As a result of these factors, the Mountain Pass Facility may not be able to compete effectively against current and future competitors, which would have a material adverse effect on our financial condition and results of operations.

***Changes in China's import or export policy may adversely affect our financial condition and results of operations.***

China is a major source of production and demand for rare earth minerals. In the past two decades, the government of China has significantly altered the export quota systems, export tax policy, and mining quotas policies applicable to the production and export of rare earth minerals from China. Most recently on January 5, 2015, the Chinese Ministry of Foreign Commerce announced that it intended to abolish current rare earth export quotas. Continued volatility in China's policy regarding the production and export or import of rare earth minerals may affect the markets for products derived from the Mineral Rights.

***Our business may be adversely affected by new processing technologies and capabilities.***

Markets for the products that could be derived from the Mineral Rights are highly competitive and characterized by rapid technological change. As technologies develop, substitutes may be developed for products derived from the Mineral Rights that may have an adverse impact on their marketability. There is risk that the replacement of products derived from the Mineral Rights by other products may have a material adverse impact on our financial condition and results of operations.

***Inaccuracies in estimates of rare earths reserves and resource deposits at the Mountain Pass Facility could have a material adverse effect on the value of the Mineral Rights.***

We base our rare earths reserve and resource estimates at the Mountain Pass Facility on engineering, economic and geological data assembled and analyzed by outside firms and Molycorp, which have not yet been reviewed by our engineers and geologists. Ore reserve estimates are necessarily imprecise and depend to some extent on statistical inferences drawn from available drilling data, which may prove unreliable. There are numerous uncertainties inherent in estimating quantities and qualities of rare earths reserves and non-reserve rare earths deposits and costs to mine recoverable reserves, including many factors beyond our control. Estimates of economically recoverable rare earths reserves necessarily depend upon a number of variable factors and assumptions, all of which may vary considerably from actual results, such as:

- geological and mining conditions and/or effects from prior mining that may not be fully identified by available data or that may differ from experience;
- assumptions concerning future prices of rare earth products, operating costs, mining technology improvements, development costs and reclamation costs; and
- assumptions concerning future effects of regulation, including the issuance of required permits and taxes by governmental agencies.

Revised market prices and revised operating cost estimates could impact the level of economically recoverable reserves. Any inaccuracy in our estimates related to our rare earths reserves and non-reserve rare earths deposits could have a material adverse effect on the value of the Mineral Rights.

Period-to-period conversion of probable rare earths ore reserves to proven ore reserves may result in increases or decreases to the total reported amount of ore reserves. Conversion, an indicator of the success in upgrading probable ore reserves to proven ore reserves, is evaluated annually. Conversion rates are affected by a number of factors,

19

including geological variability, applicable mining methods and changes in safe mining practices, economic considerations and new regulatory requirements.

**Financial Risks**

***We may require additional financing even if this Offering is successful and fully subscribed.***

Even if we are successful in raising the maximum amount from this Offering, we may need to raise additional capital in the future to support our operations.  Our ability to raise additional capital will depend on conditions in the capital markets at that time, which are outside our control, and on our financial performance.  Any inability of the Company to acquire necessary capital for any reason will threaten its ability to continue operations successfully or at all.

***We face risks from potential litigation.***

We may from time to time in the future become subject to legal proceedings, claims, litigation and government investigations or inquiries, which could be expensive, lengthy, and disruptive to normal business operations. In addition, the outcome of any legal proceedings, claims, litigation, investigations or inquiries may be difficult to predict and could have a material adverse effect on our business, operating results or financial condition.

The Company's assets were acquired during the restructuring proceedings of Molycorp. These proceedings continue, and there is a risk that the sale of such assets could be challenged by the Molycorp Mineral Debtors or other creditors. The potential challenge of the sale of such assets and a determination by the Court that the sale of such assets was not valid could have a material adverse effect upon the Company.

**Risks related to the Offering.**

***Factual statements have not been independently verified.***

No party has been engaged to verify the accuracy or adequacy of any of the factual statements contained in this Memorandum.  In particular, neither legal counsel nor any other party has been engaged to verify any statements relating to the experience, skills, contacts or other attributes of the managers, officers and employees of the Company, or to the anticipated future performance of the Company.

***Absence of regulatory oversight.***

The Offered Units offered hereby have not been approved or disapproved by the U.S. Securities and Exchange Commission, any state securities commission or other regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of this Memorandum.  The Offered Units offered hereby have not been registered under the Act, or the securities laws of any state and are being offered and sold in reliance on exemptions from the registration requirements of those laws.

***The subscription price determined for the Offering of the Common Units is not necessarily an indication of our value.***

The subscription price per unit of the Offered Units was the price approved by our board of managers after considering, among other things, the price of the assets acquired by the Company under the Asset Purchase Agreement and the Company's business, operations and prospect, and projected financial results. The subscription price for each unit of our Common Units is $1.00 per unit.  The subscription price does not necessarily bear any relationship to the book value of our assets, past operations, cash flows, losses, financial condition or any other established criteria for value.  You should not consider the subscription price as an indication of the value of our Common Units or that any meaningful value of the Company can be extrapolated from the subscription price.

***The value of the Common Units is difficult to determine and may fluctuate significantly. Accordingly, members could lose all or part of their investment.***

The value of the Company, and thereby the value of its Common Units, is difficult to determine due to its lack of operating history and may be influenced by many factors, some of which are beyond our control, including:

- the extremely volatile rare earths industry;
- the performance of competitors;
- general economic conditions;
- other factors described in this "*Risk Factors*" section.

In particular, if prices or demand for rare earths were to decline, the value of the Common Units would likely decline.

**The Common Units are not publicly traded and may never be publicly traded**.

The Common Units are not publicly traded securities, and there may never be a public market for the Common Units. The Common Units are not registered under the Act and may not be sold, pledged or transferred in the absence of such registration or a valid exemption from the Act and any applicable state securities laws.

**Purchasers of the securities offered hereby may have to bear the risk of their investment for an indefinite period of time since there are substantial restrictions on their resale.**

The securities offered hereby have not been registered under the Act or any state securities or blue-sky law and constitute "restricted securities" under applicable federal securities laws.  As a result, purchasers of the securities offered hereby may not sell or otherwise transfer those securities except pursuant to registration under the Act and applicable state securities laws or pursuant to an exemption therefrom.  In addition, the LLC Agreement contains substantial restrictions on the transfer of securities.  By investing in the securities offered hereby, you are agreeing to significant restrictions on the liquidity of your securities for the foreseeable future.  As a result of all of these restrictions, purchasers of the securities offered hereby must bear the economic risks of their investment for an indefinite period of time.  An investment in the Company is suitable only for sophisticated purchasers who can afford to bear the risk of a complete loss of such investment.  A purchase of the Company's securities should be considered only by persons financially able to maintain their investment and who can afford a loss of all or a substantial part of such investment.

**If you purchase any less than your pro rata allocation of the Offering your ownership percentage will be diluted.**

If you do not fully purchase your pro rata allocation of the Offered Units, your percentage ownership in the Company will be proportionately reduced.

**You may not cancel or revoke your purchase commitment.**

Once you submit a purchase commitment, you may not cancel or revoke your commitment to purchase Common Units in the Offering and the Company may, at its option, pursue contractual and any other available remedies against you for payment.

**If we cancel this Offering, we will not have any obligation to you except to return your subscription payment, without interest, which amounts will be subject to Company bankruptcy risk.**

If we elect to withdraw or terminate this Offering, we do not have any obligation with respect to your purchase except to return, without interest or deduction, any subscription payments we received from you.

**If you do not act promptly and follow subscription instructions in full, your ability to purchase Common Units may expire or be rejected.**

Eligible Purchasers who desire to purchase Common Units in this Offering must act promptly to ensure that all required forms, documents and payments in respect of such Eligible Purchasers' Base Allocation Amounts are

actually received by the Company prior to the applicable deadline specified in the Subscription Materials, i.e., 5:00 p.m., New York City time, on August 23, 2016, unless such deadline is extended by the Company. If you fail to complete, sign and return the required Subscription Materials, send an incorrect payment amount, or otherwise fail to follow the subscription procedures that apply to the exercise of your option to purchase in this Offering, we may, depending on the circumstances, reject your subscription or accept it only to the extent of the payment received and we may enforce all of the Company's rights against you in connection therewith. We do not undertake to contact you concerning an incomplete or incorrect subscription form or payment, nor are we under any obligation to correct such forms or payment. We have the sole discretion to determine whether a subscription exercise properly follows the subscription procedures.

***We do not anticipate paying any cash or in kind distributions on our Common Units in the foreseeable future.***

We do not expect to pay cash or in kind distributions in the foreseeable future on our Common Units as we intend to use cash flow generated by operations and future financings to continue to operate our business.

***The issuance of Common Units or other securities in the future would be dilutive to the holders of Common Units.***

In the future, we may issue Common Units or additional securities to raise capital. We may also acquire interests in other companies by using a combination of cash and our Common Units or just our Common Units. We may also issue securities convertible into our Common Units. Any of these events may dilute or otherwise adversely affect your ownership interest in the Company.

***Our board of managers can issue, without member approval, preferred units with voting and conversion rights and convertible debt that could adversely affect the voting power of the holders of Common Units.***

Our board of managers can issue, without member approval, preferred units with voting and conversion rights and convertible debt that could adversely affect the voting power of the holders of Common Units and reduce the likelihood that such holders will receive distribution payments or payments upon liquidation. The issuance of preferred units and/or convertible debt, or even the ability to issue preferred units and/or convertible debt, could also have the effect of delaying, deterring or preventing a change of control or other corporate action.

***Our board of managers and management has broad discretion over the use of our cash reserves and might not apply this cash in ways that increase the value of your investment.***

Our board of managers and management has broad discretion to use our cash reserves, and you will be relying on their judgment regarding the application of this cash. Our board of managers and management might not apply the cash in ways that increase the value of your investment. Until we use the cash raised in the Offering, we plan to invest it, and these investments may not yield a favorable rate of return. If we do not invest or apply the cash in ways that enhance member value, we may fail to achieve expected financial results.

***The governance rights in the LLC Agreement may change in a material manner as a result of the litigation with Oaktree.***

There is currently an unresolved dispute between Oaktree and certain Noteholders, including the Lead Investors, with respect to the terms of the LLC Agreement relating to the formation and governance of the Company. If the Noteholders prevail in this dispute, the governance of the Company will remain substantially consistent with the terms of the LLC Agreement as currently provided. However, if Oaktree prevails or a settlement agreement is reached, material changes may be necessary to the terms of the LLC Agreement, including the provision of special governance rights to Oaktree that may or may not be available to other holders of our Common Units. The exercise of these special governance rights by Oaktree may adversely affect the value of your investment in the Company. Furthermore, the litigation could require substantial resources or delay or have a material adverse effect on the Company's business plan.

***Holders of our Common Units may have liability to repay distributions that were wrongfully distributed to them.***

Under certain limited circumstances, holders of Common Units may have to repay amounts wrongfully returned or distributed to them. Under Section 18-607 of the Delaware Limited Liability Company Act, the Company may not make a distribution to holders of Common Units if the distribution would cause the Company's liabilities to exceed the fair value of its assets. Delaware law provides that for a period of three years from the date of an impermissible distribution, members who received the distribution and who knew at the time of the distribution that it violated Delaware law will be liable to the limited liability company for the distribution amount.  A purchaser of Common Units will be liable for the obligations of the transferor to make contributions to the Company that are known to such purchaser at the time it became a member and for unknown obligations if the liabilities could be determined from the LLC Agreement.

### Risks Related to Environmental Regulation

***Operations involving rare earth mineral production and development are subject to extensive and costly environmental requirements and labor laws; and current and future laws, regulations and permits will impose significant costs, liabilities or obligations on the Mountain Pass Facility or could limit or prevent the Mountain Pass Facility's ability to recommence operations or to undertake new operations and consequently result in a material adverse effect on our financial condition and results of operation.***

Operations involving rare earth mineral production and development are subject to numerous and detailed international, national, federal, state and local environmental and labor laws, regulations and permits, including those pertaining to employee health and safety, environmental permitting and licensing, air quality standards, greenhouse gas (GHG), emissions, water usage and disposal, pollution, waste management, plant and wildlife protection, including the protection of endangered species, handling and disposal of radioactive substances, remediation of soil and groundwater contamination, land use, reclamation and restoration of properties, the discharge of materials into the environment and groundwater quality and availability. Failure to comply with these laws, regulations and permits may result in the assessment of administrative, civil and criminal penalties, the issuance of injunctions to limit or cease operations, the suspension or revocation of permits and other sanctions. Pursuant to such requirements, the Mountain Pass Facility may also be subject to third-party claims, including for damages to property or injury to persons arising from its operations. Moreover, these environmental requirements, and the interpretation and enforcement thereof, change frequently and have tended to become more stringent over time. Any future changes in these laws, regulations or permits (or the interpretation or enforcement thereof) or any sanctions, damages, costs, obligations or liabilities in respect of these matters could have a material adverse effect on the business, results of operations and financial condition of the Mountain Pass Facility and consequently on the value of our assets.

***The Mountain Pass Facility may be unable to obtain, maintain or renew permits necessary for the development of the Mineral Rights, which could have a material adverse effect on the value of the Mineral Rights.***

The Mountain Pass Facility is a key component of the Company's potential business plan.  In order to exploit the Mineral Rights, the Mountain Pass Facility must obtain, or contract with a third party who has obtained, a number of permits that impose strict conditions, requirements and obligations relating to various environmental and health and safety matters. To obtain, maintain and renew certain permits, the Mountain Pass Facility may be required to conduct environmental studies and collect and present data to governmental authorities pertaining to the potential impact of its current and future operations upon the environment, including the potential impact on endangered species, and to take steps to avoid or mitigate those impacts. The permitting rules, and interpretation thereof, are complex and have tended to become more stringent over time. In some cases, the public (including environmental interest groups) has rights to comment upon and submit objections to permit applications and environmental analysis prepared in connection therewith, and otherwise participate in the permitting process, including challenging the issuance of permits, validity of environmental analyses and determinations and performance of permitted activities. Accordingly, permits required for operations at the Mountain Pass Facility may not be issued, maintained or renewed in a timely fashion or at all, may be issued or renewed with conditions that restrict its ability to conduct operations economically, or may be subsequently revoked. Any such failure to obtain, maintain or renew permits, or

other permitting delays or conditions, including in connection with any environmental impact analyses, could have a material adverse effect on the value of the Mineral Rights.

***Obligations regarding the reclamation and restoration of mining property and the Mountain Pass Facility's inability to acquire, maintain or renew financial assurances related to the foregoing could have a material adverse effect on the value of the Mineral Rights.***

The owners of the Mountain Pass Facility may be obligated to restore the property above the Mineral Rights after it has been mined in accordance with regulatory standards. They may be required under federal, state and local laws to maintain financial assurances, such as surety bonds, to secure such obligations. The failure to acquire, maintain or renew such assurances, as required by federal, state and local laws, could subject them to fines and penalties as well as the revocation of their operating permits. Estimates of their total reclamation and mine closure liabilities are based upon their closure and reclamation plans, third-party expert reports, current applicable laws and regulations, certain permit terms and their engineering expertise related to these requirements. Any change in the underlying assumptions or other variation between the estimated liabilities and actual costs could materially and adversely affect the business, results of operations and financial condition of the Mountain Pass Facility and consequently the value of the Mineral Rights.

### Risks Related to Intellectual Property

***We may not be able to adequately protect our intellectual property rights. If we fail to adequately enforce or defend our intellectual property rights, our business may be harmed.***

Our Intellectual Property Assets may be challenged or infringed upon by third parties. Identifying unauthorized use of our Intellectual Property Assets may be difficult, and proceedings to enforce or defend our Intellectual Property Assets could result in substantial costs. The enforcement of intellectual property rights is subject to considerable uncertainty, and patent reform laws, including the recently-enacted America Invents Act, and court decisions interpreting such laws, may create additional uncertainty around our ability to enforce patent protection for our Intellectual Property Assets. If we seek to enforce our rights, we may also be subject to claims that our Intellectual Property Assets are invalid or otherwise unenforceable. In addition, our Intellectual Property Assets may be subject to infringement or other unauthorized use outside of the United States. In such case, our ability to protect our intellectual property rights by legal recourse or otherwise may be limited, particularly in countries where laws or enforcement practices are undeveloped or do not recognize or protect intellectual property rights to the same extent as the United States. Unauthorized use of our Intellectual Property Assets or our inability to preserve existing intellectual property rights could therefore adversely impact the value of our Intellectual Property Assets. The loss of our patents could also reduce the value of the related products. In addition, the cost to litigate infringements of our Intellectual Property Assets, or the cost to defend ourselves against intellectual property infringement actions by others, could be substantial.

Our Intellectual Property Assets also include proprietary trade secrets and unpatented know-how. However, trade secrets are difficult to protect. In particular, many of the former and current employees, consultants, contractors, outside scientific collaborators and other advisors of the Molycorp Mineral Debtors who had access to our Intellectual Property Assets may unintentionally or willfully disclose our confidential information to others. Enforcing a claim that a third party illegally obtained and is using our trade secrets is expensive and time consuming, and the outcome is unpredictable. Moreover, others may independently develop equivalent knowledge, methods and know-how. Failure to obtain or maintain trade secret protection could adversely affect the value of our Intellectual Property Assets.

***We may not be able to monetize or utilize our Intellectual Property Assets.***

We may not ever be able to monetize, whether by sale, license, or other utilization, our Intellectual Property Assets. Products derived from our Intellectual Property Assets, including SorbX™ and PhosFIX™, were sold only in limited commercial quantities by Molycorp. Failure to monetize or otherwise utilize our Intellectual Property Assets could adversely affect the ability of the Company to carry out its business plan.

## PROCEDURES FOR THE OFFERING

**Participation in the Offering – Subscription Procedures**

In order to participate in the Offering (i.e., subscribe for Common Units), please refer to the instructions included in the Subscription Materials accompanying this Memorandum.  In particular, please carefully read the section entitled "*Procedures for Subscribing to Purchase Common Units.*"  You will note in the instructions thereto that, among other things, in order to participate in the Offering, you must carefully complete, sign and return the following documents by the applicable deadline specified in the Subscription Materials:

- 10% Noteholders – Eligible Purchaser Status (only applicable to holders of the 10% Notes who are not members of the Company holding Common Units in the Company);

- Eligible Purchaser Information (applicable to all Eligible Purchasers);

- Accredited Investor Certification (applicable to all Eligible Purchasers);

- Indication of Investment Interest (applicable to all Eligible Purchasers);

- the Investor Signature Page to the Purchase Agreement (applicable to all Eligible Purchasers); and

- the Joinder Agreement to the LLC Agreement (only applicable to Eligible Purchasers who are not members of the Company holding Common Units in the Company)

In addition, the nominee of any Eligible Purchaser who is a holder of the 10% Notes must complete and return the Nominee Certification in the Subscription Materials.

The completed and signed documents must be returned to the Company in the manner set forth in the Subscription Materials by not later than 5:00 p.m. (New York City time) on August 23, 2016 and otherwise in accordance with the instructions contained in the Subscription Materials.  Following receipt of all Indications of Interest, the Company will calculate the allocation of Offered Units among all Eligible Purchasers, including those that have elected to subscribe for an Excess Participation Amount and notify all Eligible Purchasers in writing as to the total number of Common Units each of them has committed to purchase and the purchase price owed in respect of their Base Allocation Amount and Excess Participation Amount, if any.  Such purchase price must be paid within two business days after such written notice or such later date as the Company may specify in such notice (the "Payment Date").

## COMMON UNIT OWNERSHIP

The Lead Investors currently own collectively 362,379.356 Common Units, representing 100% of the outstanding Common Units. As described above in *Company Overview — Entitlements to Common Units*, 352,830 Common Units have been reserved for issuance to Oaktree and 284,800.644 Common Units are reserved for issuance to holders of the 10% Notes who comply with the provisions (and subject to the terms and conditions) of Section 3(b) of the Credit Bid Agreement and the 10% Noteholder Notice. The Lead Investors may, however, acquire all or a portion of the 284,800.644 Common Units reserved for issuance to the holders of the 10% Notes as described above in *Company Overview —Cash-Outs of Membership Entitlements* beginning on pg. 11.

If not all Eligible Purchasers participate for at least their pro rata allocation of the Offering, the Lead Investors' commitment in the Letter Agreement to subscribe for their Base Allocation Amount, their maximum Excess Participation Amount and any of the Offering Amount not purchased by the other Eligible Purchasers will result in a further increase in their Common Unit ownership.

## USE OF PROCEEDS

The Company expects to use the net proceeds from the Offering for general corporate purposes, including, but not limited to, funding working capital, capital expenditures and payments owing under the Management Services Agreement (See "*Management Services Agreement*" beginning on pg. 27). The Company may use an unspecified portion of the net proceeds of the Offering to fund initiatives to monetize the Mineral Assets, including, but not limited to, engaging consultants to evaluate and/or market the Mineral Assets and hiring employees dedicated to our monetization efforts. The Company, from time to time, will evaluate the usage of the Company's cash to determine whether the then existing uses and apportionment should be changed. As a result, there can be no assurance that the Company's use of proceeds will strictly adhere to those uses described in this Memorandum as the Company's circumstances may materially change. Accordingly, the Board will have broad discretion in the application of the net proceeds of the Offering. The failure of the Board to apply such funds effectively could have a material adverse effect on the Company's business, results of operations and financial condition.

## UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

Each Eligible Purchaser should consult its own tax advisor regarding the tax consequences associated with the Offering of the Common Units, including the applicability and effect of any state, local, foreign or other tax laws as well as changes in applicable tax laws. The Company and its advisors are not providing any tax advice to any Eligible Purchaser. Each Eligible Purchaser is responsible for obtaining its own tax advice.

## DISTRIBUTION POLICY

We have never paid any cash distributions on our Common Units and we do not anticipate paying any cash distributions on our Common Units in the foreseeable future. Any future determination relating to our distribution policy will be made at the discretion of our board of managers and will depend on a number of factors, including restrictions in our debt instruments, future earnings, capital requirements, financial condition, prospects and other factors that our board of managers may deem relevant.

## MANAGEMENT SERVICES AGREEMENT

The Company has retained JHL Capital Group LLC (the "Service Provider"), which is an affiliate of JHL Capital Group Holdings One LLC, a Lead Investor and holder of Common Units of the Company, to provide certain management, consulting  and financial services upon the terms and conditions set forth in the Management Services Agreement, dated as of July 6, 2016, by and between the Service Provider and the Company (the "MSA"). The following is a summary of the material terms of the MSA.

- Term. The MSA will continue for a term of one year from the effective date (April 15, 2016) and renew automatically for successive one year terms, unless terminated pursuant to its terms. If, following the expiry of the initial one-year term, the Company receives a bona fide offer from a third party for the provision of the Services that the Company desires to accept (each, a "Third-Party Offer"), the Company shall immediately notify the Service Provider in writing (the "Offer Notice") of the identity of all proposed parties to such Third-Party Offer and the material financial and other terms and conditions of such Third-Party Offer (the "Material Terms"). Each Offer Notice shall constitute an offer made by the Company to enter into an agreement with the Service Provider on the same Material Terms of such Third-Party Offer, which the Service Provider may accept within the 30 day period after receipt of the Offer Notice. The Service Provider's right of first refusal as described in the foregoing will expire after the expiration of two one-year extensions after the initial one-year term.

- Services. Pursuant to the MSA, the Service Provider has committed to provide the Company services as requested from time to time by the Board of Managers and agreed to by the Service Provider, which services may include (a) managing the day-to-day operations of the Company and its direct or indirect subsidiaries (the "SNR Group"); (b) advice in connection with securing financing arrangements for the benefit of the Company or any other member of the SNR Group on terms and conditions satisfactory to the Company or such other member of the SNR Group; (c) advice in connection with acquisition, disposition and change of control transactions involving the Company or any other member of the SNR Group; (d) establishing and maintaining books and records of the Company and the other members of the SNR Group in accordance with customary practice and generally accepted accounting principles in effect in the United States; (e) engaging agents, consultants or other third party service providers to the Company or any other member of the SNR Group, including but not limited to accountants, attorneys, registered investment advisors or experts; (f) attending to the timely calculation and payment of taxes payable, and the filing of all tax returns due, by the Company and the other members of the SNR Group; (g) advice and assistance concerning any and all other aspects of the operation, planning and financing of the Company and the other members of the SNR Group; and (h) meeting regularly with the Board to provide the services in clauses (a) through (h) above and to address other concerns or issues raised by the Board (collectively, the "Services").

- Fees and Reimbursement of Expenses. The Company shall pay the Service Provider for the Services an amount equal to the sum of: (i) the Allocable Base Salary of any officers, directors, or employees of the Service Provider or any affiliate thereof devoted to providing the Services hereunder; (ii) the Overhead Costs associated with the provision of the Services by any officers, directors, or employees of the Service Provider or any affiliate thereof; and (iii) the Margin.

For purposes of the MSA, "Allocable Base Salary" shall mean the portion of a person's annualized base salary (excluding any bonus or similar contingent compensation) that is allocable to the Company based on (1) the quotient derived from such person's annualized base salary divided by 1,800 hours (2) multiplied by the total number of hours such person spent providing Services to the Company.  Allocable Base Salaries will be calculated by the Service Provider in good faith and the Company shall be entitled to review any documentation used in support of such calculations. "Overhead Costs" shall mean overhead costs associated with the provision of the Services, where overhead costs, for each person that provides Services to the Company shall mean, 100% of such person's Allocable Base Salary.  "Margin" shall mean 10% of the Allocable

Base Salary of any person that provides Services to the Company.

The Company shall also reimburse the Service Provider, at cost and without any markup, for all reasonable and documented costs and expenses incurred by the Service Provider or its affiliates in the performance of the Services, including, but not limited to, (i) fees and disbursements of auditors, attorneys and other advisors or consultants; (ii) costs of any outside services of independent contractors such as financial printers, couriers, business publications or similar services; and (iii) all other third party costs and expenses incurred by the Service Provider and/or its personnel in rendering the Services.

- Termination.

  o Either party may terminate the MSA by providing written notice of its intention to not automatically renew the MSA for an additional one-year term at least 30 days prior to the expiration of the current term, such termination to be effective at the end of such current term.

  o The Service Provider may terminate the MSA at any time, upon 90 days' written notice to the Company.

  o The Company may terminate the MSA (i) due to the Service Provider's unsatisfactory performance; provided, that the Service Provider will have at least 90 days to cure such unsatisfactory performance or (ii) for Cause. "Cause" means (1) the Service Provider breaches any material provision of the MSA which the Company determines is materially detrimental to the Company, and such breach shall continue for a period of 30 days after written notice thereof specifying such breach and requesting that the same be remedied in such 30-day period; (2) there is a commencement of any proceeding relating to the Service Provider's bankruptcy or insolvency, including the Service Provider authorizing or filing a voluntary bankruptcy petition; provided, however, that if a petition in involuntary bankruptcy or similar proceedings is filed against the Service Provider, the Company may terminate the MSA if such petition is not dismissed within 30 days after the date of its filing; (3) the Service Provider ceases to be an affiliate of JHL Capital Group Holdings One, LLC and the Company reasonably determines that the event may be materially detrimental to the Company; (4) the dissolution of the Service Provider; or (5) any officer, director, employee or agent of the Service Provider is convicted of a felony involving fraud against the Company or any other member of the SNR Group or misappropriation or embezzlement of funds of the Company or any other member of the SNR Group.

  o The MSA will terminate automatically upon either (i) the sale to an independent third party of no less than 50% of the equity capital of the Company (whether by merger, consolidation, recapitalization, sale or transfer) or all or substantially all of the assets of the Company or (ii) upon the consummation of an initial public offering of the Company.

- Permissible Activities; Disclaimer of Duties. Pursuant to the MSA, none of the Service Provider or its officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives and affiliates (each a "Related Party" and, collectively, the "Related Parties") shall be required to devote full time and business efforts to performing the Services, but instead shall devote only such time and business efforts as the Service Provider reasonably deems necessary for the performance of the Services.  Each of the Service Provider and its Related Parties has the right to, and shall have no duty (contractual, fiduciary or otherwise) not to, directly or indirectly engage in any business, business activity or line of business, including those that are the same or similar to those of the Company or any other member of the SNR Group or may be deemed to be competing with the Company or any other member of the SNR Group. In the event that the Service Provider or any of its Related Parties acquires knowledge of a potential transaction or matter that may be a business opportunity for the Company or any other member of the SNR Group, on the one hand, and the Service Provider or such Related Party, on the other

hand, the Service Provider or such Related Party shall have no duty (contractual, fiduciary or otherwise) to communicate or present such business opportunity to the Company or any other member of the SNR Group, as the case may be, and shall not be liable to the Company, its members, creditors or affiliates for breach of any duty (contractual, fiduciary or otherwise) by reason of the fact that the Service Provider or such Related Party, directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another person, or does not present such opportunity to the Company or any other member of the SNR Group.

## DESCRIPTION OF COMMON UNITS

The following summarizes the material terms and provisions of Common Units, which constitute the only outstanding membership interest in the Company. The following summary does not purport to be comprehensive and in every respect is qualified by and subject to the terms contained in the LLC Agreement attached hereto as Annex A and the Purchase Agreement attached hereto as Annex B (collectively, the "Operative Documents").  *Your rights as a member and all terms of the Company's membership interests, including the Common Units are controlled by the Operative Documents, not by this description, and you should read the Operative Documents and other Annexes hereto in their entirety.*

### Common Units

- Distributions.  Distributions will be made when and as declared by the Board of Managers to the holders of Common Units pro rata in accordance with the number of Common Units held by them.

- Liquidation Rights.  Upon any dissolution and winding up on the Company, any assets remaining after satisfaction (whether by payment or the making of reasonable provision for payment thereof) of any liabilities, including liabilities to Members as creditors, will be distributed to the members of the Company (the "Members") in accordance with the above.

- Voting Rights.  Each Member shall be entitled to one vote per Common Unit. Any matter presented to the Members shall require the vote of the Members owning a majority of the Common Units.

### Transfer Rights and Restrictions

- Transfer Restrictions.  No Member may directly or indirectly sell, exchange, transfer, assign, pledge, encumber, or otherwise dispose of ("Transfer") its Common Units other than in Transfers that are in compliance with applicable law and will not require the Company to register any class of its Securities under the Securities Act of 1933 or the Securities Exchange Act of 1934.

- Right of First Refusal.  Prior to any Transfer of Common Units by a Member, the Member desiring to make such Transfer must give notice to the Company and the Company has a right to purchase all (but not less than all) of the Common Units proposed to be Transferred at the price and on the terms and conditions of such proposed Transfer. The non-transferring Members will have a secondary right of first refusal in the event the Company does not exercise its right of first refusal.

- Tag-Along Rights.  If after complying with the right of first refusal described above one or more Members proposes to Transfer a majority of the outstanding Common Units (other than a Transfer to affiliates), the other Members shall be entitled to participate in such proposed Transfer, pro rata in accordance with the number of Common Units they hold.

- Drag Along Right.  If the Board of Managers and Members holding a majority of the outstanding Common Units approve a Sale Event, all Members will be bound to Transfer the Securities owned by them, vote their Securities in favor of such transaction and execute any merger, asset purchase, security purchase, recapitalization or other agreement, as applicable. "Sale Event" means a bona-fide, arm's-length Transfer (including a Transfer structured as a merger, reorganization, consolidation or other similar business consolidation) in one or a series of related transactions to a Person not affiliated with a Member of (a) more than 50% of the Common Units or (b) all or substantially all of the assets of the Company and its subsidiaries, taken as a whole.

### Preemptive Rights

Except with respect to the issuance of Common Units under the Credit Bid Agreement, each Member who holds Common Units is entitled to preemptive rights, on a pro rata basis, to future issuances of Securities by the

Company; provided, however, that with respect to the issuance of any Securities more than 120 days after April 15, 2016, the Board of Managers will determine the specific terms and conditions on which such preemptive rights may be exercised, including any limitations or restrictions thereon. Following such determination, the Board shall, without the consent of any Member, amend the LLC Agreement to set forth such rights and restrictions. "Securities" means Common Units and other equity securities or other securities convertible into or exercisable or exchangeable for Common Units or other securities of the Company or any of its subsidiaries.

**Board of Managers**

The business and affairs of the Company are managed by a board of managers (the "Board of Managers"). The LLC Agreement provides for an initial five-member Board of Managers. Three of the five members of the Board of Managers are outside managers (i.e., individuals who are not employed by the Lead Investors or any of their affiliates). Pursuant to the terms of the LLC Agreement, each member of the Board of Managers owes to the Company and its Members the fiduciary duties that a director of a Delaware corporation owes to such corporation and its stockholders under Delaware law; provided, that Members of the Company and their affiliates, officers, directors, trustees, employees, partners, managers, members, stockholders, beneficiaries and agents have no duty (including any fiduciary duty) not to engage in any business, business activity or line of business that may be deemed to be competing with the Company and no duty (including any fiduciary duty) to bring potential transactions or matters that may be business opportunities for the Company before the Company or not to pursue such business opportunities. The Board will be separated into three staggered classes, with each Manager serving three-year terms and one class of Managers up for re-election each year. Unless otherwise determined by the Board of Managers, the Managers are elected by Members owning a plurality of the Common Units that are voted in the election of Managers. Unless otherwise determined by the Board, any vacancies on the Board may be filled only by the vote or written consent of the Board. No Manager may be removed, with or without cause, by a vote or written consent of the Members.

**Information Rights**

The Company will keep accurate books of account and records with respect to its business. Upon reasonable advance notice, each Member and/or its authorized representatives, at its or their sole cost and expense, shall be permitted during reasonable business hours, at a location reasonably determined by the Company, to reasonably inspect and make copies of the Company's records, consistent with reasonable confidentiality restrictions imposed by the Company.

**Registration Rights**

- Demand Registration. At any time on or after the date on which the Company has consummated an initial public offering and is eligible to use a Form S-3 registration statement to register its Securities under the Securities Act of 1933, the holders of a majority of the outstanding Common Units may request the registration of their Common Units. The Company will effect a registration of such Common Units, subject to certain limitations as more fully described in the LLC Agreement.

- Piggyback Registration Rights. If at any time the Company determines to register its securities, either for its own account or the account of any party owning Common Units, subject to certain limitations more fully described in the LLC Agreement, the Company will deliver notice of such registration to the Members and include in such registration any Common Units requested to be included by such Members by written notice to the Company within 10 days of such notice from the Company.

**[REST OF PAGE INTENTIONALLY BLANK; ANNEXES FOLLOW]**

**ANNEX A**

Execution Version

---

SECURE NATURAL RESOURCES LLC

---

LIMITED LIABILITY COMPANY AGREEMENT

Dated as of April 15, 2016

THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

**Execution Version**

## TABLE OF CONTENTS

**Page(s)**

ARTICLE I DEFINITIONS ..................................................................................................1

    SECTION 1.1    Definitions........................................................................................1

    SECTION 1.2    Definitions; Cross-References .........................................................6

    SECTION 1.3    Interpretation...................................................................................7

ARTICLE II GENERAL PROVISIONS .............................................................................8

    SECTION 2.1    Formation.........................................................................................8

    SECTION 2.2    Name................................................................................................9

    SECTION 2.3    Term.................................................................................................9

    SECTION 2.4    Purpose; Powers...............................................................................9

    SECTION 2.5    Foreign Qualification.......................................................................9

    SECTION 2.6    Registered Office; Registered Agent; Principal Office; Other Offices.............................................................................................9

    SECTION 2.7    Tax Classification............................................................................9

ARTICLE III CLASSES OF UNITS; THE MEMBERS ...................................................10

    SECTION 3.1    Names, Addresses and Units of Members; Admission.....................10

    SECTION 3.2    Units...............................................................................................10

    SECTION 3.3    Action by the Members...................................................................11

    SECTION 3.4    Certain Reorganizations..................................................................12

    SECTION 3.5    Freedom to Pursue Opportunities ..................................................12

    SECTION 3.6    Cooperation with an Initial Public Offering ..................................12

    SECTION 3.7    No Appraisal Rights........................................................................14

ARTICLE IV MANAGEMENT OF THE COMPANY ......................................................14

    SECTION 4.1    Board of Managers; Delegation of Authority and Duties..................14

    SECTION 4.2    Establishment of the Board.............................................................15

    SECTION 4.3    Board Meetings...............................................................................16

    SECTION 4.4    Approval or Ratification of Acts or Contracts.................................17

    SECTION 4.5    Action by Written Consent or Telephone Conference......................17

    SECTION 4.6    Officers and Agents........................................................................17

ARTICLE V DISTRIBUTIONS........................................................................................18

i

**Execution Version**

SECTION 5.1    Distributions................................................................................18

SECTION 5.2    Security Interest and Right of Set-Off or Recoupment......................18

ARTICLE VI TRANSFERABILITY OF INTERESTS; ADMISSION AND
RESIGNATION OF MEMBERS ...............................................................................19

SECTION 6.1    Restrictions on Transfer ................................................................19

SECTION 6.2    Right of First Refusal.....................................................................20

SECTION 6.3    Tag-Along Rights...........................................................................21

SECTION 6.4    Drag-Along Rights.........................................................................23

SECTION 6.5    Representations, Warranties and Covenants in Connection with
               Sales ...........................................................................................25

SECTION 6.6    Permitted Transfers ......................................................................25

SECTION 6.7    Admission of Additional Members...................................................25

SECTION 6.8    Effect of Transfer .........................................................................25

ARTICLE VII PREEMPTIVE RIGHTS ....................................................................26

SECTION 7.1    Determination by Board.................................................................26

ARTICLE VIII REGISTRATION RIGHTS ...............................................................26

SECTION 8.1    Demand Registration .....................................................................26

SECTION 8.2    Piggyback Registration ..................................................................28

SECTION 8.3    Expenses of Registration................................................................29

SECTION 8.4    Obligations of the Company ...........................................................29

SECTION 8.5    Indemnification ............................................................................32

SECTION 8.6    Information by Holder ....................................................................34

SECTION 8.7    Assignment of Registration Rights ..................................................34

SECTION 8.8    Delay of Registration .....................................................................34

SECTION 8.9    Limitations on Subsequent Registration Rights.................................34

SECTION 8.10   Rule 144 and 144A ........................................................................34

SECTION 8.11   "Market Stand Off" Agreement .......................................................35

SECTION 8.12   Termination of Registration Rights ..................................................35

ARTICLE IX INFORMATION RIGHTS ....................................................................36

SECTION 9.1    Books and Records ........................................................................36

SECTION 9.2    Fiscal Year ...................................................................................36

SECTION 9.3    Accounting and Financial Matters ...................................................36

ARTICLE X REPRESENTATIONS, WARRANTIES AND COVENANTS.............................36

**Execution Version**

|  |  |  |
|---|---|---|
| SECTION 10.1 | Representations, Warranties and Covenants of Each of the Parties | 36 |
| SECTION 10.2 | Additional  Representations, Warranties and Covenants of the Company | 39 |

**ARTICLE XI LIABILITY, EXCULPATION, INDEMNIFICATION** .......................................41

| SECTION 11.1 | Liability | 41 |
|---|---|---|
| SECTION 11.2 | Exculpation | 41 |
| SECTION 11.3 | Indemnification | 41 |
| SECTION 11.4 | Exception to Right of Indemnification | 41 |
| SECTION 11.5 | Advancement of Expenses | 42 |
| SECTION 11.6 | Notice of Proceedings | 42 |
| SECTION 11.7 | Non-Exclusivity; Survival of Rights; Primacy of Indemnification; Subrogation | 43 |

**ARTICLE XII DISSOLUTION; WINDING UP** ........................................................44

| SECTION 12.1 | Dissolution | 44 |
|---|---|---|
| SECTION 12.2 | Winding Up | 44 |
| SECTION 12.3 | Order of Distribution | 45 |
| SECTION 12.4 | No Resignation or Removal | 45 |

**ARTICLE XIII MISCELLANEOUS** ........................................................45

| SECTION 13.1 | Confidentiality | 45 |
|---|---|---|
| SECTION 13.2 | Notices | 45 |
| SECTION 13.3 | Amendments and Waivers | 46 |
| SECTION 13.4 | Governing Law | 46 |
| SECTION 13.5 | Jury Trial | 46 |
| SECTION 13.6 | Successors and Assigns | 46 |
| SECTION 13.7 | Entire Agreement | 46 |
| SECTION 13.8 | No Effect Upon Lending Relationships | 47 |
| SECTION 13.9 | Counterparts | 47 |
| SECTION 13.10 | Section Titles | 47 |
| SECTION 13.11 | Severability | 47 |

| SCHEDULE A | List of Members |
|---|---|
| EXHIBIT A | Form of Joinder Agreement |

**Execution Version**

## LIMITED LIABILITY COMPANY AGREEMENT OF
## SECURE NATURAL RESOURCES LLC

This Limited Liability Company Agreement (this "<u>Agreement</u>") of Secure Natural Resources LLC, a Delaware limited liability company (the "<u>Company</u>"), dated and effective as of April 15, 2016, is entered into by and among the Company, the Members (as defined below) set forth in <u>Schedule A</u> hereto (the "<u>Initial Members</u>") and each other Person who becomes a Member in accordance with the terms of this Agreement.

RECITALS

WHEREAS, the Company was formed on February 24, 2016 as a limited liability company under the Act by the filing of the Certificate of Formation of the Company (the "<u>Certificate</u>") with the office of the Secretary of State of the State of Delaware; and

WHEREAS, on the date hereof, the Initial Members are acquiring Common Units (as defined below) in the Company in exchange for certain indebtedness held by the Initial Members and issued by Molycorp, Inc., a Delaware corporation ("<u>Molycorp</u>") in accordance with the Asset Purchase Agreement (as defined below), and all parties hereto desire to set forth the terms and conditions of the ownership, management and operation of the Company.

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.1          <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following meanings:

"<u>10% Notes</u>" means the 10% Senior Secured Notes issued by Molycorp pursuant to the Indenture dated as of May 25, 2012 among Molycorp, the Guarantors party thereto, and UMB Bank, N.A., as successor trustee to Wells Fargo Bank, National Association.

"<u>Act</u>" means the Delaware Limited Liability Company Act, Title 6, §§ 18-101, et seq.

"<u>Affiliate</u>" means, with respect to any Person, (i) any other Person that Controls, is Controlled by, or is under common Control with such Person, and (ii) any investment fund or account sponsored or managed by such Person or any other Person that Controls, is Controlled by, or is under common Control with such Person; and the term "Affiliated" has a meaning correlative to the foregoing. No Member shall be deemed to be an Affiliate of another Member solely due to a Member's ownership of Securities or by virtue of this Agreement.

1

**Execution Version**

Notwithstanding the foregoing, the Company, its Subsidiaries and its other Controlled Affiliates shall not be considered Affiliates of any Member.

"Applicable Law" means, with respect to any Person, all provisions of laws, statutes, ordinances, rules, regulations, permits, certificates, judgments, decrees or orders of any Governmental Authority applicable to such Person.

"Asset Purchase Agreement" means that Asset Purchase Agreement, dated April 15, 2016, by and among Molycorp, the other sellers party thereto and the Company.

"beneficial owner" has the meaning ascribed to such term in Rule 13d-3 of the Exchange Act.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York, New York are authorized or required by law to be closed.

"Common Member" means a Member that owns any Common Units.

"Common Unit" means a Unit representing a limited liability company interest in the Company with the rights and obligations specified in this Agreement with respect to Common Units.

"Closing Date" means April 15, 2016.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"Covered Person" means (a) each current or former Officer or Manager, in each case in his, her or its capacity as such, or in his or her capacity as a director, officer, employee or agent of another limited liability company or corporation, partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, where serving at the request of the Company, and each such Person's successors, heirs, estates or legal representatives, (b) each Person, if any, to whom or which any rights or responsibilities of the Board hereunder have been assigned, delegated, designated or otherwise Transferred, (c) any Affiliate, in his, her or its capacity as such, of each Member or of any Person set forth in clause (b), and (d) each director, officer, member, manager, shareholder, trustee, employee, partner, beneficiary, Affiliate, agent and Controlling Person, in his, her or its capacity as such, of each Member or of any other Person set forth in clauses (b) or (c); in each case in clauses (a), (b), (c) and (d) whether or not such Person continues to have the applicable status referred to in such clauses.

"Credit Bid Agreement" means the Second Amended and Restated Credit Bid Agreement and Direction dated as of April 15, 2016 by and among (i) JHL Capital Group Holdings One LLC, QVT Fund V LP, QVT Fund IV LP, and Quintessence Fund L.P., (ii) UMB Bank, N.A., (iii) Wells Fargo Bank, National Association, and (iv) the Company.

"Disabling Conduct" means, in respect of any Person, an act or omission (a) that is a criminal act by such Person that such Person had no reasonable cause to believe was lawful, (b) that constitutes fraud, bad faith, gross negligence or willful misconduct by such Person or (c) that is a material violation of this Agreement or such Person's employment, consulting or similar agreement with the Company or any of its Subsidiaries.

"Distributable Assets" means all cash receipts, and, if distribution thereof is determined to be desirable by the Board, other assets of the Company from any and all sources, reduced by operating expenses, payments (if any) required to be made in connection with any loan to the Company and any reserves established by the Board in good faith for unpaid expenses, contingent obligations or other liabilities.

"Encumbrance" means any charge, claim, community or other marital property interest, right of first option, right of first refusal, mortgage, pledge, lien, security interest or other encumbrance (except as resulting from the express terms of this Agreement).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Fair Market Value" means, with respect to any Unit, property or asset, as of any date of determination, the fair market value of such Unit, property or asset as determined by the Board in good faith.

"Governmental Authority" means any international, national, federal, state, provincial or local governmental, regulatory or administrative authority, agency, commission, court, tribunal, arbitral body or self-regulated entity, whether domestic or foreign.

"Holder" means any Member owning Registrable Securities, securities exercisable for or convertible into Registrable Securities or securities exercisable for securities convertible into Registrable Securities.

"Initial Public Offering" means the first underwritten public offering and sale of common equity of a Person (including, in the case of the Company or any of its Subsidiaries, any entity created and used as a vehicle for offering the securities of the Company or any of its Subsidiaries, as the case may be) to the public pursuant to an effective registration statement filed with the SEC pursuant to the Securities Act; provided, that an Initial Public Offering shall not include an offering made on Form S-4 or Form S-8 (or any successor form) in connection with a business acquisition or combination or an employee benefit plan, respectively.

"JHL" means JHL Capital Group Holdings One LLC, its Affiliates and its and its Affiliates' respective successors and assigns.

"Joinder Agreement" means a joinder agreement substantially in the form of Exhibit A attached hereto.

**Execution Version**

"Member" means each Person that is a party to this Agreement, owns Units and has been admitted (but has not subsequently ceased to be a Member in accordance herewith) as a member of the Company in accordance with the terms of this Agreement and the Act.  The Members shall collectively constitute the "members" (as that term is defined in the Act) of the Company.

"Options" shall mean any rights or options to subscribe for, purchase or otherwise acquire Units granted pursuant to any employment or consulting agreement with the Company or its Subsidiaries or pursuant to any equity compensation plan or program of the Company.

"Person" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

"Prospectus" means the prospectus included in any Registration Statement, all amendments and supplements to such prospectus, including post-effective amendments, and all other material incorporated by reference in such prospectus.

"QVT" means each of QVT Fund V LP, QVT Fund IV LP, and Quintessence Fund L.P., each of their Affiliates and each of their and their Affiliates' respective successors and assigns.

"register", "registered" and "registration" means a registration effected pursuant to a registration statement filed with the SEC (the "Registration Statement") in compliance with the Securities Act, and the declaration or ordering by the SEC of the effectiveness of such Registration Statement.

"Registrable Securities" means (i) the Units owned (whether now owned or hereafter acquired) by a Holder or any Transferee to the extent permitted by Section 8.7 and Section 8.12 hereof, and (ii) any Units issued as (or as of any such date of determination then currently issuable upon the conversion or exercise of any warrant, right or other security that is issued as) a dividend or other distribution with respect to, or in exchange or in replacement of, the Units contemplated by the immediately foregoing clause (i); provided, however, that Units shall cease to be treated as Registrable Securities if (a) a Registration Statement covering such Units has been declared effective by the SEC and such Units have been disposed of pursuant to such effective Registration Statement, (b) a Registration Statement on Form S-8 covering such Units is effective, (c) such Units are sold pursuant to Rule 144 promulgated under the Securities Act or may be sold pursuant to Rule 144 promulgated under the Securities Act without any time, volume or manner of sale limitations, or (d) such Units cease to be outstanding.

"Registration Expenses" means any and all expenses incident to the performance by the Company of its obligations under Article VIII hereof, including (i) all SEC and stock exchange registration and filing fees (including, if applicable, the fees and expenses of any "qualified independent underwriter," as such term is defined in Rule 5121 of the Financial Industry Regulatory Authority (or any successor provision), and of its counsel), (ii) all fees and expenses of complying with securities or "blue sky" laws (including fees and disbursements of counsel for the underwriters in connection with "blue sky" qualifications of the Registrable

**Execution Version**

Securities), (iii) all printing, messenger and delivery expenses, (iv) all fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange and all rating agency fees, (v) the reasonable fees and disbursements of counsel for the Company and of its independent public accountants, including the expenses of any special audits and/or comfort letters required by or incident to such performance and compliance, (vi) any fees and disbursements of underwriters customarily paid by the issuers or sellers of securities, including liability insurance if the Company so desires or if the underwriters so require, and the reasonable fees and expenses of any special experts retained in connection with the registration, but excluding underwriting discounts and commissions and transfer taxes, if any, (vii) the reasonable fees and out-of-pocket expenses of not more than one law firm (as selected by the owners of a majority of the Registrable Securities included in such registration) incurred by all the Holders in connection with the registration; (viii) the costs and expenses of the Company relating to analyst and investor presentations or any "road show" undertaken in connection with the registration and/or marketing of the Registrable Securities and (ix) any other fees and disbursements customarily paid by the issuers of securities.

"Relative Equity Percentage" means, with respect to any Member, the fraction, expressed as a percentage, determined by dividing (a) the aggregate number of Common Units owned by such Member as of the time of determination by (b) the aggregate number of Common Units owned, as of such time of determination, by all of the Members who were Members immediately prior to the applicable Earlier Issuance.

"Sale Event" means a bona-fide, arm's-length Transfer (including a Transfer structured as a merger, reorganization, consolidation or other similar business combination) in one or a series of related transactions to a Person not Affiliated with a Member of (a) more than fifty percent (50%) of Common Units or (b) all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities" means Units and any other equity securities (or rights, options, warrants or other securities convertible into or exercisable or exchangeable for Units or other equity securities) of the Company or any of its Subsidiaries.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Securityholder" means a holder of Securities.

"Shelf Registration Statement" means a Registration Statement of the Company filed with the SEC on Form S-3 or on Form S-1 for an offering to be made on a continuous basis pursuant to Rule 415 under the Securities Act (or any similar rule that may be adopted by the SEC) covering the Registrable Securities, as applicable.

"Subsidiary" means, with respect to any Person (the "parent") at any date, (a) any other corporation, limited liability company, association or other business entity of which, (i) securities or other ownership interests representing more than fifty percent (50%) of the voting power of all equity interests entitled (without regard to the occurrence of any

contingency) to vote in the election of the board of directors, managers or similar governing body thereof or (ii) the majority interest in the capital or profits of such corporation, limited liability company, association or other business entity, are owned, controlled, directly or indirectly, or held by the parent and/or one or more subsidiaries of the parent and (b) any other Person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent.

SECTION 1.2 <u>Definitions; Cross-References</u>.

| <u>Terms</u> | <u>Section</u> |
|---|---|
| Agreement | Preamble |
| Authorization Date | Section 6.2(a) |
| Board | Section 4.1(a) |
| Certificate | Recitals |
| Claims and Expenses | Section 11.3 |
| Company | Preamble |
| Common Manager | Section 4.2(b) |
| Conversion Price | Section 3.2(b) |
| Conversion Rate | Section 3.2(b) |
| Demand Registration | Section 8.1(a) |
| Demanding Members | Section 8.1(a) |
| Drag-Along Member Recipients | Section 6.4(a) |
| Drag-Along Sale | Section 6.4(a) |
| Drag-Along Sale Notice | Section 6.4(a) |
| Drag-Along Sellers | Section 6.4(a) |
| Election Notice | Section 6.2(b) |
| Eligible Tag-Along Members | Section 6.3(a) |
| Exempted Persons | Section 3.5(a) |
| First Refusal Period | Section 6.2(b) |
| Indemnified Party | Section 8.5(c) |
| Indemnifying Party | Section 8.5(c) |
| IPO Conversion | Section 3.6(a) |
| IPO Corporation | Section 3.6(a) |
| Lock-Up Period | Section 8.11 |
| Manager | Section 4.2(a) |
| Maximum Tag-Along Period | Section 6.3(b) |
| Offer Notice | Section 6.2(a) |
| Offered Units | Section 6.2(a) |
| Officers | Section 4.6(a) |
| Original Issue Price | Section 3.2(b) |
| Other Members | Section 6.2(a) |
| Permitted Transfers | Section 6.6 |
| Piggyback Registration | Section 8.2(a) |
| Post-IPO Subject Securities | Section 3.6(b) |
| Pre-IPO Subject Securities | Section 3.6(b) |
| Pro Rata Tag-Along Share | Section 6.3(d)(i) |
| Qualified Public Offering | Section 3.2(b)(i) |
| Sale Notice | Section 6.3(a) |

Selling Member.............................................................................................Section 6.3(a)
Similar Law..................................................................................................Section 10.1(p)
Sponsor Indemnitors....................................................................................Section 11.7(d)
Tag-Along Participation Notice....................................................................Section 6.3(b)
Tag-Along Sale............................................................................................Section 6.3(a)
Tag-Along Sale Percentage..........................................................................Section 6.3(a)
Tag-Along Securities....................................................................................Section 6.3(a)
Tag-Along Sellers.........................................................................................Section 6.3(a)
Tagging Members.........................................................................................Section 6.3(a)
Transfer........................................................................................................Section 6.1(b)
Transferee....................................................................................................Section 6.1(b)
Transferring Members..................................................................................Section 6.2(a)
Transferor....................................................................................................Section 6.1(b)
Transferred..................................................................................................Section 6.1(b)
Transferring.................................................................................................Section 6.1(b)
Units............................................................................................................Section 3.2(a)
Withdrawal..................................................................................................Section 8.1(c)

SECTION 1.3       Interpretation.  In this Agreement, except to the extent that the context otherwise requires:

(a)       the words "herein," "hereof" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision hereof;

(b)       unless otherwise specified, references to Articles, Sections, Subsections, clauses, Schedules, Exhibits, preambles and recitals are references to Articles, Sections, Subsections, clauses, Schedules, Exhibits, preambles and recitals hereof;

(c)       the table of contents hereof and the headings herein are for convenience only and shall not affect the interpretation hereof;

(d)       references to any document or agreement, including this Agreement, shall be deemed to include references to such document or agreement as amended, supplemented, replaced or restated from time to time in accordance with its terms and subject to compliance with any requirements set forth therein;

(e)       references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(f)       references to any party hereto shall include its successors and permitted assigns;

**Execution Version**

(g)    wherever the word "include," "includes" or "including" is used herein, it shall be deemed to be followed by the words "without limitation," and any list of examples following such term shall in no way restrict or limit the generality of the word or provision with respect to which such examples are provided;

(h)    the words "shall" and "will" are used interchangeably throughout this Agreement, and the use of either connotes a mandatory requirement;

(i)    the word "or" is not meant to be exclusive, and shall be interpreted as "and/or";

(j)    unless otherwise specified, references to "day" or "days" are references to calendar days;

(k)    the terms "Dollars" and "$" mean United States Dollars;

(l)    pronouns used herein, whether in masculine, feminine or neuter forms, shall be deemed to include, when appropriate, each of the masculine, feminine and neuter forms and both the singular and plural, and the grammatical construction of sentences shall be deemed to conform thereto;

(m)    references to any particular class of Units herein shall be deemed to include any Post-IPO Subject Securities contemplated by Section 3.6 or any other equity security received in connection with any combination of shares, recapitalization, merger, consolidation, or other reorganization, or by way of stock split, stock dividend or other distribution in respect of such class of Units or Post-IPO Subject Securities;

(n)    references to any time periods herein that are initiated by the receipt of a notice shall not be deemed to include the date such notice is received in the calculation of such time period; and

(o)    all parties are deemed to have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises under any provision hereof, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions hereof.

## ARTICLE II

## GENERAL PROVISIONS

SECTION 2.1    Formation.  The Company has been organized as a Delaware limited liability company by the execution and filing of the Certificate under and pursuant to the Act.  The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

Execution Version

SECTION 2.2        Name.  The name of the Company is "Secure Natural Resources LLC", and all Company business shall be conducted in that name or in such other names that comply with Applicable Law as the Board may select from time to time.

SECTION 2.3        Term.  The term of the Company commenced on the date the Certificate was filed with the office of the Secretary of State of the State of Delaware and shall continue in existence indefinitely until the Company is dissolved in accordance with the provisions hereof and of the Act.

SECTION 2.4        Purpose; Powers.  The purpose of the Company shall be (i) to engage in any lawful business and activities permitted by the Act or the laws of any jurisdiction in which the Company may do business, and (ii) to do all things necessary, desirable or incidental to the accomplishment of any such business and activities.  Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company organized under the laws of the State of Delaware.

SECTION 2.5        Foreign Qualification.  Prior to the Company's conducting business in any jurisdiction other than the State of Delaware, the Board shall, if it so determines that such compliance is required or otherwise appropriate, cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Board or the Officers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction.  At the request of the Board or any Officer, each Member shall execute and deliver all certificates and other instruments conforming with this Agreement that are reasonably necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

SECTION 2.6        Registered Office; Registered Agent; Principal Office; Other Offices.  The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by Applicable Law.  The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by Applicable Law.  The principal office of the Company shall be at such place as the Board may designate from time to time, which need not be in the State of Delaware.  The Company may have such other offices as the Board may designate from time to time.

SECTION 2.7        Tax Classification.  The Company is authorized to, and shall make, an election to be classified as an association taxable as a corporation on Internal Revenue Service Form 8832 and any comparable state or local form with an effective date as of the day following the Closing Date.  Each Member consents to such election and shall cooperate with the Company to the extent necessary to effect such election and any similar election under state or local law. Each Member acknowledges and agrees that any gain or loss recognized as a result of the exchange of creditor claims for assets contemplated by the Credit Bid Agreement shall be recognized either by the Member directly or by the Company prior to it being classified as an

association taxable as a corporation for federal and applicable state and local income tax purposes.  Each Member shall file all tax returns consistently with this Section 2.7.

ARTICLE III

CLASSES OF UNITS; THE MEMBERS

SECTION 3.1          Names, Addresses and Units of Members; Admission.  The names and addresses of the Members, the number and classes of Units owned by each Member are as set forth on Schedule A hereto.  Schedule A shall be revised from time to time by the Board following (a) the admission of a new Member, (b) the issuance, repurchase or Transfer of Units to reflect such issuance, repurchase or Transfer, (c) the conversion of any Units or (d) a change of address of a Member.  Each person who is executing this Agreement as of the Closing Date is admitted as a Member of the Company upon such execution and, simultaneously with such admission, the Company hereby issues to such Member the number and classes of Units set forth opposite such Member's name as set forth on Schedule A hereto.  For a period of one hundred and eighty (180) days following the Closing Date, the Company shall issue Common Units to the holders of 10% Notes who comply with the provisions of (and subject to the terms and conditions of) Section 3(b) of the Credit Bid Agreement.

SECTION 3.2          Units.

(a)          Issuance and Creation of Units.  Subject to the terms of this Agreement (including Article VII), the Company is authorized to issue equity interests in the Company designated as "Units," which shall constitute limited liability company interests under the Act. The Units shall consist initially of the Common Units, which shall have the rights, privileges, limitations, restrictions and/or obligations as set forth herein.  The total number of Units of any class that may be issued hereunder shall not be limited, and the references to Units shall be deemed to include fractional Units (which shall be calculated to the thousandth of a decimal place).  The Board is authorized to create and issue new Units or other Securities from time to time in one or more classes, or one or more series of such classes, which classes or series (or the holders thereof) shall have, subject to the provisions of Applicable Law, such rights, preferences, privileges, limitations, restrictions and/or obligations as shall be fixed by the Board, including with respect to: (i) the right of each class or series to receive dividends or share in distributions; (ii) maintaining separate and distinct records for each class or series; (iii) allocating specific assets, liabilities, debts, obligations and expenses to each class or series; (iv) the rights of each class or series upon dissolution and liquidation of the Company; (v) the price at which, and the terms and conditions upon which, each class or series may be redeemed by the Company, if any class or series is so redeemable; (vi) the rate at which, and the terms and conditions upon which, each class or series may be converted into another class or series of Units or other Securities; (vii) the right of the owners of each class or series to information about the Company, including limitations of the rights in Section 18-305 of the Act; and (viii) the right of each class or series to vote on Company matters.  The Board may amend this Agreement without the consent of any Member in order to effect the creation or issuance of Units or other Securities or any class or series thereof and the granting of any such rights, preferences, privileges, limitations, restrictions and/or obligations pursuant to this Section 3.2(a).

(b)     Certificates for Units.  Unless and until the Board shall determine otherwise, Units shall be uncertificated and recorded in the books and records of the Company, including Schedule A.  If at any time the Board shall determine to certificate Units, such certificates shall contain such legends as the Board shall determine are reasonably necessary or advisable.

SECTION 3.3          Action by the Members.

(a)     Meetings of the Members.

(i)     Quorum; Actions of the Members.  At all meetings of the Members, the presence of Members, in person or by proxy, owning a majority of the then outstanding Common Units required to take the action or actions to be voted upon at such meeting shall constitute a quorum for the transaction of business.  Unless otherwise determined by the Board, Managers shall be elected by Members owning a plurality of the Common Units that are voted in the election of Managers.  Except as otherwise provided in this Agreement, on each other matter presented to the Members for a vote, an action by the Members on such matter shall require and shall become effective upon the affirmative vote of the Members owning a majority of the then outstanding Common Units.  Each Member shall be entitled to one vote for each Common Unit held by it.  A Member shall not be obligated to abstain from voting on any matter (or vote in any particular manner) because of any interest (or conflict of interest) of such Member in such matter.  Except as expressly provided in this Agreement, no Members shall have any right to vote with respect to any matter hereunder under the Act, at law, in equity or otherwise with respect to the Company's affairs.

(ii)     Meeting Place; Notice.  The Board shall have the authority, without requirement for consent by any Member, to call meetings of Members, to be held within or outside the State of Delaware, in order to discuss any business that may arise at such meeting.  Meetings of Members may be called by the Board at any time and from time to time on not less than forty-eight (48) hours' notice to the Members and held at such place or places as shall be determined from time to time by the Board.  Notice of any meeting of Members shall be given in accordance with Section 13.2.  Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by Applicable Law.  Attendance of a Member at a meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purposes of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any meeting of the Members need be specified in any waiver of notice.  Minutes of each meeting shall be prepared at the direction of the Board.

(iii)     Telephonic Meetings.  Members may participate in a meeting of Members by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at such meeting.  If all participants are participating by conference telephone or other communications equipment, the meeting shall be deemed to be held at the principal place of business of the Company.

(iv)    Proxies.  Members may participate in a meeting of the Members in person or by proxy.  Any such proxy may be granted in writing, by means of electronic transmission or as otherwise permitted by Applicable Law.

(b)    Action by the Members Without a Meeting.  Any vote, consent, approval or other action required or permitted to be taken by the Members may be taken without a meeting by the written consent of Members owning a majority of the Common Units.  No meeting or prior notice shall be required in connection therewith.  Such consent, writing or writings shall be filed with the minutes of the proceedings of the Members, and written copies of such consent, writing or writings shall be sent to each Member promptly, and in any event within fifteen (15) days, after such action by written consent has been taken.

SECTION 3.4    Certain Reorganizations.  The Board shall have the authority to cause the Company to change its legal form or tax status, including to amend this Agreement in accordance with Section 13.3 to accomplish such change.

SECTION 3.5    Freedom to Pursue Opportunities.  Each of the parties hereto expressly acknowledges and agrees that notwithstanding any duty that may otherwise exist hereunder or at law or in equity, to the fullest extent permitted by Applicable Law:

(a)    each of the past, present and future Members and each of their respective Affiliates, officers, directors, trustees, employees, partners, managers, members, stockholders, beneficiaries and agents (the foregoing Persons in this clause (a), the "Exempted Persons"), has the right to, and shall have no duty (contractual, fiduciary or otherwise) not to, directly or indirectly engage in any business, business activity or line of business, including those that are the same or similar to those of the Company or any of its Subsidiaries or may be deemed to be competing with the Company or any of its Subsidiaries; and

(b)    in the event that any Exempted Person acquires knowledge of a potential transaction or matter that may be a business opportunity for any of the Company and/or one or more of its Subsidiaries, on the one hand, and such Exempted Person or any other Person, on the other hand, such Exempted Person shall have no duty (contractual, fiduciary or otherwise) to communicate or present such business opportunity to the Company or any of its Subsidiaries or Affiliates, as the case may be, and notwithstanding any provision of this Agreement to the contrary, shall not be liable to the Company or any of its Affiliates, Members or creditors for breach of any duty (contractual, fiduciary or otherwise) by reason of the fact that such Exempted Person, directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another Person, or does not present such opportunity to the Company or any of its Subsidiaries.

SECTION 3.6    Cooperation with an Initial Public Offering.

(a)    The Board may determine at any time that the Company or any of its Subsidiaries should engage in an Initial Public Offering.  In connection with any proposed Initial Public Offering approved by the Board, the Board may (i) cause this Agreement to be amended to provide for a conversion in accordance with Delaware law to a corporation or such other

capital structure as the Board may determine, (ii) cause the distribution of shares, units or other equity interests of any Subsidiary of the Company to the Members in accordance with Section 5.1, (iii) form a Subsidiary holding company and distribute its shares to the Members, (iv) change the domicile of the Company or any of its Subsidiaries to another jurisdiction to facilitate any of the foregoing and/or (v) take such other steps as it deems necessary or appropriate to create a suitable vehicle for an offering, in each such case in accordance with the Act and Applicable Law (the resulting entity, the "IPO Corporation"), and in each case for the express purpose of an initial offering of the securities of such IPO Corporation for sale to the public in a registered public offering pursuant to the Securities Act (an "IPO Conversion").

(b)     In connection with any proposed IPO Conversion, at the determination of the Board, all or any portion of the Units (the "Pre-IPO Subject Securities") may be converted into or exchanged or redeemed for shares (or other equity securities and/or options at Fair Market Value) (the "Post-IPO Subject Securities").  In connection with any such conversion, exchange or redemption, the number of Post-IPO Subject Securities to be issued to the Members in respect to the Pre-IPO Subject Securities shall be determined by the Board based upon (i) the Fair Market Value of the Company on the date of the IPO Conversion as determined by the Board and (ii) the resulting relative values of the Pre-IPO Subject Securities assuming the Company is dissolved and the net proceeds are distributed to the owners of Pre-IPO Subject Securities in accordance with Section 5.1 of this Agreement.  If any such conversion, exchange or redemption is effected, each Member agrees to execute and deliver all agreements, instruments and documents as may be reasonably requested or required by the Board in order to consummate such conversion, exchange or redemption.

(c)     If the Board determines to effect an IPO Conversion, each Member shall cooperate in good faith with the Board, including taking all actions reasonably requested or required by the Board, in connection with consummating the IPO Conversion (including the voting of any Units (including any voting as may be necessary to effect a transfer by continuation or to authorize an increase in share capital, whether by dissolution of the Company and creation of a new entity, amendment to this Agreement or otherwise) to approve such IPO Conversion and to take any other actions necessary or appropriate in order to effectuate an IPO Conversion).  Without limiting the generality of the foregoing, in connection with the IPO Conversion, if the Board determines, the IPO Corporation and each Member shall enter into a stockholders agreement which shall have substantially identical terms and conditions (taking into account differences in ownership, type of securities and other circumstances, if any) as set forth in Sections 1.3, 2.4, 2.5, 2.6, 3.3, 3.4 and 3.5, Article IV, Article VIII, Article XI and Article XIII and any associated definitions and which shall be subject to the approval of the Board.

(d)     Prior to a distribution of the securities of a Subsidiary of the Company (other than publicly traded securities), if the Board determines, as a condition of the distribution or issuance of any such securities to the Members, each Member shall enter into a stockholders agreement which shall have substantially identical terms and conditions (taking into account differences in ownership, type of securities and other circumstances) as set forth in Sections 1.3, 2.4, 2.5, 2.6, 3.3, 3.4 and 3.5, Article IV, Article VIII, Article XI and Article XIII and which shall be subject to the approval of the Board.  The Company shall withhold distributions or issuances of any such securities until such stockholders agreement or similar agreement is executed and delivered by a Member who would otherwise be entitled to receive such

distribution or issuance (it being understood that any such withholding of distributions or issuances shall not constitute a breach of this Agreement or of any duty hereunder, at law, in equity or otherwise).

SECTION 3.7    No Appraisal Rights.  No Person shall be entitled to any appraisal rights with respect to such Person's Units, whether individually or as part of any class or group of holders, in the event of a liquidation, dissolution, merger, consolidation, Sale Event or other transaction involving the Company, any of its Subsidiaries or its or their securities unless such rights are expressly provided by the agreement of merger, agreement of consolidation or other document effectuating such transaction.

ARTICLE IV

MANAGEMENT OF THE COMPANY

SECTION 4.1    Board of Managers; Delegation of Authority and Duties.

(a)    Management.  The business and affairs of the Company shall be managed by a board of managers (the "Board"), which shall possess and may exercise the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of the Company, including (i) approving all material transactions by the Company, and (ii) approving the compensation of the management of the Company.  The Members agree that, subject to the terms of this Agreement, all determinations, decisions and actions duly made or taken by the Board shall be conclusive and absolutely binding upon the Company and its successors, personal representatives and permitted assigns.

(b)    Delegation by Board.  The Board shall have the power and authority to delegate to one or more Persons any of the Board's rights and powers to manage and control the business and affairs of the Company, including to delegate to one or more Managers, Members, agents or employees of the Company (including Officers) or of a Member or any Affiliate of a Member, and to delegate by a management agreement or another agreement with, or otherwise to, other Persons.  The Board may authorize any Person (including any Member, Manager or Officer) to enter into and perform under any document on behalf of the Company.

(c)    Committees.  The Board may, from time to time, designate one or more committees, each of which shall be comprised of at least two Managers.  Any such committee, until dissolved by the Board, shall have and may exercise any or all of the authority of the Board. At every meeting of any such committee, the presence of a majority of all the members thereof shall constitute a quorum, and the affirmative vote of a majority of the members present shall be necessary for the adoption of any resolution.  The Board may dissolve any committee at any time.

(d)    Managers as Agents.  To the extent of their powers set forth herein, the Board (acting as a Board in accordance with this Agreement and Applicable Law) is an agent of the Company for the purpose of the Company's business and affairs, and the actions of the Board taken as the Board in accordance with such powers set forth herein shall bind the Company. Notwithstanding the last sentence of Section 18-402 of the Act, except as a resolution of the Board that is not inconsistent with this Agreement may otherwise provide, no individual

Manager, in his or her capacity as such, shall have any authority to bind the Company (notwithstanding the fact that the Board, acting as the Board, may do so as provided above in this Section 4.1(d)).

(e)     Fiduciary Duties.  Subject to Section 3.5, each member of the Board shall owe to the Company and its Members the fiduciary duties that a director of a Delaware corporation owes to such corporation and its stockholders under Delaware law.

(f)     Activities of Members and Managers.

(i)     Each Member acknowledges and agrees that no Member shall, in its capacity as a Member, be bound to devote any or all of such Member's business time to the affairs of the Company, and that each Member and such Member's Affiliates do and will continue to engage for such Member's own account and for the account of others in other business ventures.  Each Member acknowledges and agrees that no other Member, in its capacity as such, shall have any duties, including any fiduciary duties, to the Company or any other Member.

(ii)     Each of the Managers, in his or her capacity as a manager, shall be required to devote only such time and effort to the affairs of the Company as may be necessary to manage and operate the Company; provided, however, that, subject to the terms and conditions of any applicable employment agreements, no minimum number of hours is required to be devoted by any Manager on a weekly, monthly, annual or other basis.

SECTION 4.2          Establishment of the Board.

(a)     Size.  There shall be established a Board initially composed of five (5) natural persons (each, a "Manager").  Each Manager is hereby designated as a "manager" of the Company within the meaning of Section 18-101(10) of the Act.

(b)     Initial Composition of Board.  The initial Managers shall be James Litinsky, Randall Weisenburger, William R. Klesse, Jared Carney and John Park.

(c)     Resignation/Removal/Vacancy.  Each Manager shall remain in office until his or her death, resignation or removal.  Not later than 90 days after the Closing Date, the Board shall determine the length of the term of office of each Manager, including whether the Managers shall be divided into more than one class.  The Board shall provide written notice of its determination regarding such matters to each Member promptly following the conclusion of such meeting.  Thereafter, the Board may, without the consent of any Member, amend this Agreement in order to set forth the terms of office of each Manager.  Unless otherwise determined by the Board, any vacancies on the Board may be filled only by the vote or written consent of the Board.  No Manager may be removed, with or without cause, by a vote or written consent of the Members.

(d)     Compensation of Managers.  The Board shall have the authority to fix the compensation of the Managers, which compensation shall be paid by the Company.  In addition,

the Company shall pay the reasonable, documented and direct out-of-pocket expenses incurred by each Manager in connection with such Manager's service on the Board and its committees.

SECTION 4.3          Board Meetings.

(a)          Quorum; Actions of the Board.

(i)          A majority of the total number of Managers shall constitute a quorum for the transaction of business of the Board at a meeting of the Board and, except as otherwise provided in this Agreement, the act of a majority of the Managers present at a meeting of the Board at which a quorum is present shall be the act of the Board.

(ii)          Each Manager shall have one vote on all such matters.  A Manager who is present at a duly called meeting of the Board at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the Person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b)          Place; Waiver of Notice.  Meetings of the Board may be held at such place or places as shall be determined from time to time by resolution of the Board.  At all meetings of the Board, business shall be transacted in such order as shall from time to time be determined by resolution of the Board.  Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in any waiver of notice.

(c)          Regular and Special Meetings.  Regular quarterly meetings of the Board shall be held upon notice as provided below and at such times and places as shall be designated from time to time by resolution of the Board.  Special meetings of the Board may be called on at least twenty-four (24) hours' notice to each Manager by any two Managers.  Such notice to the Managers need not state the purpose or purposes of, or the business to be transacted at, such meeting, except as may be otherwise required by Applicable Law.

(d)          Notice.  Notice of any meeting of the Board may be given personally (including by telephone), by mail, facsimile, electronic mail, courier or other means at the address, electronic mail address, telephone number or facsimile number of the Managers or the committee members, as applicable, shown in the Company's books and records.  Notice shall be effective and deemed to have been delivered (i) if given personally, upon delivery, (ii) if given by electronic mail or facsimile, upon dispatch, (iii) if given by courier, upon the earlier of actual delivery and one (1) day after deposit with a nationally recognized overnight courier specifying next day delivery, (iv) if given by mail, three (3) days after it is deposited in the mails (first class or airmail postage prepaid) or (v) if given by other means, when delivered to the address of the Manager set forth in the books and records of the Company.

(e)     Chairman.  The Board shall designate a Manager to serve as Chairman. The Chairman shall, unless a majority of Managers present determine otherwise, preside at all meetings of the Board.  If the Chairman is absent at any meeting of the Board, a majority of the Managers present shall designate another Manager to serve as interim Chairman for that meeting. Without approval by the Board, the Chairman, in his or her capacity as such, shall have no authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to make any expenditure or incur any obligations on behalf of the Company or authorize any of the foregoing.  The Chairman shall initially, as of the Closing Date, be James Litinsky.

SECTION 4.4     Approval or Ratification of Acts or Contracts.  Any act or contract that shall be approved or be ratified by the Board in accordance with the terms of this Agreement shall be as valid and as binding upon the Company as if it shall have been approved or ratified by every Member of the Company.

SECTION 4.5     Action by Written Consent or Telephone Conference.

(a)     Any action permitted or required by the Act, the Certificate or this Agreement to be taken at a meeting of the Board may be taken without a meeting if a consent in writing (including electronically), setting forth the action to be taken, is signed (or clearly indicated electronically) by a majority of the Managers.  Such consent shall have the same force and effect as a vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of the State of Delaware, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Board.  Such consent shall be filed with the minutes of the proceedings of the Board.

(b)     Subject to the requirements in this Agreement for notice of meetings, the Managers may participate in and hold a meeting of the Board by means of a conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

SECTION 4.6     Officers and Agents.

(a)     Designation and Appointment.  Without limiting the generality of Section 4.1(b), the Board may, from time to time, designate or retain one or more Persons (subject to the supervision and control of the Board and any of whom may be, but need not be, a Member) as (i) officers ("Officers") of the Company, with titles including "chairman," "chief executive officer," "president," "vice president," "treasurer," "secretary," "general manager," "director" "chief financial officer," and "controller," as and to the extent authorized by the Board or (ii) agents, consultants or other positions as may be necessary or appropriate for the conduct of the Company's business.  Any number of offices or other positions may be held by the same Person.  In its discretion, the Board may choose not to fill any office or other position for any period as it may so determine.  Officers, agents, consultants and such other Persons need not be residents of the State of Delaware or Members.  Any Officers, agents, consultants and such other

Persons so designated shall have such authority and perform such duties as the Board may, from time to time, delegate to them.  Each Officer shall hold office until his or her successor shall be duly designated and shall qualify or until his or her death or until he or she shall resign or shall have been removed in the manner hereinafter provided.  Each such other Person shall hold such position in accordance with the provisions of his or her appointment thereto.  Subject to Section 3.5, the Officers shall owe to the Company and its Members the fiduciary duties that officers of a Delaware corporation owe to such corporation and its stockholders under Delaware law.

(b)      <u>Resignation/Removal of Officers</u>.  Any Officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any Officer may be removed as such, either with or without cause at any time by the Board.  Except as provided in Section 11.3 and Section 11.5, designation of an Officer shall not of itself create any contractual or employment rights.

ARTICLE V

DISTRIBUTIONS

SECTION 5.1      <u>Distributions</u>.

(a)      Any distributions of Distributable Assets shall be made when and as declared by the Board to the holders of Common Units pro rata in accordance with the number of Common Units held by them.

(b)      Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to a Member on account of its interest in the Company if such distribution would violate Section 18-607 of the Act or any other Applicable Law.

SECTION 5.2      <u>Security Interest and Right of Set-Off or Recoupment</u>.  As security for any withholding tax or other liability or obligation to which the Company may be subject as a result of any act or status of any Member, or to which the Company may become subject with respect to the interest of any Member in the Company, the Company shall have (and each Member hereby grants to the Company) a security interest in all Distributable Assets distributable to such Member to the extent of the amount of such withholding tax or other liability or obligation.  The Company shall have a right of set-off or recoupment against such distributions of Distributable Assets to be made to such Member in the amount of such withholding tax or other liability or obligation.  The Company may withhold distributions or portions thereof if it is required to do so by the Code or any other provision of federal, state or local tax or other Applicable Law.  Any amount withheld pursuant to the Code or any other provision of federal, state or local tax or other Applicable Law with respect to any distribution to a Member shall be treated as an amount distributed to such Member for all purposes under this Agreement.

**Execution Version**

## ARTICLE VI

TRANSFERABILITY OF INTERESTS; ADMISSION AND RESIGNATION OF MEMBERS

SECTION 6.1          Restrictions on Transfer.

(a)      Any purported Transfer of Securities that does not comply with the provisions of this Article VI shall be null and void *ab initio*.

(b)      No Member may directly or indirectly sell, exchange, transfer, assign, pledge, encumber or otherwise dispose of ("Transfer"; "Transferring," "Transferred," "Transferor" and "Transferee" having meanings correlative to the foregoing) its Securities other than any transfer that (i) is in compliance with Applicable Law (including state and federal securities laws) and (ii) will not (A) require the Company to register any class of equity under the Securities Act or the Exchange Act or (B) subject the Company to the reporting requirements under the Exchange Act, and in each case any such Transfer shall be subject to the remaining provisions of this Article VI (as applicable).  The restrictions on Transfer set out in this Section 6.1(b) shall terminate upon the earlier to occur of (i) immediately prior to the consummation of an Initial Public Offering by the Company, and (ii) a Sale Event; provided, that, for the avoidance of doubt, Transfers following any Initial Public Offering by the Company will remain subject to any applicable Lock-Up Period.

(c)      For the avoidance of doubt, any change in the direct or indirect ownership or control of any Member as a result of any merger, acquisition, joint venture, investment, sale of all or part of the equity, business or assets, or other transaction undertaken by a direct or indirect shareholder, member, partner or other equity owner of such Member shall not constitute a transfer by such Member of its interests in the Company or an assignment of the rights and benefits inuring to such Member thereby, so long as the primary objective of undertaking such change or divestiture is not to circumvent the restrictions on Transfer contained in this Article VI.  For the avoidance of doubt, any such change in the direct or indirect ownership or control of any Member that has the primary objective of circumventing the restrictions on Transfer contained in this Article VI shall be subject to this Article VI, including, without limitation, this Section 6.1, Section 6.2, Section 6.3 and Section 6.4.

(e)      No Member may Transfer any Securities unless (i) such Transfer (other than any Transfer solely consisting of an Encumbrance) is made on the books of the Company or its Subsidiary, as applicable, (ii) such Transfer is not in violation of any of the provisions of this Agreement and (iii) the Transferee of such Securities (if other than (A) the Company or another Member or (B) a Transferee pursuant to a sale registered under the Securities Act) becomes a party to this Agreement pursuant to Section 6.7.

(f)      Each Member acknowledges that no Securities have been registered under the Securities Act or any state securities or "blue sky" laws and that the Securities may not be Transferred except pursuant to an effective registration statement under the Securities Act and such state laws or pursuant to an exemption from registration under the Securities Act and such state laws.  Each Member agrees that it will not Transfer any Securities at any time if such action would constitute a violation of any securities laws of any applicable jurisdiction or a breach of

19

the conditions to any exemption from registration of Securities under any such laws or a breach of any undertaking or agreement of such Member entered into pursuant to such laws or in connection with obtaining an exemption thereunder.

(g)     No Member shall grant any proxy or enter into or agree to be bound by any voting trust with respect to any Securities or enter into any agreements or arrangements of any kind with any other Member with respect to any Securities inconsistent with the provisions of this Agreement (whether or not such agreements and arrangements are with other Members or owners of Securities who are not parties to this Agreement), including agreements or arrangements with respect to the acquisition, Transfer or voting of any Securities, nor shall any Member act, for any reason, as a member of a group or in concert with any other Members in connection with the acquisition, Transfer or voting of any Securities in any manner which is inconsistent with the provisions of this Agreement.

SECTION 6.2          Right of First Refusal.

(a)     Subject to compliance with all other provisions of this Agreement, any Member shall be permitted to Transfer all or any portion of such Member's Units, provided, that (except with respect to a Transfer pursuant to Section 6.3 or 6.4 or Permitted Transfers) at least 30 days prior to any such Transfer of any Units, the Member desiring to make such Transfer (the "Transferring Member") shall deliver a written notice (the "Offer Notice") to the Company, specifying in reasonable detail the identity of the prospective Transferee(s), the number and type of Units to be Transferred (the "Offered Units") and the price and other terms and conditions of the proposed Transfer, including a description of any other agreements entered into or to be entered into by the Transferring Member and the proposed Transferee(s); provided, that if the proposed consideration for such Offered Units consists in whole or in part of something other than U.S. dollars, then the Offer Notice will also contain a good faith estimate of the value of such consideration in U.S. dollars and an explanation of the manner in which such estimate was made.  The Company shall provide a copy of the Offer Notice to each other Member (in such capacity, the "Other Members") promptly after the Company's receipt thereof.  The Transferring Member shall not consummate such proposed Transfer until at least 60 days after receipt of the Offer Notice by the Company and the Other Members (the "Authorization Date").

(b)     The Company may elect to purchase all (but not less than all) of the Offered Units at the price and on the other terms and conditions set forth in the Offer Notice, by delivering written notice of such election (an "Election Notice") to the Transferring Member with a copy to the Other Members within 30 days after receipt of the Offer Notice (such 30 day period referred to herein as the "First Refusal Period").  If after the expiration of such 30-day period the Company has not elected to purchase all of the Offered Units, the Other Members (or any of them) may elect to purchase all (but not less than all) of the Offered Units (pro rata in accordance with the number of Common Units held by the Other Members), at the price and on the other terms and conditions set forth in the Offer Notice, by delivering an Election Notice to the Transferring Member within 30 days after expiration of the First Refusal Period.  If not all of the Other Members elect to purchase their pro rata portion of the Offered Units, the Other Members who have elected to purchase their pro rata portion of the Offered Units shall be entitled to purchase the remaining Offered Units, pro rata in accordance with the number of Common Units held by such Other Members.

Execution Version

(c)     If the Company or the Other Members elect to purchase all of the Offered Units from the Transferring Member, such purchase shall be consummated as soon as practicable after the delivery of the applicable Election Notice to the Transferring Member, but in any event within 60 days after the Authorization Date.

(d)     If the Company and the Other Members do not elect to purchase all of the Offered Units from the Transferring Member, the Transferring Member shall have the right, subject to compliance with Section 6.3, within the 90 days following the Authorization Date to Transfer all (but not less than all) of the Offered Units that have not been purchased by the Company or the Other Members pursuant to this Section 6.2 to the Transferee(s) specified in the Offer Notice in the amounts specified in the Offer Notice at a price not less than the price per unit specified in the Offer Notice and on other terms and conditions no more favorable to the Transferee(s) thereof than specified in the Offer Notice.  Any Offered Units not so Transferred within such 90 day period shall be reoffered to the Company and the Other Members pursuant to this Section 6.2 prior to any subsequent Transfer (other than a Transfer pursuant to Section 6.3 or 6.4 or Permitted Transfers).

(e)     Notwithstanding anything herein to the contrary, the Board shall be entitled to exempt any proposed Transfer of Units from the provisions of this Section 6.2.

SECTION 6.3          Tag-Along Rights

(a)     If, after complying with Section 6.2, one or more Members proposes to Transfer a majority of the outstanding Common Units to another Person (other than a Transfer of the Units held by a Member to such Member's Affiliates) (a "Tag-Along Sale"), such Member(s) (the "Selling Member(s)") shall deliver written notice (a "Sale Notice") of such proposed Tag-Along Sale to each of the other Members (the "Eligible Tag-Along Members") at least ten (10) Business Days prior to the consummation of such proposed Tag-Along Sale, setting forth (i) the number and class of Units proposed to be Transferred (the "Tag-Along Securities"), (ii) the amount and form of consideration to be received for such Tag-Along Securities by such Selling Member(s) and any other consideration to be received directly or indirectly by such Selling Member(s) and its Affiliates in connection with such Tag-Along Sale, (iii) any other material terms and conditions of the proposed Tag-Along Sale, including a copy of the proposed definitive agreement (if available), (iv) the date of the closing of such Tag-Along Sale, (v) the fraction, expressed as a percentage, determined by dividing the number of each class of Units proposed to be sold by the total number of such class of Units owned by the Selling Member(s) (the "Tag-Along Sale Percentage"), and (vi) an invitation to each Eligible Tag-Along Member to elect (the Eligible Tag-Along Members making such election being the "Tagging Members", and, together with the Selling Member(s), the "Tag-Along Sellers") to include in the Tag-Along Sale Units of the same class owned by such Tagging Member as of the date of the Sale Notice, the amount of which (except as contemplated in Section 6.3(d)) does not in any event exceed the Tag-Along Sale Percentage of the total number of such class of Units owned by such Tagging Member as of the date of the Sale Notice.

(b)     Upon delivery of a Sale Notice, each Eligible Tag-Along Member may elect to sell Units of the same class in such Tag-Along Sale pursuant to the same terms and conditions as agreed to by the Selling Member(s) (subject to Section 6.5), by delivering an

irrevocable written notice (a "Tag-Along Participation Notice") to the Selling Member(s) within five (5) Business Days of the date of delivery of the Sale Notice, indicating its election to sell up to the number of the same class of Units in the Tag-Along Sale specified by such Eligible Tag-Along Member in such Tag-Along Participation Notice (such specified number not in any event (except as contemplated in Section 6.3(d)) to exceed the Tag-Along Sale Percentage of the total number of such class of Units owned by such Eligible Tag-Along Member as of the date of the Sale Notice). Upon delivery of a Tag-Along Participation Notice, (i) the Tagging Member that has delivered such Tag-Along Participation Notice shall be obligated to sell to such proposed purchaser on the same terms and conditions as the Tag-Along Sale (subject to Section 6.5), concurrently with the Selling Member(s) and the other Tag-Along Sellers, the number of such class of Units set forth in the Tag-Along Participation Notice (such number not to exceed the total number of such class of Units calculated pursuant to Section 6.3(d)) so long as such sale occurs within ninety (90) days (subject to reasonable extension to the extent necessary to obtain required governmental or other approvals) after the expiration of the five (5) Business Day period for giving Tag-Along Participation Notices with respect to such Tag-Along Sale (the "Maximum Tag-Along Period"); and (ii) in accordance with Section 6.5, such Tagging Member that has delivered such Tag-Along Participation Notice shall be obligated to make, on a several, and not joint and several, basis and as to itself and not as to any other Member, the same representations, warranties and covenants with respect to such Member's title to the Units and such Member's authority as the Selling Member(s) makes with respect to itself in its capacity as a Member and an owner of Units in connection with such Tag-Along Sale.

(c)     Subject to the provisions of this Section 6.3 and Section 6.5, all determinations as to whether to complete any Tag-Along Sale and as to the timing, manner and other terms of any such Tag-Along Sale shall be at the sole discretion of the Selling Member(s); provided, that the Tag-Along Sale is consummated (i) within the Maximum Tag-Along Period, (ii) at the price per Unit set forth in the Sale Notice and (iii) on terms and conditions that are not materially different than the terms and conditions set forth in the Sale Notice. Notwithstanding the foregoing, a Tag-Along Sale may be consummated by the Selling Member(s) and, if any of them so elect, one or more of the Tagging Members on less advantageous terms to them (which may include a decrease in the price per Unit) than those set forth in the Sale Notice, in which case such Tag-Along Sale, if consummated, will be consummated on such new terms and will not again be subject to the provisions of this Section 6.3 so long as such Tag-Along Sale is consummated within the Maximum Tag-Along Period and the Selling Member(s) has provided ten (10) Business Days' notice to each Tagging Member setting forth such revised terms. For the avoidance of doubt, any of the original Tagging Members that does not elect to sell on such less advantageous terms shall not be required to do so. With respect to any Tag-Along Securities referred to in a Sale Notice that are not sold by the Selling Member(s) on or prior to the expiration of the Maximum Tag-Along Period, such Tag-Along Securities will again be subject to the provisions of this Section 6.3 upon any subsequent applicable sale of such Tag-Along Securities by such Selling Member(s).

(d)     The Tag-Along Sellers shall be entitled to sell in the Tag-Along Sale a number of Common Units calculated as follows:

(i)     first there shall be allocated to each Tag-Along Seller a number of Common Units equal to the lesser of (A) the maximum number of such Common Units

Execution Version

such Tag-Along Seller has elected to sell in the Tag-Along Sale in its Sale Notice or Tag Along Participation Notice (as applicable) and (B) the number of Common Units determined by multiplying (x) the number of such Common Units subject to the Tag-Along Sale by (y) a fraction, the numerator of which is the number of such Common Units owned by such Tag-Along Seller and the denominator of which is the total number of Common Units owned by all Tag-Along Sellers (the "Pro Rata Tag-Along Share"); and

(ii)     any remaining Common Units subject to the Tag-Along Sale shall be allocated to the Tag-Along Sellers that agree to sell in excess of their Pro Rata Tag-Along Share, *pro rata* to such Tag-Along Sellers based upon such Tag-Along Sellers' relative Pro Rata Tag-Along Shares, or as such Tag-Along Sellers may otherwise agree in writing among themselves.

(e)     This Section 6.3 shall not apply to any Transfer (i) to an Affiliate pursuant to Sections 6.6 and 6.7, (ii) in connection with any Drag-Along Sale pursuant to Section 6.4, (iii) effected as part of any IPO Conversion, (iv) effected in connection with an Initial Public Offering, or (v) effected pursuant to Article VIII.

(f)     This Section 6.3 shall terminate upon the earlier to occur of (i) immediately prior to the consummation of an Initial Public Offering by the Company, and (ii) a Sale Event.

(g)     The rights of the Members contained in this Section 6.3 may be assigned by such Members in connection with any Transfer permitted under Article VI.

SECTION 6.4          Drag-Along Rights.

(a)     If the Board and Members holding a majority of the outstanding Common Units approve a Sale Event, such Members may give notice (a "Drag-Along Sale Notice") to all of the other Members (the "Drag-Along Member Recipients," and, together with the above-mentioned Members, the "Drag-Along Sellers") that such Members intend to enter into (or have agreed to vote the Securities they own, or to execute a written consent in lieu thereof, in favor of) such Sale Event (a "Drag-Along Sale") and that such Members require the Drag-Along Member Recipients to participate in such transaction (which, subject to Section 6.5, shall include the requirement that each Drag-Along Member Recipient make the same representations, warranties and covenants as such Members make with respect to themselves in their capacity as Members and owners of Units in the Company in connection with such Drag-Along Sale).  Such notice shall also specify (i) the amount and form of consideration to be received by the Drag-Along Sellers or the Company and any other consideration to be received directly or indirectly by any Drag-Along Seller and/or its Affiliates in connection with such Drag-Along Sale, (ii) any other material terms and conditions of the proposed Drag-Along Sale, including a copy of the proposed definitive agreement (if available), (iii) the identity of the proposed Transferee in the proposed Drag-Along Sale, (iv) the date of anticipated completion of the proposed Drag-Along Sale (which date shall be not less than ten (10) Business Days after the date of such notice, or in the event of an amended notice pursuant to Section 6.4(d), no less than ten (10) Business Days after the date of such amended notice) and (v) the action or actions reasonably requested or

required of each Drag-Along Member Recipient (without limiting those that may be reasonably requested or required in the future) in order to complete or facilitate such proposed Drag-Along Sale (including (1) the Transfer of Securities owned by the Drag-Along Member Recipient, (2) the voting by such Drag-Along Member Recipient in favor of the Drag-Along Sale and the transactions contemplated thereby and the waiver of any related appraisal or dissenters' rights and/or (3) the execution and delivery of any merger, asset purchase, security purchase, recapitalization or other agreement, as applicable). Subject to Section 6.5, upon receipt of such notice, each Drag-Along Member Recipient shall be obligated to take the actions referred to in subclause (v) above and any other actions reasonably requested by the initiating Drag-Along Sellers in connection with the Drag-Along Sale.

(b)     If a Drag-Along Sale contemplates the Transfer of less than all of the outstanding Securities of the Company, then each Drag-Along Seller shall Transfer a number and class of Securities of the Company equal to the product of the following (rounded to the nearest whole number):  (x) the number of the same class of Securities owned by such Drag-Along Seller multiplied by (y) a fraction, the numerator of which is the aggregate number of such class of Securities being Transferred in such Drag-Along Sale and the denominator of which is the aggregate number of all outstanding Securities of such class as of the date of the Drag-Along Sale.

(c)     To the extent not paid by the Company or the Transferees in such Drag-Along Sale, in connection with the completion of the Drag-Along Sale, all actual and reasonable out-of-pocket costs and expenses reasonably incurred by the Drag-Along Sellers in connection with the transaction or transactions described in the Drag-Along Notice shall be borne on a *pro rata* basis in accordance with the consideration received in respect of its Securities by each of the Drag-Along Sellers in connection with such Drag-Along Sale (as determined by the consideration such Drag-Along Seller would receive in such sale prior to reduction for any indemnification claims), to the extent such costs and expenses are incurred for the benefit of substantially all of the Drag-Along Sellers.

(d)     Subject to the provisions of this Section 6.4 and Section 6.5, all determinations to complete any Drag-Along Sale and as to the timing, manner, price and other terms of any such Drag-Along Sale shall be at the sole discretion of the initiating Drag-Along Members.  In the event that the Drag-Along Sale contemplated by a Drag-Along Sale Notice has not been completed within one-hundred and twenty (120) days after the delivery of the Drag-Along Sale Notice for such Drag-Along Sale (subject to reasonable extension to the extent necessary to obtain required governmental or other approvals), then such Drag-Along Notice shall be null and void, each Drag-Along Member Recipient shall be released from its obligations under such Drag-Along Notice and it shall be necessary for a separate Drag-Along Sale Notice to be furnished by the initiating Drag-Along Seller, and the other terms and provisions of this Section 6.4 separately complied with, in order to consummate a Drag-Along Sale pursuant to this Section 6.4.

(e)     This Section 6.4 shall terminate immediately prior to the consummation of an Initial Public Offering by the Company.

SECTION 6.5          Representations, Warranties and Covenants in Connection with Sales.  In connection with a transaction pursuant to Section 6.3 or Section 6.4, all participating Members shall be required to make, on a several, and not joint and several, basis and as to itself and not as to any other Member, the same representations, warranties and covenants with respect to title to the Units and such Member's authority with respect to themselves in their capacity as Members or owners of Securities, but no Member shall be required to make any other representations, warranties or covenants regarding the Company and/or its Subsidiaries; provided, that, notwithstanding anything to the contrary contained herein including the foregoing provisions of this Section 6.5, each Member participating in such transaction shall be required (if applicable under the terms of such transaction) to provide several, and not joint and several, indemnification (if such sale contemplates indemnification) up to, but not exceeding, its *pro rata* portion (as determined by the proceeds such Member would actually receive, as compared to the proceeds all other Members would actually receive, in such sale prior, in each case, to reduction for any indemnification claims) of any such indemnification obligation if such indemnification relates to (a) representations or matters relating to the Company and its Subsidiaries and (b) such Member's individual representations, warranties and covenants including in relation to (i) such Member's ownership of, and title to, the Securities to be Transferred by such Member, (ii) such Member's authority, power and right to enter into and consummate the transaction and (iii) matters otherwise relating to such Member.  For the avoidance of doubt, no Member shall have any liability for any breach of a representation or warranty of any other Member.

SECTION 6.6          Permitted Transfers.  The procedures set forth in Section 6.2 or Section 6.3 shall not apply to any Transfer by a Member of its Securities to an Affiliate of such Member (a "Permitted Transfer").

SECTION 6.7          Admission of Additional Members.  An Affiliate of a Member or any Person otherwise seeking to be admitted as an additional or substitute Member shall (i) execute and deliver a joinder in the form attached to this Agreement as Exhibit A, signifying its agreement to be bound by all the terms and conditions hereof, which joinder shall not be effective unless accepted and countersigned by the Company and, subject to Section 6.1, which the Company shall accept and countersign as promptly as practicable, and (ii) execute and deliver any further documents and take any further actions as may be necessary or appropriate, in the reasonable determination of the Board, to make such Person an additional Member in compliance with the terms and conditions of this Agreement, and shall notify the Company of the address to which notices, consents and communications hereunder shall be sent pursuant to Section 13.2.  When a Member Transfers all its Units pursuant to this Article VI, such Member shall cease to be a Member of the Company.

SECTION 6.8          Effect of Transfer.  Following a Transfer of any Unit that is permitted under this Article VI, the Transferee of such Unit shall (a) receive distributions under Article V in respect of such Unit and (b) have all rights as a Member under this Agreement.

**Execution Version**

ARTICLE VII

PREEMPTIVE RIGHTS

SECTION 7.1          Determination by Board.  Except with respect to the issuance of Common Units in accordance with Section 3(b) of the Credit Bid Agreement, each Member who holds Common Units shall be entitled to preemptive rights, on a pro rata basis, with respect to any issuance of Securities by the Company following the Closing Date; provided, however, that with respect to any issuance of Securities by the Company more than one hundred and twenty (120) days following the Closing Date, the Board shall determine the specific terms and conditions on which such preemptive rights may be exercised, including any limitations or restrictions thereon or exemptions therefrom.  Following such determination, the Board shall, without the consent of any Member, amend this Agreement in order to set forth such specific terms, conditions, limitations, restrictions and exemptions, and shall provide written notice to each Member describing in reasonable detail such specific terms, conditions, limitations, restrictions and exemptions.

ARTICLE VIII

REGISTRATION RIGHTS

The Company hereby grants to each of the Holders the registration rights set forth in this Article VIII, with respect to the Registrable Securities owned by such Holders.

SECTION 8.1          Demand Registration.

(a)          At any time on or after the date on which the Company has consummated an Initial Public Offering and is eligible to use a Form S-3 registration statement to register Securities under the Securities Act, the holders of a majority of the outstanding Common Units (the "Demanding Members") may request registration under the Securities Act of their Registrable Securities (a "Demand Registration").  The request for a Demand Registration shall be in writing and shall specify the number of Registrable Securities requested to be registered and the intended method of distribution.

(b)          Within ten (10) days after receipt of any request for a Demand Registration, the Company shall give written notice of such requested registration to all other Holders and, subject to Section 8.1(c), will include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within 15 days after receipt of the Company's notice.

(c)          A request for Demand Registration shall be deemed to have been effected for purposes of Section 8.1(a) if the Registration Statement relating to such Demand Registration has been declared effective by the SEC; provided, however, that if the holders of a majority of Registrable Securities held by the Demanding Members request that the Company withdraw the registration statement relating to such Demand Registration prior to it being declared effective by the SEC, or if such holders revoke such Demand Registration prior to the initial filing of a registration statement relating to such Demand Registration (any such request or revocation a

26

"Withdrawal"), the Demanding Members shall not be entitled to make a subsequent Demand Registration prior to the date that is one-hundred and eighty (180) days after the date of such Withdrawal unless such Withdrawal is as a result of a material adverse change in the Company's business, financial condition or operating results or the market for the Company's equity securities or as a result of an event which materially and adversely affects the Demanding Members' ability to sell their Registrable Securities in compliance with the federal securities laws (other than an event that results from an act or omission by a Demanding Member).

(d)      The Company shall not be obligated to effect more than one (1) Demand Registration hereunder in any six (6) month period.

(e)      If a Demand Registration is an underwritten offering and the managing underwriters advise the Company that, in their opinion, the number of Registrable Securities requested to be included in such offering, and other securities requested to be included in such offering, exceeds the largest number of securities which can be sold therein without adversely affecting the marketability of the offering and within a price range reasonably acceptable to the holders of a majority of the Registrable Securities requested to be registered, then the Company shall include in such registration, prior to the inclusion of any securities which are not Registrable Securities, the Registrable Securities requested to be included which in the opinion of such underwriters can be sold without adversely affecting the marketability of the offering, allocated in accordance with the following priorities: first, the Registrable Securities requested to be included therein by the Holders that initially requested such Demand Registration, and, second, the Registrable Securities requested to be included therein by the other Holders of Registrable Securities participating in such Demand Registration, in each case pro rata among the respective Holders on the basis of the number of Registrable Securities so requested to be included therein by each such Holder.

(f)      The Company shall be entitled to postpone for up to one-hundred and eighty (180) days the filing, effectiveness or use of a Registration Statement for a Demand Registration (and the Holders of Registrable Securities participating in the related offering hereby agree not to offer or sell any Registrable Securities pursuant to such Registration Statement during such postponement or suspension) pursuant to Section 8.1(a) if the Company provides written notice to the Demanding Members requesting such registration stating that, in the good faith judgment of the Board, such filing or effectiveness would be reasonably expected to (i) interfere with or adversely affect the negotiation or completion of any material transaction or other material event that is being contemplated by the Company or (ii) involve initial or continuing disclosure obligations relating to a material event or material state of facts regarding the Company, the disclosure of which would, in the reasonable judgment of the Company, be adverse to its interests; provided, however, that in the event of such a postponement or suspension of registration, the holders of Registrable Securities initially requesting such Demand Registration shall be entitled to withdraw such request and, if such request is withdrawn, such Demand Registration shall not count as a Demand Registration hereunder, or constitute a "Withdrawal" pursuant to Section 8.1(c).

(g)      If any public offering pursuant to a Demand Registration shall involve, in whole or in part, an underwritten offering, the Company shall have the right to designate an underwriter or underwriters as the lead or managing underwriter(s) of such underwritten

offering, provided that such underwriter shall be reasonably acceptable to the holders of a majority of Registrable Securities held by the Demanding Members.  The holders of Registrable Securities and the Company agree that if the Registrable Securities, or any portion thereof, are sold in any public offering involving, in whole or in part, an underwritten offering, then such holders and the Company will enter into a customary underwriting agreement with the underwriter(s) selected pursuant to the preceding sentence.

SECTION 8.2    Piggyback Registration.

(a)    If at any time or from time to time the Company determines to register any of its securities, either for its own account or for the account of any party owning any Registrable Securities (other than (1) in a registration relating solely to employee benefit plans, (2) a Registration Statement on Form S-4 or S-8 (or such other similar successor forms then in effect under the Securities Act), (3) a registration pursuant to which the Company is offering to exchange its own Securities, (4) a Registration Statement relating solely to dividend reinvestment or similar plans, (5) a Shelf Registration Statement pursuant to which only the initial purchasers and subsequent transferees of debt securities of the Company or any Subsidiary that are convertible for Units and that are initially issued pursuant to Rule 144A and/or Regulation S of the Securities Act may resell such notes and sell the Units into which such notes may be converted or (6) a Demand Registration) (a "Piggyback Registration"), the Company will:

(i)    promptly (but in no event less than fifteen (15) days before the effective date of the relevant Registration Statement) deliver to each Holder written notice thereof; and

(ii)    include in such registration (and any related qualification under state securities laws or other compliance), and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests delivered within ten (10) days after delivery of such written notice from the Company by any Holders, except as set forth in Section 8.2(b).

(b)    Underwriting.  If the Company gives notice of a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to Section 8.2(a)(i).  In such event the right of any Holder to registration pursuant to this Section 8.2 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein.  All Holders proposing to dispose of their Registrable Securities through such underwriting, together with the Company and the other parties distributing their securities through such underwriting, shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company.  If a Piggyback Registration is an underwritten offering and the managing underwriters advise the Company that, in their opinion, the number of Registrable Securities requested to be included in such offering, and other securities requested to be included in such offering, exceeds the largest number of securities which can be sold therein without adversely affecting the marketability of the offering and within a price range reasonably acceptable to the holders of a majority of the Registrable Securities requested to be registered, then the Company shall include in such registration, prior to

the inclusion of any securities which are not Registrable Securities, the Registrable Securities requested to be included which in the opinion of such underwriters can be sold without adversely affecting the marketability of the offering, allocated in accordance with the following priorities: first, the Securities the Company proposes to sell and second, the Registrable Securities requested to be included in such registration, pro rata among the respective Holders thereof on the basis of the number of Registrable Securities so requested to be included therein by each such Holder.  No Registrable Securities excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such registration.  For the avoidance of doubt, nothing in this Section 8.2(b) is intended to diminish the number of Registrable Securities to be included by the Company in the underwriting.

      (c)     Right to Terminate Registration.  The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 8.2 prior to the effectiveness of such registration whether or not any Holder has elected to include Registrable Securities in such registration.

      SECTION 8.3     Expenses of Registration.  All Registration Expenses incurred in connection with all registrations effected pursuant to Section 8.1 or Section 8.2 shall be borne by the Company; provided that, for the avoidance of doubt, the Company shall not be required to pay transfer taxes or underwriters' discounts or selling commissions relating to Registrable Securities.

      SECTION 8.4     Obligations of the Company.  Whenever required under this Article VIII to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

      (a)     prepare and file with the SEC a Registration Statement with respect to such Registrable Securities and use its reasonable best efforts to cause such Registration Statement to become effective, and keep such Registration Statement effective for (x) the lesser of one hundred and eighty (180) days or until the Holder or Holders have completed the distribution relating thereto or (y) for such longer period as may be prescribed herein;

      (b)     prepare and file with the SEC such amendments and supplements to such Registration Statement and the prospectus used in connection with such Registration Statement as may be necessary to keep such Registration Statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement in accordance with the intended methods of disposition by sellers thereof set forth in such Registration Statement;

      (c)     permit (i) any Holder that (in the good faith reasonable judgment of such Holder) might be deemed to be a Controlling Person of the Company to participate in good faith in the preparation of such Registration Statement and to cooperate in good faith to include therein material, furnished to the Company in writing, that in the reasonable judgment of such Holder and its counsel should be included, and (ii) any Holder that is including Registrable Securities in such Registration Statement a reasonable opportunity to review and comment on any portions of such Registration Statement with respect to which such Holder would be obligated to provide any indemnification or contribution pursuant to Section 8.5;

(d)     furnish to the Holders such numbers of copies of the Registration Statement and the related Prospectus, including all exhibits thereto and documents incorporated by reference therein and a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned by them;

(e)     in the event of any underwritten public offering, enter into and perform its obligations under any applicable underwriting agreement, in usual and customary form, with the underwriter(s) of such offering.  Each Holder participating in such underwriting shall also enter into and perform its obligations under any such an agreement;

(f)     notify each Holder of Registrable Securities covered by such Registration Statement as soon as reasonably possible after notice thereof is received by the Company of any written comments by the SEC or any request by the SEC or any other federal or state governmental authority for amendments or supplements to such Registration Statement or such Prospectus or for additional information;

(g)     notify each Holder of Registrable Securities covered by such Registration Statement, at any time when a Prospectus relating thereto is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing;

(h)     notify each Holder of Registrable Securities covered by such Registration Statement as soon as reasonably practicable after notice thereof is received by the Company of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or any order by the SEC or any other regulatory authority preventing or suspending the use of any preliminary or final Prospectus or the initiation or threatening of any proceedings for such purposes, or any notification with respect to the suspension of the qualification of the Registrable Securities for offering or sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose;

(i)     use its reasonable best efforts to prevent the issuance of any stop order suspending the effectiveness of any Registration Statement or of any order preventing or suspending the use of any preliminary or final Prospectus and, if any such order is issued, to obtain the withdrawal of any such order as soon as practicable;

(j)     make available for inspection by each Holder including Registrable Securities in such registration, any underwriter participating in any distribution pursuant to such registration, and any attorney, accountant or other agent retained by such Holder or underwriter, all financial and other records, pertinent corporate documents and properties of the Company, as such parties may reasonably request, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such Holder, underwriter, attorney, accountant or agent in connection with such Registration Statement;

(k)     use its reasonable best efforts to register or qualify, and cooperate with the Holders of Registrable Securities covered by such Registration Statement, the underwriters, if any, and their respective counsel, in connection with the registration or qualification of such Registrable Securities for offer and sale under the securities or "blue sky" or securities laws of each state and other jurisdiction of the United States as any such Holder or underwriters, if any, or their respective counsel reasonably request in writing; <u>provided</u>, that the Company shall not be required to qualify generally to do business in any jurisdiction where it is not then so qualified or take any action which would subject it to taxation or service of process in any such jurisdiction where it is not then so subject;

(l)     obtain for delivery to the Holders of Registrable Securities covered by such Registration Statement and to the underwriters, if any, an opinion or opinions from counsel for the Company, dated the effective date of the Registration Statement or, in the event of an underwritten offering, the date of the closing under the underwriting agreement, in customary form, scope and substance, which opinions shall be reasonably satisfactory to such Holders or underwriters, as the case may be, and their respective counsel;

(m)     in the case of an underwritten offering, obtain for delivery to the Company and the underwriters, with copies to the Holders of Registrable Securities included in such Registration, a cold comfort letter from the Company's independent certified public accountants in customary form and covering such matters of the type customarily covered by cold comfort letters as the managing underwriter or underwriters reasonably request, dated the date of execution of the underwriting agreement and brought down to the closing under the underwriting agreement;

(n)     use its reasonable best efforts to list the Registrable Securities covered by such Registration Statement with any securities exchange or automated quotation system on which such class or series of Registrable Securities is then listed;

(o)     provide and cause to be maintained a transfer agent and registrar for all Registrable Securities covered by the applicable Registration Statement from and after a date not later than the effective date of such Registration Statement;

(p)     cooperate with Holders including Registrable Securities in such registration and the managing underwriters, if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold, such certificates to be in such denominations and registered in such names as such Holders or the managing underwriters may request at least two (2) Business Days prior to any sale of Registrable Securities;

(q)     use its reasonable best efforts to comply with all applicable securities laws and make available to Holders, as soon as reasonably practicable, an earnings statement satisfying the provisions of Section 11(a) of the Securities Act and the rules and regulations promulgated thereunder; and

(r)     in the case of an underwritten offering, cause the senior executive officers of the Company to participate in the customary "road show" presentations that may be reasonably requested by the underwriters and otherwise to facilitate, cooperate with and

**Execution Version**

participate in each proposed offering contemplated herein and customary selling efforts related thereto.

SECTION 8.5        Indemnification.

(a)        The Company will, and does hereby undertake to, to the fullest extent permitted by Applicable Law, indemnify and hold harmless each Holder of Registrable Securities, its Affiliates and each of such Holder's and such Affiliates' respective officers, directors, trustees, employees, partners, managers, members, stockholders, beneficiaries, Affiliates and agents and each Person, if any, who controls such Holder and such Affiliates, within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, and each underwriter, if any, and each Person who controls any underwriter, of the Registrable Securities owned by or issuable to such Holder, against all claims, losses, damages and liabilities (or actions in respect thereto) arising out of or based on (i) any untrue statement (or alleged untrue statement) of a material fact contained in any prospectus, offering circular, free writing prospectus or other similar document (including any related Registration Statement, notification, or the like) incident to any registration, qualification, compliance or sale effected pursuant to this Article VIII or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances in which they were made, (ii) any violation or alleged violation by the Company of any federal, state or common law rule or regulation applicable to the Company in connection with any such registration, qualification, compliance or sale, or (iii) any failure to register or qualify Registrable Securities in any state where the Company or its agents have affirmatively undertaken or agreed in writing (including pursuant to Section 8.4(k)) that the Company (the undertaking of any underwriter being attributed to the Company) will undertake such registration or qualification on behalf of the Holders of such Registrable Securities (provided, that in such instance the Company shall not be so liable if it has undertaken its reasonable best efforts to so register or qualify such Registrable Securities) and will reimburse, as incurred, each such Holder, each such Affiliate, each such underwriter and each such director, officer, trustee, employee, partner, manager, member, stockholder, beneficiary, Affiliate, agent and controlling Person, for any legal and any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action; provided, that the Company will not be liable in any such case to the extent, but only to the extent, that any such claim, loss, damage, liability or expense arises out of or is based on any untrue statement (or alleged untrue statement) or omission (or alleged omission) made in reliance upon and in conformity with written information furnished to the Company by such Holder, Affiliate or underwriter expressly for use therein.

(b)        Each Holder (if Registrable Securities owned by or issuable to such Holder are included in such registration, qualification or compliance pursuant to this Article VIII) does hereby undertake, to the fullest extent permitted by Applicable Law, severally and not jointly, to indemnify and hold harmless the Company, each of its officers, directors, employees, stockholders, Affiliates and agents and each Person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, each underwriter, if any, and each Person who controls any underwriter, of the Company's securities covered by such a Registration Statement, and each other Holder, each of such other Holder's Affiliates and each of such other Holder's and its Affiliates' respective officers, directors,

Execution Version

trustees, employees, partners, managers, members, stockholders, beneficiaries, Affiliates and agents and each Person, if any, who controls such Holder within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such Registration Statement, prospectus, offering circular, free writing prospectus or other document, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances in which they were made, and will reimburse, as incurred, the Company, each such underwriter, each such other Holder, each Affiliate of such other Holder, and each such officer, director, trustee, employee, partner, manager, member, stockholder, beneficiary, Affiliate, agent and Controlling Person of the foregoing, for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) was made in such Registration Statement, prospectus, offering circular, free writing prospectus or other document, in reliance upon and in conformity with written information furnished to the Company by such Holder expressly for use therein; provided, however, that the aggregate liability of each Holder hereunder shall be limited to the proceeds actually received by such Holder (after underwriting discounts and commissions received by such Holder) upon the sale of the Registrable Securities giving rise to such indemnification obligation.  It is understood and agreed that the indemnification obligations of each Holder pursuant to any underwriting agreement entered into in connection with any Registration Statement shall be limited to the obligations contained in this Section 8.5(b).

(c)     Each party entitled to indemnification under this Section 8.5 (the "Indemnified Party") shall give notice to the party required to provide such indemnification (the "Indemnifying Party") of any claim as to which indemnification may be sought promptly after such Indemnified Party has actual knowledge thereof, and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom; provided, that counsel for the Indemnifying Party, who shall conduct the defense of such claim or litigation, shall be subject to approval by the Indemnified Party (whose approval shall not be unreasonably withheld) and the Indemnified Party may participate in such defense at the Indemnifying Party's expense if representation of such Indemnified Party would be inappropriate due to actual or potential differing interests between such Indemnified Party and any other party represented by such counsel in such proceeding; provided further that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Article VIII, except to the extent that such failure to give notice materially prejudices the Indemnifying Party in the defense of any such claim or any such litigation.  An Indemnifying Party, in the defense of any such claim or litigation, may, without the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement that (i) includes as a term thereof the giving by the claimant or plaintiff therein to such Indemnified Party of an unconditional release from all liability with respect to such claim or litigation and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of such Indemnified Party, and provided that any sums payable in connection with such settlement are paid by the Indemnifying Party.

(d)     In order to provide for just and equitable contribution in case indemnification is prohibited or limited by law, the Indemnifying Party, in lieu of indemnifying such Indemnified Party, to the fullest extent permitted by Applicable Law, shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.  The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and such party's relative intent, knowledge, access to information and opportunity to correct or prevent such actions; provided, however, that, in any case, (i) no Holder will be required to contribute any amount in excess of the proceeds actually received by such Holder (after underwriting discounts and commissions received by such Holder) upon the sale of the Registrable Securities giving rise to such contribution obligation and (ii) no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(e)     The indemnities provided in this Section 8.5 shall survive the Transfer of any Registrable Securities by such Holder.

SECTION 8.6          Information by Holder.  Each Holder of Registrable Securities that are included in any registration shall furnish to the Company such information regarding itself and the distribution proposed by it as the Company may reasonably request in writing or as shall otherwise be required in connection with any registration, qualification or compliance referred to in this Article VIII.

SECTION 8.7          Assignment of Registration Rights.  Subject to Section 8.12, the rights of the Members contained in this Article VIII may be assigned by such Members in connection with any Transfer permitted under Article VI.

SECTION 8.8          Delay of Registration.  To the fullest extent permitted by Applicable Law, no Holder shall have any right to obtain, and hereby waives any right to seek, an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Article VIII.

SECTION 8.9          Limitations on Subsequent Registration Rights.  From and after the Closing Date, the Company shall not, without the approval of Members holding a majority of the Common Units, enter into any agreement with any owner or prospective owner of any Securities of the Company that would allow such owner or prospective owner to (i) require the Company to effect a registration or (ii) include any Securities in any registration filed under Section 8.2 hereof.

SECTION 8.10         Rule 144 and 144A.  The Company agrees that, upon the request of any Holder of Registrable Securities or any prospective purchaser of Registrable Securities

designated by a Holder, the Company shall promptly provide (but in any case within ten (10) days of a request) to such Holder or potential purchaser, the following information:

(a) a brief statement of the nature of the business of the Company and any subsidiaries and the products and services they offer;

(b) the most recent consolidated balance sheets and profit and losses and retained earnings statements, and similar financial statements of the Company for the two (2) most recent fiscal years (such financial information shall be audited, to the extent reasonably available); and

(c) such other information about the Company, any subsidiaries, and their business, financial condition and results of operations as the requesting Holder or purchaser of such Registrable Securities shall request in order to comply with Rule 144 and Rule 144A promulgated under the Securities Act, as amended, and in connection therewith the anti-fraud provisions of the federal and state securities laws.

The Company hereby represents and warrants to any such requesting Holder and any prospective purchaser of Registrable Securities from such Holder that the information provided by the Company pursuant to this Section 8.10 will, as of their dates, not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  The Company shall also make and keep adequate and current public information with respect to the Company available, as those terms are understood and defined in Rule 144(c)(1) or any similar or analogous rule promulgated under the Securities Act, at all times after the effective date of an Initial Public Offering.

SECTION 8.11        "Market Stand Off" Agreement.  Each Holder hereby agrees that, during (i) such period (which period shall in no event exceed one hundred and eighty (180) days) following the effective date of a Registration Statement of the Company filed in connection with the Initial Public Offering as recommended by the underwriter or underwriters of such offering and (ii) such period (which period shall in no event exceed ninety (90) days) following the effective date of a Registration Statement of the Company filed under the Securities Act subsequent to the Initial Public Offering as recommended by the underwriter or underwriters of such offering and/or the Company (if applicable) (such period, the "Lock-Up Period"), it shall not, to the extent requested by the Company and/or any underwriter, sell, pledge, hypothecate, Transfer, make any short sale of, loan, grant any option or right to purchase of, or otherwise Transfer or dispose of (other than to donees who agree to be similarly bound) any Registrable Securities owned by it at any time during such period, except Registrable Securities included in such registration; provided, that any release of Registrable Securities from such agreement shall be effected among the Holders on a *pro rata* basis according to the Registrable Securities then owned by them.  Each Holder agrees that it shall deliver to the underwriter or underwriters of any offering to which clause (i) or (ii) is applicable to such Holder a customary agreement reflecting its agreement set forth in this Section 8.11.

SECTION 8.12        Termination of Registration Rights.  The rights of any particular Holder under this Article VIII shall terminate as to such Holder on the date such Holder, together with its Affiliates, ceases to own five percent (5%) or more of the outstanding Common Units.

**Execution Version**

## ARTICLE IX

## INFORMATION RIGHTS

SECTION 9.1        Books and Records.  The Board shall cause the Company and its Subsidiaries to keep complete and accurate books of account and records with respect to the business and affairs of the Company and its Subsidiaries, including Schedule A, and to preserve all such books and records during the term of the Agreement and for a period of six (6) years thereafter.  During such period and upon furnishing reasonable advance notice, each Member and/or its authorized representatives, at its or their sole cost and expense, shall be permitted, at a location reasonably determined by the Company, to reasonably inspect and make copies of such books and records for any proper purpose and consistent with reasonable confidentiality restrictions imposed by the Company at any reasonable time during normal business hours.

SECTION 9.2        Fiscal Year.  The fiscal year of the Company shall end on December 31 of each calendar year.

SECTION 9.3        Accounting and Financial Matters.

(a)        All determinations, valuations and other matters of judgment required to be made for accounting or tax purposes under this Agreement shall be made by the Board and shall be conclusive and binding on all Members, their successors, heirs, estates or legal representatives and to any other Person, and to the fullest extent permitted by Applicable Law no such Person shall have the right to an accounting or appraisal of the assets of the Company or any successor thereto.

(b)        The Board shall consider and make all determinations regarding the preparation of financial statements of the Company and its Subsidiaries, including the format of such financial statements, whether such financial statements shall be audited or unaudited, the frequency upon which such financial statements shall be prepared and whether such financial statements shall be delivered or otherwise made available to the Members.

## ARTICLE X

## REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 10.1        Representations, Warranties and Covenants of Each of the Parties.  Each of the parties hereto hereby represents and warrants, severally, and not jointly and severally, and as to itself and not as to any other party, to each of the other parties that, on the Closing Date and on any subsequent date on which such representing party acquires Securities from the Company or any of its Subsidiaries (and in respect of Persons who become a party to this Agreement after the Closing Date, such party hereby represents and warrants to each of the other parties on the date of its execution of this Agreement or a Joinder Agreement and on any subsequent date on which such representing party acquires Securities from the Company or any of its Subsidiaries) as follows:

(a)     Such party is duly organized or incorporated, validly existing and in good standing under the laws of the jurisdiction of its organization or incorporation and has all requisite power and authority to conduct its business as it is now being conducted and is proposed to be conducted.

(b)     Such party has the requisite limited partnership, corporate, limited liability company or other organizational power and authority, as the case may be, to execute, deliver and perform this Agreement and to consummate the transactions contemplated herein.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action, corporate or otherwise, of such party.  This Agreement has been duly executed and delivered by such party and constitutes his, her or its legal, valid and binding obligation, enforceable against it, him or her in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and the availability of equitable remedies.

(c)     The execution and delivery by such party of this Agreement, the performance by such party of its obligations hereunder and the consummation of the transactions contemplated herein by such party does not and will not violate (i) any provision of its by-laws, charter, articles of association, partnership agreement, operating agreement, trust instrument or other similar document, (ii) any provision of any material agreement to which it is a party or by which it is bound or (iii) any law, rule, regulation, judgment, order or decree to which it is subject.

(d)     No consent, waiver, approval, authorization, exemption, registration, license or declaration is required to be made or obtained by such party in connection with the execution, delivery or enforceability of this Agreement or the consummation of any of the transactions contemplated herein.

(e)     Such party is not currently in violation of any law, rule, regulation, judgment, order or decree, which violation could reasonably be expected at any time to have a material adverse effect upon the Company and its subsidiaries, taken as a whole, or such party's ability to enter into this Agreement or to perform its obligations hereunder.

(f)     There is no pending legal action, suit or proceeding that would materially and adversely affect the ability of such party to enter into this Agreement or to perform its obligations hereunder.

(g)     Such party is an "accredited investor" as defined in Rule 501(a) of the Securities Act.

(h)     Such party is acquiring Securities for its own account for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of any Applicable Law, nor with any present intention of distributing or selling the same in violation of any Applicable Law.

(i)     Such party has been advised by the Company (or a Subsidiary thereof, if applicable) and understands that (i) the offer and sale of Securities to such party has not been registered under the Securities Act or any state "blue sky" laws; (ii) the Securities must be owned

indefinitely and such party must continue to bear the economic risk of an investment in the Securities unless the offer and sale of such Securities is subsequently registered under the Securities Act and all applicable state securities laws or an exemption from such registration is available; (iii) there is no established market for any of the Securities and it is not anticipated that there will be any public market for the Securities in the foreseeable future; and (iv) a notation shall be made in the appropriate records of the Company (or a Subsidiary thereof, if applicable) indicating that the Securities are subject to restrictions on Transfer and, if the services of a securities transfer agent are engaged in the future, appropriate stop-transfer instructions will be issued to such transfer agent with respect to the Securities.

(j)     Such party's financial situation is such that such party can afford to bear the economic risk of owning the Securities for an indefinite period of time, has adequate means for providing for such party's current needs and personal contingencies and can afford to suffer a complete loss of such party's investment in the Securities.

(k)     Such party's knowledge and experience in financial and business matters is such that such party is capable of evaluating the merits and risks of the investment in the Securities.

(l)     Such party understands that the Securities are a speculative investment which involves a high degree of risk of loss of some or all of such party's investment therein, there are substantial restrictions on the transferability of the Securities and, on the Closing Date and for an indefinite period following the Closing Date, there will be no public market for the Securities and, accordingly, it may not be possible for such party to liquidate any or all of such party's investment in case of emergency, if at all.

(m)     Such party and its respective advisors have been given the opportunity to examine all documents and to ask questions of, and to receive answers from, the Company and its representatives concerning the Company and its Subsidiaries, the Asset Purchase Agreement, the organizational documents (including this Agreement) of the Company and the terms and conditions of the acquisition of the Securities and to obtain any additional information which such party or its respective advisors deems necessary.

(n)     Such party has completed its independent investigation, verification, analysis, review and evaluation of the Company and its Subsidiaries, the organizational documents (including this Agreement) of the Company and the terms and conditions of the acquisition of the Securities, in each case, as such party has deemed necessary or appropriate, and has relied solely upon such independent investigation, verification, analysis, review and evaluation in determining whether to purchase Securities of the Company or enter into this Agreement.

(o)     All information such party has provided to the Company (or a Subsidiary thereof, if applicable) and the representatives of the Company (or a Subsidiary thereof, if applicable) concerning such party and such party's financial position is complete and correct in all material respects as of the date so provided.

(p)     Each Member hereby represents, warrants and covenants, severally, and not jointly and severally, and as to itself and not as to any other Member, to each of the other parties that, as of the date hereof and for so long as such Member holds any Units in the Company, no portion of the assets used by such party to acquire or hold the Units constitutes or will constitute the assets of (i) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA) which is subject to Title I of ERISA, (ii) a plan, individual retirement account or other arrangement which is subject to Section 4975 of the Code or any Similar Law (as defined below) or (iii) an entity which is deemed to hold the assets of any of the foregoing types of plans, accounts or arrangements for purposes of ERISA or otherwise.  Each such Member agrees to (x) notify the Board and the Company immediately if any representation or warranty contained in this Section 10.1(p) becomes untrue at any time and (y) provide such information and execute and deliver such documents with respect to itself as the Company may from time to time reasonably request to verify the accuracy of such Member's representations and warranties contained in this Section 10.1(p) and/or to comply with any law, regulation or governmental order to which the Company or any of its Affiliates may be subject; provided, that such Members will in no event be obligated to provide any information or execute and deliver such documents with respect to its direct and indirect beneficial owners.  "Similar Law" means any federal, state, local, non-U.S. or other law or regulation that would cause the underlying assets of the Company to be treated as assets of such Party by virtue of its interest in the Company and thereby subject the Company and the Board (or other persons responsible for the investment and operation of the Company's assets) to laws or regulations that are similar to the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the Code.

SECTION 10.2     Additional Representations, Warranties and Covenants of the Company.

(a)     The Company hereby represents, warrants and covenants to each of the Members that, as of the Closing Date:

(i)     The Company was newly formed for purposes of completing the transactions contemplated by the Asset Purchase Agreement and does not have any liabilities except as incurred in connection therewith or disclosed to the Members in writing.

(ii)     The Company is duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to conduct its business as it is now being conducted and is proposed to be conducted.

(iii)     The Company has the requisite limited liability company power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated herein.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action of the Company.  This Agreement has been duly executed and delivered by the Company and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and the availability of equitable remedies.

(iv)     Schedule A sets forth the names of the Members and their Units as of the Closing Date.  Except as otherwise set forth in this Agreement, the Company (A) does not have any authorized or outstanding subscription, warrant, option, convertible security or other right (contingent or otherwise) to purchase or acquire any of their Units, (B) is not committed to issue any subscription, warrant, option, convertible security or other such right or to issue or distribute to holders of any of its Securities any evidences of indebtedness or assets and (C) has no obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any of its Securities or any interest therein or to pay or make any distribution in respect thereof.

(v)     The execution and delivery by the Company of this Agreement, the performance by the Company of its obligations hereunder and the consummation of the transactions contemplated herein by the Company does not and will not violate (A) any provision of the Certificate, (B) any provision of any material agreement to which it is a party or by which it is bound or (C) any law, rule, regulation, judgment, order or decree to which it is subject.

(vi)     (A) There is no pending or, to the knowledge of the Company, threatened legal action, suit or proceeding that would materially and adversely affect the ability of the Company to enter into this Agreement or to perform its obligations hereunder and (B) there are no outstanding orders, writs, judgments, decrees, injunctions or settlements that would reasonably be expected to have a material adverse effect on the Company.

(vii)     No consent, waiver, approval, authorization, exemption, registration, license or declaration is required to be made or obtained by the Company in connection with the execution, delivery or enforceability of this Agreement or the consummation of any of the transactions contemplated hereby.

(b)     The Company shall promptly notify each Member if it determines that such Member's ownership of the Company, or indirect ownership of any Subsidiary of the Company, or any action or proposed action by the Company or any of its Subsidiaries, will likely give rise to any beneficial ownership reporting requirements of the Company or any Member under Sections 13(d) or 13(g) of the Exchange Act, or any other public disclosure or reporting requirements that require disclosure of the identity of any Member or any of its Affiliates, partners, or members.

(c)     In case of any filing or other transaction which would result in the Securities of the Company or the securities of any of its Subsidiaries being listed on any regulated stock exchange, the Company shall notify each Member at least thirty (30) days prior to such filing or other transaction and cooperate with, and take such actions as are reasonably requested by, such Member so that it can comply with and meet all restrictions and obligations applicable to it in connection with any such filing or other transaction.

**Execution Version**

## ARTICLE XI

## LIABILITY, EXCULPATION, INDEMNIFICATION

SECTION 11.1      <u>Liability</u>.  To the fullest extent permitted by Applicable Law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for the repayment, satisfaction or discharge of any portion of such debt, obligation or liability solely by reason of being a Covered Person.

SECTION 11.2      <u>Exculpation</u>.  No Covered Person shall be liable to the Company, any of its Subsidiaries, the Board, any Member or any creditor for any Claims and Expenses arising out of any act or omission of such Covered Person to the extent that such act or omission did not constitute Disabling Conduct.  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person believes are within such other Person's professional or expert competence and which such other Person the Covered Person believes has been selected with reasonable care, including information, opinions, reports or statements as to the value and amount of assets, liabilities, profits or losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

SECTION 11.3      <u>Indemnification</u>.  The Company and its Subsidiaries shall indemnify and hold harmless each of the Covered Persons from and against any and all liabilities, obligations, losses, damages, fines, taxes and interest and penalties thereon (other than income taxes and other taxes based on fees or other compensation received by such Covered Person from the Company), claims, demands, actions, suits, proceedings (whether civil, criminal, administrative, investigative or otherwise), costs, expenses and disbursements (including reasonable and documented legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever (collectively, "<u>Claims and Expenses</u>") which may be imposed on, incurred by or asserted at any time against such Covered Person by reason of its status as a Covered Person, including that is in any way related to or arising out of the ownership of Securities, the control of, or ability to influence, the Company or any of its Subsidiaries or the management or administration of the Company and its Subsidiaries (if applicable) or the activities of such Covered Person pursuant to this Agreement or otherwise on behalf of the Company and its Subsidiaries; <u>provided</u>, that a Covered Person shall not be entitled to indemnification hereunder (a) against Claims and Expenses that are finally determined by a court of competent jurisdiction or binding arbitration to have resulted from such Covered Person's Disabling Conduct, or (b) to the extent such Claims and Expenses arise out of any economic losses or tax obligations incurred by a Covered Person as a result of its owning Securities of the Company.

SECTION 11.4      <u>Exception to Right of Indemnification</u>.  Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnity or pay any expenses (in advance or otherwise) in connection with any claim made against a Covered Person in the following circumstances:

41

(a)      for which payment has actually been made to or on behalf of such Covered Person under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision; provided, that the foregoing provisions of this clause (a) shall not affect the rights of a Covered Person or the Sponsor Indemnitors set forth in Section 11.7(d);

(b)      for an accounting of profits made from the purchase and sale (or sale and purchase) by any Covered Person of Securities within the meaning of Section 16(b) of the Exchange Act or similar provisions of state statutory law or common law; or

(c)      in connection with any claim, demand, action, suit or proceeding (or any part thereof) initiated by such Covered Person, including any claim, demand, action, suit or proceeding (or any part thereof) initiated by a Covered Person against the Company or against any other Covered Person (in its capacity as such), unless (i) the Board authorized the claim, demand, action, suit or proceeding (or such relevant part thereof) prior to its initiation or (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under Applicable Law.

SECTION 11.5      Advancement of Expenses.  Subject to Section 11.4, the Company shall pay the expenses (including reasonable legal fees and expenses and costs of investigation) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding (other than a claim, demand, action, suit or proceeding brought by the Company against (i) a Member for such Member's material breach or violation of this Agreement or (ii) an employee of the Company or any of its Subsidiaries for such employee's material breach or violation of his or her employment agreement, as such expenses are incurred by such Covered Person and in advance of the final disposition of such matter); provided, that such Covered Person undertakes to repay such expenses if it is determined by agreement between such Covered Person and the Company or, in the absence of such an agreement, by a final judgment of a court of competent jurisdiction that such Covered Person is not entitled to be indemnified pursuant to Section 11.3.

SECTION 11.6      Notice of Proceedings.  Promptly after receipt by a Covered Person of notice of the commencement of any claim, demand, action, suit or proceeding against such Covered Person, such Covered Person shall, if a claim for indemnification in respect thereof is to be made against the Company, give written notice to the Board of the commencement of such claim, demand, action, suit or proceeding; provided, that the failure of a Covered Person to give notice as provided herein shall not relieve the Company of its obligations under Section 11.3 and Section 11.5 except to the extent that the Company is materially prejudiced by such failure to give timely notice.  In case any such claim, demand, action, suit or proceeding is brought against a Covered Person in his, her or its capacity as a current or former Member (other than a claim, demand, action, suit or proceeding by or in the right of the Company), the Company will be entitled to assume the defense of such proceeding; provided, that (i) the Covered Person shall be entitled to participate in such proceeding and to retain its own counsel at its own expense and (ii) if the Covered Person has been advised by its counsel that the proposed representation of such Covered Person and other parties by the same counsel in such matter would be inappropriate under applicable standards of professional conduct due to actual or potential conflicts of interest between the Covered Person and such other parties with respect to such matter, then the Covered Person shall have the right to control (at its own expense and with

counsel reasonably satisfactory to the Company) the defense of such specific claims with respect to the Covered Person (but not with respect to the Company or any other Person); provided, further, that no Covered Person shall consent to the entry of a judgment or enter into a settlement that would require the Company to pay any amounts under this Article XI without the prior written consent of the Company, such consent not to be unreasonably withheld.  After notice from the Company to such Covered Person electing to assume the defense of such claim, demand, action, suit or proceeding, the Company will not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof.  Without the consent of such Covered Person, such consent not to be unreasonably withheld, the Company will not consent to the entry of any judgment or enter into any settlement with respect to such claim, demand, action, suit or proceeding that does not include as a term thereof the giving by the claimant or plaintiff to such Covered Person of an unconditional release from all liability arising out of the claim, demand, action, suit or proceeding and all claims asserted therein.

SECTION 11.7    Non-Exclusivity; Survival of Rights; Primacy of Indemnification; Subrogation.

(a)    The rights of indemnification as provided by this Agreement are not intended to be and shall not be deemed to be exclusive of any other rights to which a Covered Person may at any time be entitled under Applicable Law, any agreement, a vote of the Members, a resolution of the Board or otherwise.  No amendment, alteration or repeal of this Agreement or of any provision of this Article XI shall limit or restrict any right of a Covered Person under this Article XI in respect of any action taken or omitted by such Covered Person in his, her or its capacity as such prior to such amendment, alteration or repeal.  No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b)    Except as provided in clause (d) below, in the event of any payment under this Article XI, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of the Covered Person, who shall execute all papers required and take all action necessary to secure such rights for the Company, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

(c)    Except as provided in clause (d) below, the Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder if and to the extent that a Covered Person has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

(d)    The Company hereby acknowledges that certain Covered Persons may have rights to indemnification, advancement of expenses and/or insurance provided by an Affiliated or otherwise related investment fund or investment manager or certain Affiliates of such investment fund or investment manager (collectively, the "Sponsor Indemnitors").  The Company hereby agrees (i) that the Company is the indemnitor of first resort with respect to matters that are the subject of indemnification or advancement of expenses under this Article XI

43

except to the extent that indemnification is available to a Covered Person from another Subsidiary of the Company, in which case such other Subsidiary shall be the indemnitor of first resort if the arrangements with such other Subsidiary so provide (i.e., the Company's obligations to a Covered Person pursuant to this Article XI are primary to any obligation to such Covered Person from the Sponsor Indemnitors, and any obligation of the Sponsor Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such Covered Person are secondary to such obligations of the Company), (ii) that the Company shall be required to advance the full amount of expenses incurred by the Covered Persons and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by this Agreement (or any other agreement between the Company and the Covered Person), without regard to any rights a Covered Person may have against the Sponsor Indemnitors (except to the extent that any such advancement or payment is available to a Covered Person from another Subsidiary of the Company, in which case such Subsidiary shall be responsible for such advancement if the arrangements with such Subsidiary so provide), and (iii) that the Company irrevocably waives, relinquishes and releases the Sponsor Indemnitors from any and all claims against the Sponsor Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Sponsor Indemnitors on behalf of any Covered Person with respect to any claim for which a Covered Person has sought indemnification and/or advancement or payment of expenses from the Company shall affect the foregoing and the Sponsor Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Covered Person against the Company. The Company agrees that the Sponsor Indemnitors are express third party beneficiaries of the terms of this Section 11.7(d).

## ARTICLE XII

## DISSOLUTION; WINDING UP

SECTION 12.1     Dissolution.  The Company shall be dissolved and its affairs shall be wound up upon a determination by the Board to dissolve the Company at any time.  The death, termination, retirement, dissolution, resignation, expulsion or bankruptcy of any Member shall not cause the dissolution of the Company, and following any such event the remaining Members shall continue the business of the Company.  The Company shall not be dissolved as result of there no longer being any Members of the Company if the Company is continued in accordance with Section 18-801(a)(4) of the Act.  The Members (in their capacity as such) and Managers (in their individual capacity as such but not in their collective capacity as the Board) hereby waive any rights to, and shall not petition for, judicial dissolution of the Company under Section 18-802 of the Act and any rights to petition or apply for the appointment of a liquidator, receiver or trustee under the Act or otherwise.

SECTION 12.2     Winding Up.  If the Company is dissolved pursuant to Section 12.1, the Board has the full right and discretion to manage such process, including without limitation the power to prosecute and defend suits, collect debts, dispose of property, settle and close the business of the Company, discharge the liabilities of the Company, pay reasonable costs and expenses incurred in the winding up, distribute remaining assets to Members (in accordance with Section 5.1) and execute and file a certificate of cancellation under the Act.

Execution Version

SECTION 12.3        Order of Distribution.  Upon any dissolution and winding up of the Company, after satisfaction (whether by payment or the making of reasonable provision for payment thereof) of any liabilities (including all contingent, conditional or unmatured claims) of the Company owed to any creditors, including any Members who are creditors (to the fullest extent permitted by Applicable Law), any remaining assets of the Company shall be paid to each of the Members in accordance with Section 5.1.

SECTION 12.4        No Resignation or Removal.  No Member has the right to resign as a Member of the Company and require repayment of all or any portion of the purchase price for its Units (if any) or redeem its Units, except in each case, in the event of the dissolution and winding up of the Company as provided in this Article XII.

ARTICLE XIII

MISCELLANEOUS

SECTION 13.1        Confidentiality.

(a)        By executing this Agreement, each Member expressly agrees, at all times during the term of the Company and thereafter and whether or not at the time such Person is a Member of the Company, to maintain the confidentiality of, and not to disclose, without the consent of the Company, to any Person other than its Affiliates (who agree to be bound or are bound by confidentiality), any direct or indirect limited partner or any current or prospective investor (in each case, who agrees to be bound or are bound by confidentiality), the Company, another Member, a Person designated by the Company or any of their respective financial planners, accountants, attorneys or other advisors (who agree to be bound or are bound by confidentiality), any information relating to the business, financial results or customers of the Company that is not generally known to the public, except in each case as otherwise required by Applicable Law or judicial or administrative process or by any regulatory or self- regulatory organization having jurisdiction and, except in the case of any Member who is employed by any entity controlled by the Company, in the ordinary course of his duties.

(b)        The Company shall not make, or allow any of its Subsidiaries to make, any public announcement, public disclosure or governmental filing that mentions any Member or beneficial owner of any Member without first notifying such Member and giving such Member a reasonable opportunity to review and comment on such announcement, disclosure or filing.

SECTION 13.2        Notices.  Whenever notice is required or permitted by this Agreement to be given, such notice shall be in writing (including facsimile or similar writing) and shall be given, if to any Member, at its address, facsimile number or email address shown in Schedule A or, if to the Company, at the following address:

Secure Natural Resources LLC
c/o JHL Capital Group LLC
900 N. Michigan Avenue
Suite 1700

45

**Execution Version**

Chicago, IL 60611
Attention:  Chairman

Each such notice shall be effective and shall be deemed to have been delivered (i) if given by facsimile or email, upon dispatch, (ii) if given by mail, three (3) days after it is deposited in the mails (first class or airmail postage prepaid) addressed as aforesaid, (iii) if given by courier, upon the earlier of actual delivery and one (1) day after deposit with a nationally recognized overnight courier specifying next day delivery and (iv) if given by any other means, when delivered to the address of such Member or the Company, as the case may be, specified as aforesaid.

SECTION 13.3        Amendments and Waivers.

(a)        Except as otherwise provided herein, this Agreement may be amended or any terms or conditions of this Agreement waived only pursuant to a written instrument approved by the Board and signed by the Company and Members holding at least a majority of the outstanding Common Units.  Notwithstanding the foregoing, it is agreed that any amendment providing rights to purchasers of any additional Common Units or other Securities of the Company, and the effect of admitting such purchasers as members of the Company, shall not require the consent of any Member.

SECTION 13.4        Governing Law.  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.  In the event of a direct conflict between the provisions of this Agreement and any mandatory provision of the Act, the applicable provision of the Act shall control.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances are not affected thereby and that provision shall be enforced to the greatest extent permitted by Applicable Law.

SECTION 13.5        Jury Trial.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 13.6        Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and the rights and obligations hereunder may not be assigned except to the extent permitted hereunder in connection with a Transfer of Units.

SECTION 13.7        Entire Agreement.  This Agreement and the other documents and agreements referred to herein or entered into concurrently herewith embody the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein; provided, that such other agreements and documents shall not be deemed to be a part of, a modification of or an amendment to this Agreement.  There are no restrictions, promises, representations, warranties, covenants or undertakings with respect to the subject matter

46

contained herein, other than those expressly set forth or referred to herein.  This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter, including the Credit Bid Agreement (except that, in accordance with Section 3.1 of this Agreement, the provisions of Section 3(b) of the Credit Bid Agreement shall continue to apply until the obligations of the Company contained therein have been discharged in accordance therewith).

SECTION 13.8       <u>No Effect Upon Lending Relationships</u>.  Notwithstanding anything contained in other paragraphs and sections of this Agreement to the contrary, (a) nothing contained in this Agreement shall affect, limit or impair the rights and remedies of the Members or any of their respective Affiliates, funding or financing sources or any other lenders in each case in their capacities as lenders to the Company or any of its Subsidiaries and, (b) without limiting the generality of the foregoing, none of the Members or their Affiliates, in exercising its rights as a lender, including making its decision on whether to foreclose on any collateral security, shall have any duty to consider (i) its (or the applicable Member's) status as a holder of Units of the Company, as a Member of the Company or otherwise, (ii) the interests of the Company or any of its Subsidiaries (except to the extent required under any applicable credit or similar agreement or by commercial law applicable to creditors generally) or (iii) any duty it may have to any other Member of the Company or holder of Units of the Company.

SECTION 13.9       <u>Counterparts</u>.  This Agreement (including the Joinder Agreement) may be executed in any number of counterparts, all of which together shall constitute a single instrument.

SECTION 13.10       <u>Section Titles</u>.  Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text hereof.

SECTION 13.11       <u>Severability</u>.  The provisions hereof shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision hereof, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

SECURE NATURAL RESOURCES LLC

By: _____

Name:

Title:     James H. Litinsky
           Authorized Signatory

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**JHL CAPITAL GROUP HOLDINGS ONE LLC**

By: _____
Name:        James H. Litinsky
Title:        **Authorized Signatory**

**QVT FUND V LP**

By: _____
Name:
Title:

**QVT FUND IV LP**

By: _____
Name:
Title:

**QUINTESSENCE FUND L.P.**

By: _____
Name:
Title:

SIGNATURE PAGE TO LIMITED LIABILITY COMPANY AGREEMENT

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**JHL CAPITAL GROUP HOLDINGS ONE LLC**

By: _____
Name:
Title:

**QVT FUND V LP**

By: _____
Name:
Title:

**QVT FUND IV LP**

By: _____
Name:
Title:

**QUINTESSENCE FUND L.P.**

By: _____
Name:
Title:

**Execution Version**

## SCHEDULE A

### LIST OF MEMBERS AND UNITS

| Name and Address | Common Units |
|---|---|
| JHL Capital Group Holdings One LLC<br>900 N. Michigan Avenue, Suite 1340, Chicago, IL 60611 | 298,438.960 |
| QVT Fund V LP<br>1177 Avenue of the Americas, 9th Floor, New York, NY 10036 | 47,097.050 |
| QVT Fund IV LP<br>1177 Avenue of the Americas, 9th Floor, New York, NY 10036 | 10,718.131 |
| Quintessence Fund L.P.<br>1177 Avenue of the Americas, 9th Floor, New York, NY 10036 | 6,125.215 |
| **TOTAL** | **362,379.360** |

SCHEDULE A

## <u>EXHIBIT A</u>

### Form of Joinder Agreement

The undersigned is executing and delivering this Joinder Agreement pursuant to the Limited Liability Company Agreement of Secure Natural Resources LLC, a Delaware limited liability company, dated as of April 15, 2016, as amended, supplemented or otherwise modified in accordance with the terms thereof (the "<u>LLC Agreement</u>").  Capitalized terms used but not defined in this Joinder Agreement shall have the respective meanings ascribed to them in the LLC Agreement.

By executing and delivering this Joinder Agreement to the LLC Agreement, the undersigned hereby agrees to be admitted as a member of the Company and to become a party to, to be bound by, and to comply with all of the provisions of the LLC Agreement in the same manner as if the undersigned were an original signatory to such agreement as a Member.  In connection therewith and without limiting the foregoing, effective as of the date hereof the undersigned hereby makes the representations and warranties contained in the LLC Agreement.

Accordingly, the undersigned has executed and delivered this Joinder Agreement as of the ____ day of _____, 20___.

_____

Signature of Member


_____

Print Name of Member


_____

_____

_____

Address of
Member


Acknowledged and accepted:

SECURE NATURAL RESOURCES LLC


By:_____
     Name:
     Title:

Exhibit A

Confidential

## AMENDMENT NO. 1 TO THE LIMITED LIABILITY COMPANY AGREEMENT

Amendment No. 1 to the Limited Liability Company Agreement of Secure Natural Resources LLC (the "Company"), dated as of July 14, 2016 (the "Amendment"), is entered into by and among the Company and all of the Members of the Company (collectively, "Parties", and each, a "Party").

WHEREAS, the Parties have entered into the Limited Liability Company Agreement of the Company, dated April 15, 2016 (the "Existing Agreement");

WHEREAS, pursuant to Section 4.2(c) of the Existing Agreement, not later than 90 days after the Closing Date, the Board is required to determine the length of the term of office of each Manager, including whether the Managers should be divided into more than one class; and.

WHEREAS, pursuant to a duly convened meeting of the Board, the Board has approved the amendments to the Existing Agreement contemplated herein.

NOW, THEREFORE, in consideration of the premises set forth above and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Definitions. Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the Existing Agreement.

2. Amendments to the Existing Agreement. As of the Effective Date (defined below), the Existing Agreement is hereby amended or modified as follows:

(a) Section 4.2(c) of the Existing Agreement is hereby amended in its entirety to read as follows:

"(c) Classes of Managers/Resignation/Removal/Vacancy. The Board shall be and is divided into three classes, as nearly equal in number as possible, designated: Class I, Class II and Class III. In case of any increase or decrease, from time to time, in the number of Managers, the number of Managers in each class shall be apportioned as nearly equal as possible. No decrease in the number of Managers shall shorten the term of any incumbent Manager. Class I will initially be comprised of Jared Carney. Class II will initially be comprised of John Park and William R. Klesse. Class III will initially be comprised of James Litinsky and Randall Weisenburger.

Each Manager shall serve for a term ending on the date of the third annual meeting following the annual meeting of Members at which such Manager was elected; provided, that each Manager initially appointed to Class I shall serve for an initial term expiring at the Company's first annual meeting of Members following the effectiveness of this provision; each Manager initially appointed to Class II shall serve for an initial term expiring at the Company's second annual meeting of Members following the effectiveness of this provision; and each Manager initially appointed to Class III shall serve for an initial term expiring at the Company's third annual meeting of Members following the effectiveness of this provision; provided, further, that the term of each Manager shall continue until the election and qualification of a successor and be subject to such Manager's earlier death, resignation or removal. For purposes of determining the term of a Manager, any action by written consent to elect Managers in lieu of an annual meeting shall be deemed an "annual meeting".

The annual meeting of Members for the election of Managers shall be held at such date, time and place as shall be determined by the Board pursuant to Section 3.3(a)(ii); provided, that Managers may be elected by written consent of the Members pursuant to Section 3.3(b) in lieu of an annual meeting of Members; provided, further, that the Board shall hold an annual meeting of Members for the election of Managers no later than 13 months after the latest to occur of the Closing Date, the last annual meeting or the last action by written consent to elect Managers in lieu of an annual meeting.

Unless otherwise determined by the Board, any vacancies on the Board may be filled only by the vote or written consent of the Board. No Manager may be removed, with or without cause, by a vote or written consent of the Members."

3.    Date of Effectiveness; Limited Effect. This Amendment will become effective on the date first written above (the "Effective Date"). Except as expressly provided in this Amendment, all of the terms and provisions of the Existing Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the Parties. Without limiting the generality of the foregoing, the amendments contained herein will not be construed as an amendment to or waiver of any other provision of the Existing Agreement or as a waiver of or consent to any further or future action on the part of either Party that would require the waiver or consent of the other Party. On and after the Effective Date, each reference in the Existing Agreement to "this Agreement," "the Agreement," "hereunder," "hereof," "herein" or words of like import, and each reference to the Existing Agreement in any other agreements, documents or instruments executed and delivered pursuant to, or in connection with, the Existing Agreement will mean and be a reference to the Existing Agreement as amended by this Amendment.

4.      Miscellaneous.

(a)     This Amendment is governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflict of laws provisions of such State.

(b)     This Amendment shall inure to the benefit of and be binding upon each of the Parties and each of their respective successors and assigns.

(c)     The headings in this Amendment are for reference only and do not affect the interpretation of this Amendment.

(d)     This Amendment may be executed in counterparts, each of which is deemed an original, but all of which constitutes one and the same agreement. Delivery of an executed counterpart of this Amendment electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Amendment.

(e)     This Amendment constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the date first written above.

SECURE NATURAL RESOURCES
LLC

By_____

Name: James H. Litinsky
Title: Manager

JHL CAPITAL GROUP HOLDINGS
ONE LLC

By_____

Name: James H. Litinsky
Title: Authorized Signatory

QVT FUND V LP                        by its general partner
                                     QVT Associates GP LLC

By_____

Name:
Title:

QVT FUND IV LP                       by its general partner
                                     QVT Associates GP LLC

By_____

Name:
Title:

QUINTESSENCE FUND L.P.               by its general partner
                                     QVT Associates GP LLC

By_____

Name:
Title:

4

**ANNEX B**

Confidential

**SECURE NATURAL RESOURCES LLC**

**UNIT PURCHASE AGREEMENT**

## SECURE NATURAL RESOURCES LLC

## UNIT PURCHASE AGREEMENT

THIS UNIT PURCHASE AGREEMENT (this "Agreement") is made as of [●], 2016, by and among Secure Natural Resources LLC, a Delaware limited liability company, (the "Company") and the investors listed on Schedule A hereto, each of which is referred to herein as an "Investor".

The Investors are Eligible Purchasers (as such term is defined in the Confidential Offering Memorandum (as defined below)) who have provided irrevocable commitments to purchase common units of the Company (the "Common Units") by the Deadline (as defined in the Confidential Offering Memorandum).

As used herein, the "Confidential Offering Memorandum" means the Confidential Offering Memorandum dated as of August 2, 2016 and relating to the offering of the Common Units.

As used herein, "Lead Investors" means (i) JHL Capital Group Holdings One LLC, (ii) QVT Fund V LP, (iii) QVT Fund IV LP, and (iv) Quintessence Fund L.P.

THE PARTIES HEREBY AGREE AS FOLLOWS:

1.  Purchase and Sale of Common Units.  Subject to the terms and conditions of this Agreement:

1.1  Sale and Issuance of Common Units.  Each Investor agrees, severally and not jointly, to purchase at the Closing, and the Company agrees to sell and issue to such Investor at the Closing, the number of Common Units set forth across from such Investor's name on Schedule A to this Agreement, for a purchase price of $1.00 per unit, for an aggregate purchase price set forth on Schedule A across from such Investor's name (it being understood and agreed that the number of Common Units and the aggregate purchase price set forth on Schedule A across from such Investor's name in respect of such Common Units shall be filled in by the Company at the Closing based on each Investor's election, as set forth in the "Indication of Investment Interest" included in the Subscription Materials provided by the Company to such Investor relating to the subscription for the Common Units pursuant to this Agreement (the "Subscription Materials") (which election shall be adjusted by the Company after the application of the pro-rations and limitations described in the Confidential Offering Memorandum.

1.2  Closing.

(a)  The purchase and sale of the Common Units (the "Closing") shall take place at the offices of the Company, at 10:00 a.m. (New York City time), on [●], 2016 or at such other time and place as the Company and the Lead Investors mutually agree in writing (the "Closing Date").

(b)      Promptly following the Closing, the Company shall deliver to each Investor the Common Units that such Investor is purchasing in uncertificated form, which shall be duly registered on the books of the Company and duly recorded in the Limited Liability Company Agreement of the Company, dated as of April 15, 2016 (as thereafter amended, amended and restated, supplemented or otherwise modified, the "<u>LLC Agreement</u>") against payment of the purchase price therefor by wire transfer of immediately available funds.

1.3     <u>LLC Agreement</u>.  With respect to each Investor who is a signatory to this Agreement and who is not already a member of the Company, such Investor shall also sign and deliver at the Closing the Joinder Agreement to the LLC Agreement (the "<u>Joinder Agreement</u>") included in the Subscription Materials accompanying the Confidential Offering Memorandum (it being understood and agreed that if such Investor does not sign and deliver at the Closing the Joinder Agreement, the Company shall have no obligation to sell or issue any Common Units to such Investor and the Company may consummate the Closing with respect to all other Investors who have satisfied such obligation except for such Investor).  This Agreement and the Joinder Agreement are referred to herein, collectively, as the "<u>Transaction Documents</u>".

2.      <u>Representations and Warranties of the Company</u>.  The Company hereby represents and warrants to each Investor that:

2.1     <u>Organization</u>.   The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted.

2.2     <u>Authorization</u>.  The Company has all requisite power and authority to execute and deliver and perform its obligations under this Agreement and to consummate the transactions contemplated by this Agreement in all material respects.  The Company's execution and delivery of, and performance of its obligations under, this Agreement have been duly and validly authorized by all requisite action on the part of the Company, and this Agreement constitutes, or upon its execution and delivery will constitute, a valid and binding obligation of the Company enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and subject to general principles of equity that restrict the availability of equitable remedies.

2.3     <u>Non-Contravention</u>. The Company's execution and delivery of and performance of its obligations under this Agreement, and the consummation of the transactions contemplated hereby will not (a) violate any law applicable to the Company, (b) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default or give rise to any right of termination, cancellation or acceleration under any provision of its organizational documents or any contract, to which it is a party or by which it or its assets or properties is bound or (c) require the Company to make or provide any notice to, declaration or filing with, or obtain any consent, authorization, permit or approval from, any governmental authority.

2.4     <u>Valid Issuance</u>.  The Common Units that are being purchased by each Investor hereunder, when issued, sold and delivered in accordance with the terms of this

Agreement for the consideration expressed herein, will be duly and validly issued, fully paid, and nonassessable, and will be free of restrictions on transfer other than restrictions on transfer under this Agreement, the LLC Agreement and under applicable state, federal and foreign securities laws.

      2.5   <u>Subsidiaries</u>. Except for SNR Patented Holdings LLC, the Company does not, directly or indirectly, own, of record or beneficially, any outstanding voting securities or other equity interests in any corporation, partnership, joint venture or other entity.

      2.6   <u>Offering / Registration</u>.  Assuming the truth and accuracy of the representations of the Investors in <u>Section 3</u>, the offering, sale, and issuance of the Common Units will be exempt from registration under the Securities Act under the Securities Act of 1933, as amended (the "<u>Securities Act</u>") and applicable state securities laws and the rules and regulations promulgated thereunder, and the Company will not be under any obligation to register any of its Common Units pursuant to the Securities Act.

      2.7   <u>Brokers</u>.  Neither the Company nor any of its affiliates, officers, directors, managers, equity holders or employees has employed any broker, finder or agent or incurred any actual or potential liability or obligation, whether direct or indirect, for any brokerage fees, commissions, finders' fees or agents' fees in connection with the transactions contemplated by this Agreement.

      2.8   <u>No Other Representations and Warranties</u>. Except for the representations and warranties contained in this <u>Section 2</u>, neither the Company nor any other person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Company furnished or made available to the Investors or their representatives (including the Confidential Offering Memorandum, and any information, documents or material made available to the Investors in any form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Company, or any representation or warranty arising from statute or otherwise in law.

      3.   <u>Representations and Warranties of the Investors</u>.  Each Investor hereby severally represents and warrants to the Company that:

      3.1   <u>Organization</u>.  Such Investor, to the extent not an individual, is duly organized, validly existing and in good standing under the laws of the state of its organization and has all requisite power and authority to carry on its business as now conducted.

      3.2   <u>Authorization</u>.  Such Investor has all requisite power and authority to execute and deliver and perform its obligations under this Agreement and the Transaction Documents to which such Investor is a party and to consummate the transactions contemplated by this Agreement and the Transaction Documents in all material respects.  Such Investor's execution and delivery of, and performance of its obligations under, this Agreement and the Transaction Documents to which it is a party have been duly and validly authorized by all requisite action on the part of such Investor, and this Agreement and each such Transaction Document constitutes, or upon its execution and delivery will constitute, a valid and binding

obligation of such Investor enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and subject to general principles of equity that restrict the availability of equitable remedies.

        3.3    <u>Non-Contravention</u>. Such Investor's execution and delivery of and performance of its obligations under this Agreement and the Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby will not (a) violate any law applicable to such Investor, (b) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default or give rise to any right of termination, cancellation or acceleration under any provision of its organizational documents (in case of an entity) or any contract, to which it is a party or by which it or its assets or properties is bound or (c) require Investor to make or provide any notice to, declaration or filing with, or obtain any consent, authorization, permit or approval from, any governmental authority.

        3.4    <u>Purchase Entirely for Own Account</u>.  This Agreement is made with such Investor in reliance upon such Investor's representation to the Company, which by such Investor's execution of this Agreement such Investor hereby confirms, that the Common Units purchased by such Investor will be acquired for investment for such Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same.  By executing this Agreement, such Investor further represents that such Investor does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Common Units.

        3.5    <u>Disclosure of Information</u>.  Such Investor represents that it has had an opportunity to ask questions and receive satisfactory answers from the Company regarding the terms and conditions of the offering of the Common Units and the business, properties, results of operations, prospects and financial condition of the Company.  The foregoing, however, does not limit or modify the representations and warranties of the Company in <u>Section 2</u> of this Agreement or the right of the Investor to rely thereon.

        3.6    <u>Investment Experience</u>.  Such Investor is an investor in securities of similarly situated companies and acknowledges that it is able to fend for itself, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Common Units.  If other than an individual, Investor also represents it has not been organized for the purpose of acquiring the Common Units.

3.7     Accredited Investor; Non-U.S. Person. Such Investor is an "accredited investor" within the meaning of Securities and Exchange Commission ("SEC") Rule 501 of Regulation D, as presently in effect.

3.8     No Public Market. Such Investor understands that no public market now exists for the Common Units, and that there can be no assurance that a public market will ever exist for the Common Units.

3.9     Restricted Securities. Such Investor understands that the Common Units it is purchasing are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Securities Act, only in certain limited circumstances. In this connection, such Investor represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

3.10     Further Limitations on Disposition. Without in any way limiting the representations set forth above, such Investor further agrees not to make any disposition of all or any portion of the Common Units unless and until the transferee has agreed in writing for the benefit of the Company to be bound by this Section 3 and the LLC Agreement provided and to the extent this Section and such agreement are then applicable, and:

(i)     there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(ii)     such Investor shall (A) have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition and (B) if reasonably requested by the Company, such Investor shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company that such disposition will not require registration of such units under the Securities Act.

3.11     Brokers. Neither such Investor nor any of its affiliates, officers, directors, managers, equity holders or employees has employed any broker, finder or agent or incurred any actual or potential liability or obligation, whether direct or indirect, for any brokerage fees, commissions, finders' fees or agents' fees in connection with the transactions contemplated by this Agreement.

4.     Conditions of Investors' Obligations at Closing. The obligations of the Investors under Section 1.1 of this Agreement are subject to the fulfillment on or before the Closing of each of the following conditions, which may be waived as to all Investors by consent of the Lead Investors:

4.1     Representations and Warranties. The representations and warranties of the Company contained in Section 2 shall be true and correct in all material respects on and as of the

Closing with the same effect as though such representations and warranties had been made on and as of such Closing.

        4.2   <u>Performance</u>.  The Company shall have performed and complied in all material respects with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing.

        4.3   <u>Qualifications</u>.

        (a)   All authorizations, approvals, or permits, if any, of any governmental authority or regulatory body that are required in connection with the lawful issuance and sale of the Common Units pursuant to this Agreement shall be duly obtained and effective as of the Closing.

        (b)   The board of managers of the Company shall have approved and authorized this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

        4.4   <u>Proceedings and Documents</u>.  All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall have been performed, and the Lead Investors shall have received all such counterpart original and certified or other copies of such documents as they may reasonably request.

        4.5   <u>Absence of Proceedings</u>.  There shall not be any instituted or pending action or proceeding before governmental authority, challenging or seeking to invalidate, make illegal or otherwise directly or indirectly restrain or prohibit, the consummation of the transactions contemplated by this Agreement or the other Transaction Documents or seeking to obtain material damages in connection with such transactions.

        5.   <u>Conditions of the Company's Obligations at Closing</u>.  The obligations of the Company under <u>Section 1.1</u> of this Agreement are subject to the fulfillment on or before the Closing of each of the following conditions by the Investors, the waiver of which shall not be effective against the Company unless it consents thereto:

        5.1   <u>Representations and Warranties</u>.  The representations and warranties of the Investors contained in <u>Section 3</u> shall be true and correct in all material respects on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the Closing.

        5.2   <u>Performance</u>.  The Investors shall have performed and complied in all material respects with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by him, her or it on or before the Closing.

        5.3   <u>Payment of Purchase Price</u>.  All Investors shall have delivered the respective purchase prices set forth on <u>Schedule A</u> hereto in full.

5.4     Qualifications; Approvals.

(a)     All authorizations, approvals, or permits, if any, of any governmental authority or regulatory body that are required in connection with the lawful issuance and sale of the Common Units pursuant to this Agreement shall be duly obtained and effective as of the Closing.

(b)     The board of managers of the Company shall have approved and authorized this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

6.     Termination.

6.1     Termination.  This Agreement shall terminate prior to Closing:

(a)     upon the mutual written consent of the Company and the Lead Investors; or

(b)     by either the Company or either Lead Investor by written notice to the Company if the Closing does not occur on or prior to September 30, 2016.  Upon the request of the Company, the Lead Investors shall have the right to extend the aforesaid date for additional periods.

6.2     Effect of Termination.   If this Agreement is terminated pursuant to Section 6.1, all further obligations of the parties under this Agreement shall become null and void and of no further force or effect, except that (i) Section 7 and any confidentiality undertaking with respect to this Agreement by any party shall survive and continue to be in force and effect, and (ii) nothing herein shall relieve any of the parties from liability in connection with any breach of this Agreement prior to the date of termination.

7.     Miscellaneous.

7.1     Survival of Warranties.  The warranties, representations and covenants of the Company and the Investors contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing for a period of twelve (12) months and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of the Investors or the Company; provided, however, that (i) the representations and warranties of the Company set forth in Section 2.1 (Organization), Section 2.2 (Authorization), Section 2.4 (Valid Issuance) and Section 2.7 (Brokers) shall survive until ninety-one (91) days after the applicable statute of limitations for such matters.

7.2     Successors and Non-Assignability.  Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; provided that no Investor shall be entitled to assign this Agreement without the consent of the Company.  Any purported assignment in contravention of this Section 7.2 shall be null and void.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective

7

successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

7.3    Governing Law.   This Agreement shall be governed by and construed under the laws of the State of New York without giving effect to its conflicts of law provisions.

7.4    Jury Trial.    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7.5    Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7.6    Titles and Subtitles.   The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

7.7    Notices.   Any notice required or permitted by any provision of this Agreement shall be given in writing and shall be delivered personally, by courier, by facsimile or by registered or certified mail, postage prepaid, addressed (i) in the case of the Company, to its principal office; and (ii) in the case of any Investor at the address of such Investor as set forth on the signature page hereto or such other address for such Investor as shall be designated in writing from time to time by such Investor.  Notices that are mailed shall be deemed received five (5) days after deposit in the United States mail.  Notices sent by courier or overnight delivery shall be deemed received two (2) days after they have been so sent.  Notices sent by facsimile shall be deemed received on the day of written confirmation of receipt of such facsimile.

7.8    Expenses.   Except as set forth in the Commitment Letter, dated as of August 2, 2016, between the Company and the Lead Investors, each party hereto shall bear its own expenses with respect to costs incurred in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby.

7.9    Amendments and Waivers.   Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) with the written consent of the Company and the Lead Investors in their sole discretion.  Any amendment or waiver effected by the written consent of the Company and the Lead Investors in accordance with this paragraph shall be binding upon each Investor, each holder of any Common Units purchased under this Agreement at the time outstanding and each future holder of all such Common Units, and the Company.

7.10    Severability.   If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

7.11    <u>Entire Agreement</u>.  This Agreement and the documents referred to herein constitute the entire agreement among the parties and no party shall be liable or bound to any other party in any manner by any warranties, representations, or covenants except as specifically set forth herein or therein.

7.12    <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power or remedy accruing to any party hereto upon any breach or default of the any other party under this Agreement shall impair any such right, power or remedy of such party, nor shall it be construed to be a waiver of any such breach or default or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party hereto of any provisions or conditions of this Agreement, or any waiver on the part of any party hereto of any provisions or conditions of this Agreement, must be made in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any party hereto, shall be cumulative and not alternative.

7.13    <u>Exculpation Among Investors</u>.  Each Investor acknowledges that such Investor is not relying upon any person, firm, corporation, or other entity in making its investment or decision to invest in the Company.  Each Investor agrees that no other Investor nor the respective controlling persons, officers, directors, agents, or employees of any other Investor shall be liable to such Investor for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the Common Units.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

COMPANY:

SECURE NATURAL RESOURCES LLC

By: _____
        Name:
        Title:

Address:_____

_____

*Company Signature Page to Unit Purchase Agreement*

## INVESTOR SIGNATURE PAGE

By its execution and delivery of this signature page, the undersigned Investor hereby joins in and agrees to be bound by the terms and conditions of the Secure Natural Resources LLC Unit Purchase Agreement, relating to the purchase and sale of Common Units (the "Purchase Agreement"), as an "Investor" thereunder, as to the number of Common Units set forth on Schedule A with respect to the undersigned and authorizes this signature page to be attached to the Purchase Agreement or counterparts thereof.

Print Name of Investor

Date:_____, 2016        By:_____

Name:_____

Title:_____

Address:_____

_____

Copies of any notices shall be provided to:

_____

_____

_____

Agreed to and accepted this
_____ day of _____, 2016

SECURE NATURAL RESOURCES LLC

By:_____

Name:_____

Title:_____

*Investor Signature Page to Unit Purchase Agreement*

## <u>Schedule A</u>

**Schedule of Investors**

*See attached*

**ANNEX C**

Confidential

# COMMITMENT LETTER

August 2, 2016

Secure Natural Resources LLC
c/o JHL Capital Group LLC
900 N. Michigan Avenue
Suite 1700
Chicago, IL 60611
Attention: Chairman

Re:     Funding Commitment

Ladies and Gentlemen:

We understand that Secure Natural Resources LLC (the "Company") proposes to offer (the "Rights Offering") to the Company's existing members and certain other persons who are entitled to interests in the Company, in each case who are Eligible Purchasers (as defined in the Subscription Materials), common units of the Company (the "Common Units") in accordance with the terms and conditions described in the following documents (collectively, the "Rights Offering Documents") attached hereto as Exhibit A: (a) the Confidential Offering Memorandum, (b) the Subscription Materials, and (c) the form of the Unit Purchase Agreement to be entered into between the Company and the Investors who agree to purchase Common Units (the "Unit Purchase Agreement"). Capitalized terms used but not defined in this letter (this "Commitment Letter") have the meanings assigned to them in the Unit Purchase Agreement.

1.     Subject to the terms and conditions set forth herein, each of the undersigned members of the Company (collectively, the "Lead Investors") agrees, severally and not jointly, to subscribe for and purchase at the Closing pursuant to the Unit Purchase Agreement and the Company agrees to sell and issue to such Lead Investor at the Closing pursuant to the Unit Purchase Agreement, the number of Common Units equal to the sum of (a) such Investor's Base Allocation Amount (as defined in the Subscription Materials), (b) such Investor's maximum Excess Participation Amount (as defined in the Subscription Materials), and (c) any of the Offering Amount (as defined in the Subscription Materials) not purchased by the other Eligible Purchasers, such Offering Amount allocated ratably among the Lead Investors based on their Relative Equity Percentage (as defined in the LLC Agreement), in each case for a purchase price of $1.00 per unit and in accordance with and subject to the terms and conditions of the Unit Purchase Agreement (the "Commitment").

2.     Each of the Lead Investors hereby agrees that it shall deliver to the Company not later than the Deadline (as defined in the Subscription Materials) a completed and signed "Indication of Investment Interest" included in the Subscription Materials (which shall include an election to purchase a number of Common Units that is not less than such Lead Investor's Commitment), together with all other Investment Documents (as defined in the Subscription Materials).

3.      The Company hereby further agrees, for the benefit of each of the Lead Investors, that (a) it shall not amend, supplement, waive or otherwise modify in any material respect any terms or conditions of the offer set forth or otherwise described in the Rights Offering Documents (the "Offer") without the prior written consent of the Lead Investors, (b) it shall promptly provide to any Lead Investor any information relating to the progress of the Offer reasonably requested by such Lead Investor, and (c) it shall not, without the prior written consent of the Lead Investors, from the date of this Commitment Letter until such time as the Company notifies the Lead Investors in writing that the Offer is abandoned, (i) solicit, encourage others to solicit or encourage or accept any offers for, the provision of any debt or equity financing to the Company or the purchase and acquisition of all or any substantial part of the assets of the Company, or any proposals for any merger or consolidation involving the Company, or (ii) negotiate with or enter into any agreement or understanding with any other person in respect of any such transaction.

4.      The obligations of each of the Lead Investors under paragraphs 1 and 2 of this Commitment Letter, including its Commitment, are made in reliance on, and are subject to, compliance by the Company with the terms of paragraph 3 of this Commitment Letter.

5.      Each of the undersigned Lead Investors hereby represents and warrants to the Company, and the Company hereby represents and warrants to each of the Lead Investors, that (i) the execution, delivery and performance of this Commitment Letter has been duly and validly authorized by all necessary action and does not contravene, conflict with or result in any violation of any provision of such party's charter, partnership agreement, operating agreement or similar organizational documents or any law, regulation, rule, decree, order, judgment or contractual restriction applicable to or binding on such party or its assets; (ii) all consents, approvals, authorizations, permits of, filings with and notifications to, any governmental authority necessary for the due execution, delivery and performance of this Commitment Letter by such party have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority or regulatory body is required in connection with the execution, delivery or performance of this Commitment Letter; and (iii) this Commitment Letter constitutes a legal, valid and binding obligation of such party enforceable against such party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and subject to general principles of equity that restrict the availability of equitable remedies.

6.      By executing this Commitment Letter, the Company hereby agrees to indemnify and hold harmless each of the Lead Investors and each of their affiliates and each director, officer, employee, agent and representative thereof (each, an "indemnified person") against, and to reimburse each indemnified person, for, any and all losses, claims, damages, liabilities and other expenses, including, without limitation, attorneys' fees or other expenses incurred in connection with investigating, defending or participating in any investigation, litigation or proceeding (collectively, "Losses") arising out of any claim, action, lawsuit, or other proceeding brought against any indemnified person (collectively, "Claims") and resulting from the execution or performance of this Commitment Letter by the Lead Investors; provided that, the foregoing indemnity shall not apply to (i) any Claim or Losses to the extent resulting from

the willful misconduct of such indemnified person, or (ii) any Claim or Losses arising out of any breach by any Lead Investor or any affiliate or assignee thereof of this Commitment Letter, the Unit Purchase Agreement or any other Rights Offering Document.  In the case of an investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Company or its subsidiaries or affiliates, its equity holders or creditors, whether or not an indemnified person is otherwise a party thereto and whether or not any aspect of the Offer is consummated.

       7.     The Company hereby agrees that this Commitment Letter may not be disclosed to any third party or circulated or referred to publicly without the prior written consent of each of the Lead Investors except, after providing written notice to the Lead Investors, pursuant to a subpoena or order issued by a court of competent jurisdiction or by a judicial, administrative or legislative body or committee; provided that, each of the Lead Investors hereby consents to the Company's disclosure of: (a) this Commitment Letter to the Company's officers, directors, agents and advisors who are directly involved in the consideration of the terms of this Commitment Letter and who have been informed by the Company of the confidential nature of the Commitment Letter and who have agreed to treat such information confidentially; and (b) after the Company's acceptance hereof, references to this Commitment Letter contained in the Rights Offering Documents and/or the inclusion of a copy of this Commitment Letter in the Rights Offering Documents.  The provisions of this paragraph shall survive any termination or completion of the arrangement provided by this Commitment Letter.

       8.     The indemnification and confidentiality provisions set forth in the immediately preceding two paragraphs shall remain in full force and effect regardless of whether the Unit Purchase Agreement shall be executed and delivered or terminated and notwithstanding the termination of this Commitment Letter or any commitment or undertaking of the Lead Investors hereunder.

       9.     The Company acknowledges and agrees that: (a) the transactions contemplated by this Commitment Letter, the Offer and the Rights Offering Documents are arm's-length commercial transactions between, among others, the Lead Investors, on the one hand, and the Company, on the other; (b) in connection therewith and with the process leading up to such transaction, each of the Lead Investors is acting solely as a principal and not the agent or fiduciary of the Company, its management, members, creditors or any other person; (c) none of the Lead Investors has assumed fiduciary responsibility in favor of the Company with respect to the transactions contemplated hereby or the process leading thereto or any other obligation to the Company except the obligations expressly set forth in this Commitment Letter; and (d) the Company has consulted its own legal, accounting, regulatory, tax and financial advisors to the extent it deemed appropriate.

      10.     The Company further acknowledges and agrees that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  The Company agrees that it will not claim that any Lead Investor owes a fiduciary or similar duty to the Company, in connection with such transaction or the process leading thereto.

4

11.    This Commitment Letter, including the attached Rights Offering Documents, (i) supersedes all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the Lead Investors and the Company with respect hereto and thereto other than the Rights Offering Documents; (ii) shall be governed by the laws of the State of New York, without giving effect to the conflict of laws provisions thereof; (iii) shall not be assignable by the Lead Investors except to such of their designees as may be reasonably acceptable to the Company; (iv) shall not be assignable by the Company; (v) is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto; and (vi) may not be amended or waived except by an instrument in writing signed by the Company and each of the Lead Investors.

12.    This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this Commitment Letter by facsimile transmission or scanned PDF file shall be effective as delivery of a manually executed counterpart hereof.

13.    This Commitment Letter and the obligations hereunder shall immediately terminate upon the earlier to occur of (a) September 30, 2016, if the Closing has not previously occurred by such date, and (b) receipt by the Lead Investors of written notice from the Company that the Offer has been abandoned.  The Lead Investors, acting jointly, may terminate this Commitment Letter in the event the Company fails to commence the Rights Offering prior to 11:59PM (New York City time) on the fifth (5th) business day after the date this Commitment Letter; provided that written notice of such termination is delivered to the Company prior to the time the Rights Offering is commenced.

14.    In consideration for the Lead Investors' execution and delivery of this Commitment Letter, the Company shall reimburse the Lead Investors for the reasonable legal fees and expenses incurred by them with respect to this Commitment Letter and Rights Offering and the transactions contemplated hereby and thereby regardless of whether the Unit Purchase Agreement shall be executed and delivered or terminated and notwithstanding the termination of this Commitment Letter or any commitment or undertaking of the Lead Investors hereunder.

15.    Any notice, request, demand, instruction or other document to be given or served hereunder or under any document or instrument executed pursuant thereto shall be in accordance with the Notice provision contained in the Unit Purchase Agreement.

If to the Lead Investors:

If to JHL Capital Group
Holdings One LLC:

JHL Capital Group Holdings One LLC
c/o JHL Capital Group LLC
900 N. Michigan Avenue
Suite 1700
Chicago, IL 60611
Attention: James Litinsky
Facsimile No:
Email: jhl@jhlcapitalgroup.com

With a copy to:

Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Attention: Mike Huang
Facsimile No.: 212-446-2350
Email: mhuang@bsfllp.com

If to QVT Fund V LP, QVT
Fund IV LP and Quintessence
Fund L.P.:

QVT Fund V LP, QVT Fund IV LP and Quintessence
Fund L.P.
c/o QVT Financial LP
1177 Avenue of the Americas
9th Floor
Attention:
Facsimile No.:
Email:

With a copy to:

Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Attention: Mike Huang
Facsimile No.: 212-446-2350
Email: mhuang@bsfllp.com

If to the Company:

Secure Natural Resources LLC
c/o JHL Capital Group LLC
900 N. Michigan Avenue
Suite 1700
Chicago, IL 60611
Attention: Chairman
Facsimile No.:
Email:

With a copy to:       Hunton & Williams LLP
                          1111 Brickell Ave, 25th floor
                          Miami, FL 33131
                          Attention: Fernando Alonso
                          Facsimile No.:305-810-1604
                          Email: falonso@hunton.com


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms hereof by returning to us executed counterparts hereof.

Very truly yours,


JHL CAPITAL GROUP HOLDINGS ONE LLC


By:_____
Name:
Title:


QVT FUND V LP


By:_____
Name:
Title:


QVT FUND IV LP


By:_____
Name:
Title:


QUINTESSENCE FUND L.P.


By:_____
Name:
Title:


[Signature Page to the Commitment Letter]

Agreed and accepted on this _____ day of
_____, 2016:


SECURE NATURAL RESOURCES LLC


By:_____
Name:
Title:

## **EXHIBIT A**

### **Rights Offering Documents**

Confidential Offering Memorandum

Subscription Materials

Form of Unit Purchase Agreement